IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA            :

     VS                                           :

GARY MIN, a/k/a                            :    Criminal Action No. 06 -121-SLR
YONGGANG Min

## DEFENDANT GARY MIN'S MOTION
## FOR DOWNWARD DEPARTURE FROM THE
## ADVISORY LEVELS OF THE UNITED STATES
## SENTENCING GUIDELINES PURSUANT TO U.S.S.G. §5K2

Defendant Gary Min, by and through his undersigned counsel, hereby moves this Court

for downward departure from the Advisory Levels of the United States Sentencing Guidelines

pursuant to U.S.S.G. §5K2.  In support of this Motion, Dr. Min relies upon and incorporates by

reference the Sentencing Memorandum and Exhibits attached hereto.

Respectfully Submitted,

DUANE MORRIS LLP

Dated: November 2, 2007                    By: _____
                                           Michael M. Mustokoff, Esquire
                                           30 S. 17th Street
                                           Philadelphia, PA 19103
                                           (215)979-1810 (p)
                                           (215)979-1020 (f)
                                           Attorneys for Defendant
                                           Gary Min

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA            :

      VS                          :

GARY MIN, a/k/a                     :    Criminal Action No. 06 -121-SLR
YONGGANG Min

**DEFENDANT GARY MIN'S SENTENCING MEMORANDUM IN SUPPORT OF HIS
MOTION FOR DOWNWARD DEPARTURE FROM THE ADVISORY LEVELS OF
THE UNITED STATES SENTENCING GUIDELINES**

I.    **INTRODUCTION**

Our law firm was retained by Dr. Gary Min in February, 2006. Although the essentials

of what would become the charges against Dr. Min were quite clear at the time, the questions

concerning the motivation for his acts, the scope of his misconduct and whether or not any actual

harm had been suffered, remained to be seen. Two years of investigation have passed.

Numerous debriefings of Dr. Min and serious efforts at confirmation in England, the United

States and China, have established critical facts in answer to those questions. Although it is the

obligation of federal agents and prosecutors to remain suspicious, there now appears to be basic

agreement as to the outlines of the offense. There is no evidence of any master plot. Dr. Min's

remorse and contrition are beyond question. The actual harm to Dupont appears negligible[1]; any

actual specific intent to hurt the company seems blurred, at best. As to Dr. Min's acceptance of

responsibility, there can be no doubt.

---

[1]    We understand that both the Government and the Probation Department agree that
restitution to be paid DuPont is $14,467.89. While the initial Presentence Report
("PSR") stated that restitution should be a greater amount, a supplemental PSR, reflecting
a recommendation of $14,467.89 in restitution has been issued.

The Government's response to the Probation Department's PSR answers the most serious concern when it states:

> **...since there is no indication that any other entity received Dupont proprietary information, yet alone had the ability to convert the information into product lines that could compete with Dupont.** (Gvt. Resp. to PSR at p. 4).

It must be said that at the time that Dr. Min's sentencing was first delayed, that determination of harm was the primary reason for the Government's request for postponement and the Government's willingness to extend the prospect of a § 5K1 Motion for Departure.

The purpose of this memorandum is not to minimize the seriousness of the offense to which Dr. Min has pled guilty. Rather, our goal is to bring to the Court's attention those facts relevant to the exercise of judicial discretion in determining an appropriate sentence. The circumstances of this crime are unique. It is only with the closest examination of the detail surrounding these circumstances that Dr. Min's conduct can be understood. True dissection of those facts is required.

We ask this Court to depart from the federal sentencing guidelines in the extreme. It is only in departure that there can be recognition of: 1) Dr. Min's efforts in assisting the Government in its determination of loss; 2) evidence of his contrition; 3) his past good works; 4) his circumstances since leaving Dupont; and 5) the ability of Dr. Min to continue to make positive contributions to those around him both personally and professionally. Although Dr. Min's crime may not be justified, it can be explained. We cite the following factors in support of our plea for departure:

- Dr. Min's Motion to Depart under 18 U.S.C. §3553(b) and §5K2.0;

2

- The case authority supporting the attached Motion for Departure, a matter so clearly outside the heartland of the theft of trade secret offenses to which Dr. Min pled guilty;

- The facts and case authority in support of variance under 18 U.S.C. §3553(a);

- The circumstances surrounding the crime to which Dr. Min pled guilty which involved no scheme, no transfer of secrets, and no profit;

- The evidence of Dr. Min's complete acceptance of responsibility as demonstrated by his immediate cooperation with the Government's investigation into his activities, including his willingness to enlist his family in China to confirm aspects of his debriefing;

- The fact that Dr. Min has shown contrition and remorse in every way available to him;

- The devastating impact that any sentence of incarceration will have upon the Min family and what remains of Dr. Min's professional future;

- Penalties already experienced by Dr. Min and his family; and

- The demonstrated absolute certainty of there being no possibility that Dr. Min would ever again violate an employer's rules of confidentiality.

Individually, each of these factors exists to the degree necessary to remove Dr. Min's case from the "heartland" of matters normally before the Court. Dr. Min's "trade espionage" case is like no other. More importantly, and perhaps most appropriately, when viewed in toto, the factors which set Dr. Min apart provide the measure of a man who is now deserving of extraordinary leniency. Through his attorneys, Dr. Min prays that his crime might be placed in context to be understood, not excused.

3

The crime committed by Dr. Min occurred at a time when he could not have possibly understood the true nature of the danger it presented, let alone the extreme consequences of his actions to himself and/or his family. The potential harm to Dupont may have been sensed but never truly realized.

The misconduct occurred within a corporate culture in which high level employees routinely took computers overseas bearing Dupont's most confidential information. Top scientists, such as Dr. Min, who find themselves faced with a wide array of professional challenges have difficulty leaving unresolved questions at the office. Although a corporate policy against home offices and home laboratories existed, they were not clearly adhered to by scientists like Dr. Min working closely with Dupont's international corporate facilities. While home offices and home labs, such as Dr. Min's, may have been against Dupont's policy, it was a policy honored in the breach by many managers with responsibilities in Asia dealing with 12 hour time differences. It was only after Dr. Min's debriefing that Dupont upgraded its data base security and re-emphasized the need for corporate confidentiality.

Although some at Dupont may continue to disagree, the evidence is consistent with Dr. Min's first descriptions of much of what he did. He has said that his last wanderings in DuPont's confidential database were a combination of job search for other positions within Dupont, assistance to Dupont on a final project and finally, as his last wanderings "in the library". Dr. Min's judgment was certainly clouded by the way in which his career at DuPont had ended, but there is no evidence that he set out on a path to hurt the company.

It is submitted most respectfully that to destroy Dr. Min's professional career with incarceration after so much has been done to confirm the actual scope and impact of his misconduct is a particularly hard sentence. Dr. Min's prayer to the Court is simple. He asks that

4

any sentence imposed be sufficiently non-custodial so as to allow him to continue in what is left

of the career he has worked so incredibly hard to establish. He seeks to maintain his long-

standing and ongoing contributions to church and community while supporting his wife and two

young children.

It is respectfully submitted that where a man has dedicated himself to hard work and his

family from the time he was six years old – and in all aspects but one has been a model citizen

and an example to others -- justice is not compromised when served with a measure of mercy.

## II.    THE INDICTMENT AND PLEA AGREEMENT

On November 13, 2006, Dr. Min appeared before the Honorable Sue L. Robinson, United

States District Court Judge for the District of Delaware and pled guilty to the single count felony

information charging him with theft of trade secrets in violation of 18 U.S.C. § 1832(a). As part

of his Plea Agreement, Dr. Min agreed to cooperate fully and truthfully with the Government in

its investigation. Since that time, Dr. Min's cooperation has proven sufficiently reliable to allow

the Government to determine the absence of any evidence "to suggest the defendant

disseminated the trade secrets to others, specifically a foreign government" (PSR ¶ 48, p. 11) or

"any other entity" (Gvt. Resp. to PSR at p. 4). After two years of investigation, the United States

Attorney and the Probation Department have determined that the amount of restitution due

DuPont is $14,467.89.

## III.    BACKGROUND AND CIRCUMSTANCES LEADING TO PLEA[2]

As made clear by the Probation Department's PSR, Dr. Min makes no excuse and claims

no alibi for the crime to which he pled guilty. Although the Government and DuPont do not

---

[2]    Much, but not all of what is set forth in this section of Dr. Min's Memorandum was
included in counsel's letter to AUSA Robert Kravetz dated October 17, 2007. (Attached
as Exhibit "B").

necessarily accept all aspects of Dr. Min's explanation, Dr. Min needs to make that explanation known to the Court for its consideration. It is in the detail of the final explanation that lies the true foundations for Dr. Min's Motion for Departure.

By way of background, there is no dispute that prior to July, 2005, Dr. Gary Min was held in the highest esteem by his colleagues and managers at DuPont. All who knew him were aware of his personal honesty, his academic achievement and community activities. As can be easily seen, Dr. Min's lifestyle is not the typical example of conversion in anticipation of sentence. He speaks softly of his good works and accomplishments that shout so loudly for themselves.

Dr. Min's career at Dupont was marked by its productivity. He was the inventor or co-inventor of a number of patents that had been highly profitable for the company. Although the estimates vary, the Government agrees that Dr. Min and the colleagues who worked under his supervision are responsible for anywhere between $5 million and $20 million in current yearly sales at DuPont. He is the co-inventor of four patents with two other DuPont scientists and co-inventors of two other patent applications that are currently pending. He was placed on DuPont's corporate promotable list, a managerial fast track limited to the top 10% of DuPont employees. He led DuPont's Wirex Joint Venture in Taiwan for five years. During that time, he was separated from his family for periods up to five weeks. That project expanded DuPont's Kapton business and provided the business model as to how to run successful business operations in the Asia Pacific Region. He was responsible for strategy and planning for DuPont in the Asia Pacific Region. He had management duties at DuPont's Taiwan Technical Center and supervised a research group at DuPont - Japan.

6

In the Spring of 2005, Gary Min held one of Dupont's highest placed technical positions in his area of expertise in Asia. It was a position of critical importance to DuPont. Dr. Min claims that over 60% of DuPont's business revenues and much of its competition is centered in Asia. He had expected to move his family to Taiwan and continue his career as manager of DuPont's Taiwan Technical Center. Unfortunately, Dr. Min's family was unwilling to relocate to Taiwan. Although the family agreed to move to Shanghai, China, that alternative was not acceptable to Dupont. As soon as Dr. Min communicated his family's decision to remain in the United States, he was demoted. He lost his position as a technology manager (Level 6) and was downgraded to being a research associate (Level 5A). He lost his managerial role. He was required to move back to the United States within three weeks. Thus began Dr. Min's wanderings in DuPont's confidential computer database – much of which we contend was entirely legitimate, some of which clearly was not.

In his letter[3] to the Court, Dr. Min attempts to describe what he did on his return to the United States:

> As new products and new research area go, I had to relearn all the skills in order to fit the new job. I used Dupont EDL (Electronic Database Library) as my learning tools and conducted numerous searches on technical information. I also was arranged to travel to Basil/Switzerland to conduct a project meeting with Kevlar/Nomex groups with customers. I was arranged to visit Kevlar/Nomex lab in order to build a similar lab at Circleville. I certainly didn't mean to use the information in any other way.

On the same page of his letter to the Court he writes:

> I continued to work on my projects and wanted to contribute my last effort to the company. For example, I wanted to furnish the proposal on building the insulation lab for wire and insulation business; I wanted to finish the patent

---

[3]    For purposes of this Sentencing Memorandum, we cite passages of letters from Dr. Min and other members of his family "as is", and do not attempt to correct any errors in their English and grammar.

proposals, where had my name on it . . . I wanted to finish CR&D project, so they can get in Apex proposal; I wanted to help Dupont-Wirex to solve their polymide film bubble issues . . .Also I wanted to keep a good friendship with the company, where I had worked for ten years.  <u>I always believed I could go back to Dupont and/or worked as a consultant for DuPont since many former Dupont employees were doing this.</u>  (Dr. Min's letter is attached as Exhibit "A") (emphasis added)

As set forth in our letter to Mr. Kravetz (Exhibit "B"), and as have we have discussed with the United States Attorney's Office on numerous occasions, there are clearly aspects of Dr. Min's use of Dupont's confidential data base that provide foundations for his plea.  As explained in our letter to Mr. Kravetz and elsewhere in this Memorandum, however, we continue to contend and the Government agrees that much of what was mislabeled as "downloading" was not more than a few second's worth of scanning.  Much of what was feared to be inappropriate has been shown to be otherwise.[4]

Dr. Min's admitted misuse of Dupont's confidential computerized database consists of believing that somehow, some way the information that he was reviewing might be useful to him in the future.  His intent was never more crystallized than that abstract notion.

The Government's investigation has confirmed that there was no defined path to his wanderings, that there were no co-conspirators, and there was no concrete plan.  Some of the computerized meandering was part of a legitimate job search as Dr. Min sought to match his past technical expertise to job opportunities within DuPont.  Some of the wandering was necessary to complete existing assignments for DuPont.

Although there is ample circumstantial evidence of a revenge factor, Dr. Min would disagree with that characterization.  As he told the FBI on several occasions, Dr. Min always entertained the thought, however unrealistic, of coming back to DuPont in some capacity as a

---

[4]     Dr. Min has described this most accurately as "his last visits to the library".

DM1\1214070.5

consultant. Dr. Min's disappointment with the treatment he received on what he described as a "family values" issue was always primarily centered on his immediate supervisor whom he believes treated him unfairly.

As set forth in greater detail in our letter to Mr. Kravetz, the Government's claims of misuse of the DuPont confidential database are best understood if broken down in the three periods of particular concern:

1.    The period from the Summer of 2005 through October 18, 2005;

2.    October 18, 2005 through December, 2005; and

3.    January through February, 2006.

**The period from the Summer of 2005 through October 18, 2005**

The searches during this period can be divided into those relating to the product, PEEK™, manufactured by Dr. Min's prospective employer Victrex Plc ("Victrex") and those relating to DuPont's Kevlar, Nomax and their associated products. All of these searches took place during the period Dr. Min was negotiating with Victrex and during a period when he also found it necessary to reacquaint himself with information concerning Kevlar, Nomax and associated products due to his job reassignment. Although some at DuPont insist that Dr. Min did not need to review those manufacturing technologies, Dr. Min states that his Kapton group proposed to use them in the manufacture of flexible printed circuit materials and/or insulating materials.

The PEEK™ searches require some extended explanation because they first appeared to be so incriminating. PEEK™ is the principal product of what was to be Dr. Min's prospective employer, Victrex. As stated in our letter to Mr. Kravetz, the circumstances surrounding the

DM1\1214070.5

initiation of Dr. Min's contact with Victrex remains unclear.[5]  At the change of plea hearing,

PEEK™ was described quite prominently as competing with two Dupont chemicals, Vespel and

Kapton.

As a result of the Government's subsequent investigation, that description can now be

viewed as something of an overstatement.  (See Gvt. Resp. to PSR at p. 4; PSR at ¶48).

Similarly, mention was made of an e-mail Dr. Min received from a Victrex employee asking for

marketing information concerning Dupont's product, Kapton.  It was not known at the time of

the hearing that Dr. Min never responded to that request for information.[6]  (See Gvt. Resp. to

PSR at p. 6).

It has now been verified by both Victrex and Dupont that the area of competition between

the two compounds is exceedingly small and is reduced to "functional" equivalency in the

narrowest of markets.  It now appears that the Victrex and Dupont products are manufactured by

different processes and occupy different positions in the chain of industrial supply.  Dupont's

Kapton is a film-based material and its Vespel is a molded finished product.  Victrex' PEEK™ is

a resin that is used by Victrex customers to mold their own parts.  In the one example of

competition cited by Dupont, the competition is between a Dupont finished product and a

---

[5]     In July, 2005, Dr. Min provided a Taiwanese corporate headhunter with his resumé.  Dr. Min is unsure whether the contact was the result of his participation in a Taiwanese seminar, his academic studies or a PEEK™ patent which he authored early in his academic career.

[6]     In highlighting these discrepancies with what was said at the Rule 11 hearing, counsel for Dr. Min wish to make it abundantly clear, that there is absolutely no belief that there was any intention by the Government to exaggerate the evidence against Dr. Min.  What has become clear only as a result of the subsequent investigation is that the underlying evidence is so highly technical and obscure that only those closest to the actual chemistry can understand where competition exists.  Counsel recognizes the Government's determination of a loss figure in an amount no greater than $180,513.67 as evidence of its efforts to provide objective fact to the Court.  See Gvt. Resp. to PSR.

customer purchasing the Victrex resin and fabricating it to fit its needs.[7]  In this narrow range, the competition between the two products becomes one of price, supply and efficiency at any point in time.

Dr. Min's decision to search PEEK-related materials in the Dupont data base was prompted by his interest in Victrex.  He was recruited by Victrex because PEEK™ was actually the subject of his graduate thesis, his publications and his patents.

In our letter to Mr. Kravetz, we have provided the basis for many of Dr. Min's computer searches concerning other Dupont products during this time period.  Although the company continues to claim that Dr. Min had no reason to look at product information to search for job opportunities within DuPont, Dr. Min disagrees.  He points to Dupont plants being built in China and has told the Government of actual conversations with key Dupont personnel with whom he had discussed possible reassignment.  (See Exhibit "A").

**October 18, 2005 through December, 2005**

In our letter to Mr. Kravetz, we attempt to provide the Court with some explanation of Dr. Min's numerous searches and access of the computer during the time period between October 18, 2005 and December, 2005.  As noted in that letter, there is no affirmative evidence that Dr. Min ever copied any of those documents and no evidence that he transferred any of the information in those documents, other than what was uploaded onto his Victrex-issued laptop computer.  The Government has agreed that the digital photographs of the laboratory notebooks made by Dr. Min were of his own lab notebook, possibly those of research scientists who worked under his supervision.

---

[7]  We make this point simply in the interest of accuracy.

Dr. Min states that it never occurred to him that even though the notebooks were marked "Confidential" he could not copy that which he had created or had been worked on under his supervision. He states that several patents were pending and he wanted to make certain he would receive full credit for the work he had done for Dupont. As stated to the Government, he considered those notebooks to be his "scientific diaries". They were his personal record of accomplishment.

Our letter to Mr. Kravetz also notes that during this period Dr. Min was working on other long-range projects with Dupont's Research and Development Group even after he announced his plans to leave the Company. He has consistently maintained that it was always his expectation to be able to follow the pattern of other colleagues who were able to come back to Dupont as consultants or employees. Again, as noted in the letter to Mr. Kravetz, while Dr. Min offers these explanations, he admits that despite the absence of any specific intention to transfer Dupont information to anyone, he knew to a practical certainty, that the information might be useful to himself in some way or another in the future.

## January through February, 2006

The critical evidence against Dr. Min arising during this time period is the existence of Dupont information on his Victrex-supplied computer. Although the Government has no affirmative evidence that it was Dr. Min's intention to transfer any of that information, and although it is arguable as to how valuable any information on that computer might be to any Dupont competitor, there can be no contesting the fact that the Dupont-related information was in the "recycle bin" of the computer. The Government's concession at page 4 of its response to the PSR, that there is **no indication of transfer or that any other entity has the ability to convert the information into product lines that could compete with Dupont, cannot be overemphasized.** In attempting to discern Dr. Min's true intent, one important point must be

12

hammered home. Given Dr. Min's professional sophistication, and managerial expertise, if his true intent was to harm Dupont by compromising its confidential database, he would have known what to copy and what to sell.

Again, as noted in our letter to Mr. Kravetz, the Dupont business plan present on the computer was not current. The Government has verified that Dr. Min, himself, had produced a much more sophisticated and detailed Asian business plan that had actually been relied upon by Dupont in seeking business opportunities in China.

Dr. Min has also explained the presence of the large amounts of Dupont equipment and confidential materials found in his home and elsewhere. While the company had a policy against the establishment of home laboratories and offices, Dr. Min contends that during the time that he was working with the company's facility in Taiwan, it was necessary for him to conduct international conference calls, as well as to perform experiments to assist his colleagues in Taiwan. At times, his house had been a way station for the transfer of Dupont equipment from Circleville, Ohio to the Taiwanese facility. He has provided specific examples of instances where he and other Dupont managers transferred equipment to various international facilities. In his letter to the Court, he has itemized examples of sophisticated lab equipment transferred in this manner. (See Dr. Min's letter attached as Exhibit "A"). He describes an incident when he assisted his supervisor in loading a van to move equipment from one location to another as a way of avoiding corporate red tape. There is no defense other than panic and embarrassment to explain his failure to return what remained of Dupont's equipment in his possession.

## IV.    OBSTRUCTION OF JUSTICE AS AN AGGRAVATING FACTOR

Dr. Min does not contest the strong circumstantial evidence offered by the Government concerning his destruction of what can reasonably be considered to be evidence against him. He offers no evidence to the contrary. He does, however, ask the Court to understand the absolute

13

panic he felt when confronted with the reality of a criminal investigation. He was immediately aware that the mountains of Dupont information labeled confidential that he had gathered over the years and failed to destroy, would be seen as evidence of guilt. There is no underestimating the shame, embarrassment and panic that Dr. Min felt about his predicament. He has told the Government how in his panic to destroy anything labeled Dupont in his possession he deleted his Ph.D. thesis.

## V.     COOPERATION WITH THE GOVERNMENT AND DR. MIN'S PROVISION OF SUBSTANTIAL ASSISTANCE

At the time of Dr. Min's apprehension, the first concern of Dupont and the Government was the amount of confidential information that might have been shared with third parties. The possibility of a 5K1 departure was offered as a possible reward. During the 20 months that has followed, Dr. Min has been interviewed on ten occasions. Each time he drove to Wilmington from either his home in Grove City, Ohio or his Boston work place. The interviews have lasted from four to six hours. In order to confirm the information he provided, Dr. Min has enlisted the assistance of family members in China who were required to bring computer hardware to Dupont's office in Shanghai, at some inconvenience and greater risk. He has produced prescriptions for herbal remedies from China as evidence of his mother's poor health and medical records of his son's asthma. In short, he has done everything possible to demonstrate the veracity of his cooperation.[8] Although Dr. Min was able to provide the mechanical confirmation first required by the Government, he was unable to provide all that was later demanded as to certain aspects of his past history. The Government has resisted filing a 5K1

---

[8]     After hours of forensic investigation, the FBI has been able to confirm that numerous downloads from the Victrex computer were obviously personal. They included everything from his son's martial arts movies, his daughter's ice skating and pictures of an elementary school in China.

Motion on this basis alone. (Counsel is available to discuss this matter with the Court and the United States Attorney).

It is respectfully suggested that the Government's ultimate unwillingness to file such a Motion does not negate the quality of Dr. Min's cooperation, perseverance in providing it or the comfort that has resulted from those debriefing sessions. The Government's primary concern when the debriefings began was to determine the extent of any loss to Dupont or damage to national security. That goal has been achieved.

## VI.    PERSONAL REMORSE AND POST OFFENSE AMELIORATIVE CONDUCT

### A.    Refusal To Pursue Any Job Opportunity That Might Cause a Compromise of Corporate Confidentiality

The crocodile tears of those about to be sentenced are well known to this and every court. Sometimes, however, pre-sentence circumstances present themselves that allow a defendant to demonstrate true remorse and contrition.

Following the termination of his position at Victrex, Dr. Min was out of work for about eight months. Despite his family's needs, he did not take advantage of two lucrative job opportunities that might have raised concerns. He states:

> I immediately applied for numerous jobs from internet and contacted with head hunters for any potential job positions since my family needed money to cover my legal costs. With my previous working experience with Dupont and Victrex, I quickly got two interesting job positions. One was from Belgian company, Solvay, that would have been a competitor of Victrex; and the other is Kaneka, a direct competitor of Dupont. Kaneka has a plant in Bayport, TX within spitting distance of Dupont's own plant in that location. I followed on my agreement with Dupont and refused Dupont's Kaneka's job interview. With Solvay, I did not realize the competition with Victrex until they had mentioned during the job interview. For this reason, I rejected their job offering in order to show true integrity with Victrex.

DM1\1214070.5

He writes to the Court that because he refused to take any job with any connections to his past experience, he was forced to take a position in Boston at much reduced compensation. The products which Dr. Min has helped develop at his present employer have no relation to his work at Dupont. For that reason, however, Dr. Min is unable to make full use of his prior technical background and experience. He is quite content with that choice.

The decision to accept the position in Boston was governed by need. Dr. Min is only able to see his family at most two times a month when he drives from Boston to Grove City, Ohio.

### B.    Dr. Min's Present Situation

As noted, for the past year Dr. Min has worked as a chemist and manager for the St. Gobain Corporation outside of Boston. He describes how as a result of his experience at Dupont he does not allow himself to even enter that company's technical database:

> I learned from my mistakes and had no entrance into their technical database, Push Page. (See Ex. "A").

He describes the difficulties that he has had with his new employer caused by being denied permission for international travel and driving back and forth to Ohio to see his family, and down to Wilmington for interviews with the Government. Despite those handicaps, his R&D group has been extremely productive. In the past year, Dr. Min's group is responsible for twelve invention disclosures, five of which are his own. He believes his group's innovations have significantly increased the company's sales revenues and protected technologies for the company. Dr. Min has received bonuses and incentives and he is now in the process of building a new life for himself and his family.

16

C.    **The Decency of Dr. Gary Min**

Over the years, sentencing memoranda have taken on a kind of regularized format. In disclosing the basic goodness of a client, it is customary to rely on the letters of friends and co-workers. What is a lawyer to do, however, when the client is too embarrassed to reach out to his former friends or his co-workers who have reason to believe betrayal? Nevertheless, the few letters gathered on behalf of Dr. Min speak volumes as to who he is, what he has accomplished and what he still may yet achieve.

In her letter to the Court, Dr. Min's daughter, Alice, describes her father's community service: "to list all of the charity would take up all of the Harry Potter book's pages and more". See Exhibit "C".[9]

Two letters attached to this Memorandum speak best for themselves as to Dr. Min's basic goodness and integrity. The first is written by fellow scientist and mentor, Dr. Arthur Epstein, Distinguished University Professor and Director of Materials Research Center at the Ohio State University. See Exhibit "C". Dr. Epstein has known Dr. Min for about fifteen years. He met Dr. Min as a student working for Nobel prize winning chemist Alan G. MacDiarmid (Distinguished professor at University of Pennsylvania, who passed away early this year). To be accepted as one of Dr. MacDiarmid's students was, in and of itself, to be in a class apart. He describes Gary as among the best of Dr. MacDiarmid's students. Over the years Dr. Epstein and Dr. Min have collaborated on more than twenty scientific articles.

After complementing Dr. Min's scientific capabilities as to their depth of detail and the creativity of their concepts he goes on to state:

---

[9]    Letters from Dr. Min's friends and family are attached hereto as Exhibit "C".

17

He was always ethical, going to pains to explain any short-comings in his experimental studies or in the models he was developing . . .

In fact, I have mentored over 40 students to the Ph.D. degree and I without hesitation place Dr. Min among the top tier for reliability and for the ethics with which he carried out his work and; to the best of my knowledge, his personal life.

The other letter worth noting is from Dr. Min's friend, Zhao Qing Xu. <u>See</u> Exhibit "C".

She knows Dr. Min from his graduate school days at the University of Pennsylvania. She writes

of his charitable activities in the local Chinese community. She writes how when Dr. Min got

married in 1994 he bought his wife a car with the money he had saved. Later, when he was able,

he donated the very same type of car to a community charity. Again, it must be noted that Gary

Min has lived and practiced the good life long before any pragmatic decision to impress the

Court. The basic decency of Gary Min is no last minute conversion.

### D.    <u>Dr. Gary Min, Scientist</u>

From his earliest days, Gary Min dedicated himself to his studies and his career. His

mother tells the Court:

> In high school, he would leave at five every morning and close his
> restless eyes at midnight. Every part of him was determined to his
> goal. One summer, we had a couple of friends over who were
> enjoying the pleasure of conversations. Gary, who was still intently
> studying in the other room, had put on a woolen cap to muffle out
> our sounds. His focus and determination still strikes me proud. I
> wasn't the only person who saw success in his future. Everyone
> on our block also thought Gary would be very successful. (Mrs.
> Min's letter is attached as Exhibit "C"; it is translated by Alice
> Min).

In his letter to the Court, Dr. Min quite properly asks the Court to consider the effect of

incarceration on his scientific career. He states:

> My imprisonment would significantly impact my scientific career,
> to the worst standards. I would have a great difficulty to find other
> professional jobs in the future. Certainly, all of my education,
> working experience and dreams would be disappear. Even more, I
> may not be able to keep the family safe from anymore turmoil.

18

As everyone at Dupont will attest, Dr. Min was one of the company's most prolific scientists. He was the co-author of numerous patents. In the relatively short time Dr. Min has been with his most recent employer, St. Gobain, he has been remarkably productive. His letter to the Court notes:

> Over the last 12 months, I have to overcome a lot of difficulties in terms of government interviews, traveling back to Ohio to meet family, and avoid any international traveling to other countries, but still conducting my job. With my hardship and leadership, our R&D group is very productive. We had 12 invention disclosures in which 5 of them are coming from me. We finished our project on the industrialization had other three projects were at the last phase of industrialization. Our technical innovation had directed impacted to $50 million business revenue on our sales. The company likes me as well . . . We had a chance to increase our group members as well as projects. I had set up several joint development projects crossed different business and industries both internally and externally.

Dr. Min's capabilities as an employee and scientist are recognized by his peers. As the Government has noted, at the time of his resignation, Dr. Min was on Dupont's "promotable list", restricted to its most promising employees.

Dr. Min's abilities as a scientist are best described by Dr. Epstein. He speaks of his regard for Dr. Min in terms of the more than 20 transcripts they co-published. Dr. Min was included in 27 of his presentations – all of this before Dr. Min joined Dupont. He notes that despite their closeness, Dr. Min never discussed any Dupont projects with him during the ten years that Dr. Min worked at Dupont.

It is not often that a sentencing Court is faced with a decision as to the effect of incarceration on not just the victim, the defendant and his family, but also society at large. Dr. Min has a demonstrated track record of accomplishment. His list of patents is impressive. Once removed from the running current of the scientific mainstream, the likelihood of him remaining productive at his current level is doubtful.

19

E.    **Dr. Gary Min – A Good Person**

    1.    **Dr. Min – Son, Husband and Father**

Dr. Min's immediate family has written the Court. His mother writes:

> Even when times at work hard, he would always be there for his
> family. He called back home almost every day during his business
> trips. Regardless of minutes, he would always take time to tell his
> kids a fascinating new legend of the places he had been. He would
> also take a lot of pictures for the kids and explain to them where he
> had been and the facts about the local culture. Through this, the
> kids not only gained insight on the human race's variety, but also
> the stark fascination of human difference. (See Ex. "C").

His mother letter ends with a mother's plea:

> With my current age, high blood pressure, and many other
> diseases, it will be very difficult for me to come over again to help
> the family since the medical treatment in the U.S. is very
> expensive. Due to this, Wei-Wei will have a hard time to keep her
> job while taking care of two young children. The effect of
> imprisonionment would put the whole family under big jeopardy.
> The house would be taken away, the kids education would be
> down graded yet again, everything Gary has worked hard to
> achieve for his family would be gone. Nothing more than a
> shadow of a has been in the past.

Mrs. Min, Dr. Min's wife, writes the Court of a hard working father, who always had

time for his children. See Ex. "C". A father who took time to explain different "cultures, foods

and histories". A father who saw to it that his children not only received every type of lesson –

musical instruments, tennis, ice skating, and encouraged them to do their best. Mrs. Min worries

about the effect of incarceration on his children and on the family's's ability to continue their

support of her parents in China. Finally, Mrs. Min describes her fears to the Court:

> Gary's imprisonment will be not only significantly impact to his
> personal career but also to our family. It would be no doubt about
> that Gary's imprisonment will kill his professional career to find
> any new job. All of his education, working experience, and his
> dreams would disappear into nothing but thought. Gary's job
> income ($6880 per month), which is double of my income ($3270
> per month), is very important for the family in terms of paying

20

> house mortgage ($2000 per month), family's living cost ($2500 per
> month), kids after school education ($500) as well as taking care of
> grandparents ($500 per month). Even more, our family value will
> be dramatically damaged. Definitely, it will have a big impact to
> growth of two kids. With two young kids, 12 years old and 8
> years, I would hate to see them lose their father's care. They were
> so proud of their father in terms of father's knowledge, influence,
> and education. They will have a hard time to accept dad's
> imprisonment. Certainly, they will face a big pressure from the
> local community as well as other kids.

Twelve year old Alice Min's letter to the Court probably best expresses the family's

attempts to reconcile themselves to what she describes as "this painful case". See Ex. "C". She

notes the Christmas tree in the basement and the end of ice skating; she describes her brother

who knows little of the family's torment, other than the sale sign in the front yard. But, it is in

Alice's description of her father that one can get the best insight into Gary Min, the man. She

writes:

> About every two to three weeks my dad comes home from Boston,
> a blinding smile on his face matching the one on my brother's tiny
> complexion. The joy it brings to us to play ping-pong, Chinese
> Chess, swimming or monkey-in-the-middle has made it a treasure
> worth more than gold. Though at time that gold is diminished to
> bronze, it is still a bright spot in my week. My father has done so
> much for me; to list all of the charity would take up all of the
> Harry Potter book's pages and more. He taught me how to swim;
> he fed my love for history and taught me what I know of Chinese.
> He tried to teach me soccer, but quite frankly my feet aren't
> exactly one with the ball more like one with the grass. Even so he
> would still comforted me by saying that soccer wasn't my sport ice
> skating was. He always supported my ice skating dreams. Always
> telling me that I could land a double jump maybe even a triple,
> though we have yet to see if that is true.

Alice Min's description of her father is one that most of us can only aspire to, but never

achieve. She asks of those who now accuse her dad in the media:

> Have they met him? Have they seen him so immersed in getting
> his PhD? The ferocity of his determination lining his eyes, trying
> to understand more, to give a better future, money for college, an
> example of the importance of education. They've never heard him

21

> explain math, science, life and the importance of our education. He taught me and my brother things that we would have and understanding tone that only the most loving and intelligent of teachers could express. The effect of his imprisonment on us would be tragic. I cannot imagine life without my dad. Even though the past few years he has not been home all the time, I could always count on him to be a call away. I could always count on him to help me with school. He would always be there for me. I yearn for a day where my family can all be together with a blinding smile on each of our faces.

Perhaps it is in Alice's description of her father's crime that she shows the greatest understanding.

> My father didn't mean to look at the confidential papers to steal them, but to nurture his long time passion, a talent that could help humankind, a beauty of scientific knowledge that his ambition lays.

### 2.     Dr. Min's Letter

Dr. Min has attempted to tell his story to the Court. His letter describes much more than a standard defendant's "version of the offense". He has told the Court of his devotion to his family and those around him. In his letter, he explains how the severe deprivations of his childhood and the violence of the Red Guards left an indelible impression pushing him to charitable acts on behalf of his local Chinese community on the one hand, and seeing that his children had every advantage on the other. Alice and Eric Min were sent to private school; had ice skating, martial arts and every other kind of available lesson.

He tells the Court of his long hours working for Dupont – not as a complaint, but as a point of pride in all that he accomplished. He lists the charitable and community activities in which he has been involved – not as a boast, but as a fact. His activities range from Tai Chi to Bible study. It is only through the letters of others do we learn of Dr. Min's charitable endeavors.

22

Most interestingly, Dr. Min has written the Court as to how he believes his Bible study has helped him to understand and deal with his present predicament and acceptance of responsibility. It is no lawyer's letter and for that reason rings particularly true.

> The greatest of the people who believe God is the people who have no regret to face the difficulty and even challenges to the life. I believe God and I want to face the challenges from the case. I pray several times every day and wish God can help me to correct my mistakes and help me and my family to have a peaceful life. I will have a peaceful heart to your judgment.

Counsel would respectfully suggest that Dr. Min is a man who has found peace in his heart, knowing that he may have made a mistake, but with no specific intention to commit harm to a company to whom he felt indebted or to a country he loved.[10]

> Your Honor, I hope that the Court will see me as a true person, who grew up from a poor family in China, who worked hard to become successful. A person who got an education opportunity in the U.S. and he cherished it. As a person who had a great royalty [sic] and made a great contribution for the company, who loves life and loves family, who will take care of his beloved kids and serves the community as best as he can. A man who made a mistake, but take steps to correct the mistakes. I believe that you are going to make a just and right decision. I trust your choice.

Undersigned counsel can have nothing to add.

## VII.   MOTION FOR DOWNWARD DEPARTURE

### A.   The Sentencing Guidelines

Both Dr. Min and the Government have objected to certain aspects of the PSR. Copies of those objections are attached hereto as Exhibit "D". The most significant objection is shared by counsel for Dr. Min and for the U.S. Attorney's Office. It relates to the Probation Department's calculation of loss.

---

[10]   There can be no better expression of what the Existentialists would have called "good faith".

Dr. Min has no prior criminal record, placing him in Criminal History Category 1. See PSR at ¶73. The Probation Department initially calculated the loss to DuPont as $375,395.04, resulting in a 12 level increase under U.S.S.G. §2B1.1(b)(1). Id. at ¶62. The Probation Department then issued a supplemental PSR calculating loss at $264,449.67. Based on the Probation Department's calculation of loss, the guideline range allows for imposition of imprisonment in the range of 30 to 37 months. Id. at ¶99.

**Both** Dr. Min and the Government strongly disagree with the Probation Department's loss calculation. The Government and Dr. Min have stipulated that the loss figure which should be used for purposes of the Guidelines is $180,513.67, and not $264,449.67. See Ex. D. As discussed below, the efforts by counsel for the Government and Dr. Min to stipulate as to the amount of loss to be used under the Guidelines is recognition of the complicated nature of the case and the various theories of loss computation that might be employed. (All parties agree that the amount of restitution owed DuPont is $14,467.89).

Under §2B1.1(b)(1), a loss of more than $120,000 but less than $200,000 results in a 10 level increase to the base offense level. Applying a 10 level increase, as opposed to a 12 level increase utilized by the Government results in a total offense level of 17. Based on this offense level, the guideline range allows for imposition of imprisonment in the range of 24 to 30 months, as opposed to the range of 30 to 37 months stated by the Probation Department.

Dr. Min objects to two additional aspects of the PSR.[11] Dr. Min objects to Part E of the PSR, which is titled "factors that may warrant departure." Under this heading, the Probation

---

[11]     Dr. Min objects to additional statements and findings in the PSR. See Ex. "D". For purposes of this Sentencing Memorandum, Dr. Min only addresses in detail his objections to statements in the PSR that miscalculates the loss amount and indicates the absence of legal or factual grounds for departure from the Sentencing Guidelines.

Department states that "pursuant to the Plea Agreement, the government stipulated that they may file a Substantial Assistance Motion on the defendant's behalf, if he continues to cooperate fully and truthfully with the government. As of this writing, no such motion has been filed." We object to this paragraph, as it is well-established law that a motion for departure from the Government is not required for the Court to depart from the Guidelines. See, e.g., U.S. v. Jones, 382 F.3d 403, 405 (3d Cir. 2006).

Dr. Min also objects to Part F of the PSR which reads that the probation officer has not "identified any facts or circumstances addressed in the report, that may be relevant to sentencing, that were not otherwise considered in the guideline calculations or departure analysis." As set forth below, all statements in the PSR that suggest that factors warranting departure or variance from the Guidelines cannot be identified are severely inaccurate and contrary to well-settled law. United States v. Booker is clear that the Guidelines are no longer binding and do not prevent this Court from departing from the Guidelines. We submit that, at a minimum, the unique circumstances distinguishing Dr. Min's case from the "heartland" of other trade espionage cases are definite grounds for departure from the Guidelines. Alternatively, the law in this Circuit is clear that a court has discretion to impose a sentence which varies from the Guidelines on the basis of conduct not relating to a specific Guidelines departure provision. See U.S. v. Vampire Nation, 451 F.3d 189, 195 n.2 (3d Cir. 2006). We submit that: (1) Dr. Min's absolutely stellar personal and professional life prior to after the offense; (2) the quality and quantity of his cooperation; and (3) the clear disparity between the original apprehensions of the Government and DuPont regarding the impact of the crime and the actual loss--each support variance from the Guidelines.

25

B.    **Departure Considerations**

The Sentencing Guidelines have not been considered binding in the two years since the

Supreme Court's decision in U.S. v. Booker, 543 U.S. 220 (2005). In Booker, the Supreme

Court held that the Sentencing Guidelines violate the Sixth Amendment. As a remedy, the Court

severed the statutory provision making the Guidelines mandatory. After Booker, "[t]he district

courts, while not bound to apply the Guidelines, must consult those Guidelines and take them

into account when sentencing." Id. at 306. After Booker, the Sentencing Guidelines are no

longer mandatory. Even so, district courts must continue to consult the provisions of the

Sentencing Guidelines and to consider them in sentencing. U.S. v. Crawford, 407 F.3d 1174,

1178 (11th Cir. 2005). "This consultation requirement, at a minimum, obliges the district court to

calculate correctly the sentencing range prescribed by the Guidelines." Id.

The Third Circuit Court of Appeals has reiterated that District Courts are to follow

Booker. The Sentencing Guidelines are not to be treated as mandatory and courts are to exercise

flexibility and discretion in making sentencing decisions. The Third Circuit has repeatedly

reversed and remanded sentences where the trial court indicated that the Guidelines limited

discretion in sentencing. See, e.g., United States v. Shreffler, 2006 U.S. App. LEXIS 6063, at *2

(3d Cir. Mar. 13, 2006) (remanding for sentencing where District Court found that sentencing

was limited by the Guidelines); United States v. Penzera, 2006 U.S. App. LEXIS 3491, at *2 (3d

Cir. Feb. 14, 2006) (sentence remanded where "the defendant was sentenced under the

mandatory Sentencing Guidelines regime that existed prior to Booker").

In U.S. v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006), the Third Circuit explained:

> [O]ur post-Booker precedent instructs district courts to follow a
> three-step sentencing process, (1) Courts must continue to
> calculate a defendant's Guidelines sentence precisely as they
> would have before Booker. (2) In doing so, they must formally rule
> on the motions of both parties and state on the record whether they

> are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-<u>Booker</u> case law, which continues to have advisory force. (3) Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines. (citations omitted).

Although the Third Circuit's recent decision in <u>U.S. v. Tomko</u>, 2007 U.S. App. LEXIS 19755 (3d Cir. Aug. 20, 2007) has created some confusion in certain circles regarding the extent of a District Court's discretion to depart below the Sentencing Guidelines, that should not be the case. The decisive factor for that Court in that decision was that the defendant's misconduct was not a "garden-variety tax evasion offense"—<u>i.e.</u>, the sentencing judge failed to recognize the defendant's crime transcended the heartland to enter the very bad lands. The scheme perpetrated by Tomko spanned a number of years, involved multiple co-conspirators and involved sophisticated fraudulent billing. <u>Id.</u> at *31. More importantly, the Third Circuit found that the sentence of probation did not come close to satisfying the interests of deterrence where the home confinement ordered would take place in the mansion the defendant built with the funds generated through the fraudulent tax evasion scheme. The court would not allow the defendant to enjoy his punishment in the house that the crime built. <u>Id.</u> at *25-26.

C.    **The Loss Amount Set Forth In The PSR Is Inappropriate**

Initially, we ask the Court to agree with counsel and the Government that the amount of loss sustained by DuPont for purposes of calculating the Guidelines' range is $180,513.67—the amount of the stipulation was arrived at after considerable research and analysis of the expenses submitted by DuPont. According to the Third Circuit, the first step which District Courts are to follow in sentencing is "to calculate the Guidelines' sentencing range." <u>See</u> <u>U.S. v. Ricks</u>, 2007 U.S. App. LEXIS 24742, at *3 (3d Cir. Oct. 22, 2007); <u>Gunter</u>, 462 F.3d at 247. To calculate the

27

Guidelines' range correctly, a court is required to properly calculate the amount of loss pursuant to U.S.S.G. §2F1.1(b).  See Crawford, 407 F.3d at 1178.

"Under the Guidelines, the Government has the burden of showing the amount of loss resulting from criminal conduct."  U.S. v. Tupone, 442 F.3d 145, 156 (3d Cir. 2006).  In U.S. v. Evans, 155 F.3d 245, 253 (3d Cir. 1998), the Third Circuit explained that the "burden is . . . on the government to prove by a preponderance of the evidence the facts in support of a sentence enhancement; the defendant does not have to 'prove the negative' to avoid the enhanced sentence."  If the Government establishes a prima facie case, the burden of production shifts to the defendant.  Id.  At this point, the defendant is "required to come forward with evidence tending to cast doubt on the government's evidence."  Id.  The ultimate burden of persuasion, though, remains with the Government.  Id.

In this case, it is the Government's burden to prove the actual loss.  As stated in its objections to the PSR, the Government has determined that it is able to prove, by a preponderance of the evidence, that DuPont sustained $180,513.67 in loss, based on the following categories: (1) $94,167.63 in costs incurred by DuPont based on legal services provided by Crowell & Morning LLP; (2) $46,881.15 in investigative services performed by Hyden & Associates; (3) $25,000 in laboratory equipment and Kapton products in Dr. Min's possession which were returned to DuPont after his arrest; and (4) $14,467.89 in DuPont travel expenses.  See Gvt. Resp. to PSR, Ex. D.

The initial PSR submitted by the Probation Department identified the loss to DuPont as $375,395.04.  See PSR at ¶62.  In response to the objections filed by counsel for Dr. Min and the Government, the Probation Department issued a Supplemental PSR which reduced the amount of

28

loss to approximately $264,449.67.[12]   Contrary to the stipulation between the Government and

Dr. Min as to the amount of DuPont's loss, the Probation Department has advised that it intends

to supplement its calculation of loss to include: (1) $56,355.85 for costs incurred by DuPont with

law firm Squire Sanders in connection with civil litigation instituted by DuPont against Dr. Min;

(2) $13,217.88 for costs incurred by DuPont in retaining Kelly Law Registry to provide the

services of an attorney to DuPont; and (3) an additional $14,268.87 of costs incurred by DuPont

in retaining investigation firm Hyden & Associates to conduct surveillance.  The objections

submitted on behalf of Dr. Min and the Government make clear that the additional sums which

the Probation Department seeks to include in the loss calculation are without legal and factual

basis.  See Ex. D.  For purposes of this Memorandum, counsel notes the following:

First, the costs incurred by DuPont in retaining a temporary attorney from Kelly Law

Registry and the additional surveillance costs incurred through Hyden & Associates to conduct

surveillance are to be excluded from the loss calculation.  U.S.S.G. §2B1.1, app. note 3(D), titled

---

[12]    In a November 1, 2007 telephone conversation, the Probation Department advised that its
position on loss is based on U.S. v. DeRosier, 2007 U.S. App. LEXIS 21916 (8th Cir. Sep.
13, 2007).  Its reliance on this case is misplaced. It supports the loss figure advocated by
counsel for Dr. Min and the Government.  In DeRosier, the Government sought to
include in the loss calculation two categories of legal fees: (1) fees immediately incurred
by the victim in investigating the defendant's conduct; and (2) fees incurred by the victim
to pursue a civil lawsuit against the defendant.  Id. at *12.  The District Court allowed
only investigative fees incurred by the victim "in immediate response" to the defendant's
conduct, and thus it appears that the court refused to allow legal fees incurred by the
victim in the civil litigation to be included in the loss calculation.  Id. at *15-16.
DeRosier supports the distinction agreed to by defense counsel and the Government that
those costs not associated with an immediate response and prior to referral to the
government should be excluded from the loss calculation. Legal costs incurred by
DuPont in the civil litigation and investigative costs incurred months after Dr. Min was
arrested "do not flow directly and immediately from an injurious act", and thus are
consequential.  Id. at *14.  Further, unlike the investigative costs allowed in DeRosier,
the costs here were, by the Government's admission, primarily to aid its investigation,
and thus must be excluded from loss. Id. at *15.

DM1\1214070.5

"exclusions from loss" specifically provides that loss shall not include "[c]osts to the government

of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal

investigation of an offense." In its objections to the initial PSR, the Government itself,

presumably after in depth conversations with DuPont, specifically states that these categories of

costs were "incurred primarily to aid the government in the prosecution and criminal

investigation of Dr. Min's offense." See Gvt. Resp. to PSR at 4, 5. The Government concedes

that these expenses were incurred long after Dr. Min's arrest and were not incurred as an

immediate reaction to Dr. Min's conduct. Thus, the Government concludes that these voluntary

expenses by DuPont were not "reasonably foreseeable", and thus should not be included in the

loss calculation. Certainly, the Government and DuPont are in the best position to determine the

purposes of the identified underlying expenses. Since these costs are specifically labeled by the

Government and DuPont as expenses incurred to aid the Government in its investigation,

U.S.S.G. §2B1.1, app. note 3(D)(ii) requires that these costs be excluded from the loss

calculation.

Second, counsel for both the Government and Dr. Min submit that the legal fees incurred

by DuPont in filing a civil suit against Dr. Min also should not be included in the loss

calculation. While Dr. Min's counsel (and we believe counsel for the Government) has not been

able to identify case law in this Circuit specifically addressing inclusion of attorney's fees

sustained in civil litigation by a victim in a loss calculation, it has been addressed elsewhere.

In U.S. v. Seward, 272 F.3d 831, 834 (7th Cir. 2001), for example, the defendant was

convicted of bank fraud, wire fraud, mail fraud and money laundering arising out of a scheme to

steal assets belonging to his deceased business partner. In the course of the scheme, the

defendant and decedent's heirs litigated in probate court over a fraudulent will produced by

defendant. Id. at 835. The probate court found that the will was false and ordered the defendant

pay $105,000 in legal fees, $25,000 in executor fees and $50,000 in punitive damages. Id. The

defendant challenged the district court's calculation of actual loss on the basis that it included the

attorneys' and executor's fees that the probate court assessed against the defendant. The Seventh

Circuit held that these fees were consequential or incidental damages, and thus should not have

been included in the loss calculation. Id. The court stated that "[i]n calculating both the

intended loss amount for the Sentencing Guidelines and the actual loss amount for restitution, the

district court should include in the calculation all direct damages, but not include consequential

or incidental damages." Id. at 839. The court specifically found that **"[a]ttorneys' fees**

**incurred in fighting a fraudulent scheme are properly classified as consequential, not**

**direct, damages . . . For this reason, it was clear error for the district court to include the**

**attorneys' and executor's fees in its calculation of the intended loss and the restitution**

**amount. On remand, the court should recalculate the intended loss and restitution**

**amounts without reference to these fees."** Id. at 839-40. (emphasis added). See also, U.S. v.

Christopher, 2004 U.S. App. LEXIS 4399 (6th Cir. March 4, 2004) (reversing district court's

calculation of loss as "[t]he total also incorrectly includes costs and attorney fees from the civil

litigation" instituted by victims against the defendant.").

  Case law addressing whether attorney's fees incurred in separate litigation should be

included in a restitution order, while not binding on the issue of loss, is certainly persuasive.

These cases recognize the general American rule that litigants in civil courts must pay their own

attorney's fees and that it would be inappropriate to apply a different rule in the criminal context.

For example, in U.S. v. Barany, 884 F.2d 1255, 1257 (9th Cir. 1989), cert. denied, 493 U.S. 1094

(1990), the defendant was convicted of mail fraud based on her submissions of false insurance

claims. Prior to the conviction, the defendant filed a lawsuit against her insurance company for

breach of contract and bad faith based on delaying action on her claim. Id. The presentence

report estimated that the insurance company was entitled to restitution, the majority of which

related to the attorney's fees and costs which the company spent defending against the

defendant's civil suit. Id. at 1258. In holding that attorney's fees should not have been included

in the restitution order, the court stated:

> In this case, the amount of resources [the insurance company] chose to spend in
> defending the civil suit is only tangentially related to the defendant's original
> offenses . . . Moreover the district court in the criminal case is clearly without
> authority to award attorney's fees in a wholly separate civil suit still pending in a
> state court. The general rule is that litigants must pay their own attorney's fees . .
> . [The insurance company's] quest for recovery of its attorney's fees should be
> directed to the court in the civil case which is best positioned to evaluate such a
> request. Being remote from knowledge of the course of the proceedings and of
> the complexity of the issues in the civil case, the district court cannot easily judge
> the reasonableness of the hours claimed or that rates charges by [the insurance
> company's] attorneys. Accepting the probation officer's recommendation would
> result in [the insurance company] obtaining an award of attorney's fees for a
> wholly separate civil case, bypassing entirely the jurisdiction of the state court
> presiding over that case.

Id. at 1261 (citations omitted). See also, U.S. v. Simmonds, 235 F.3d 826 (3d Cir. 2000)

(holding that District Court erred by including the value of the victims' "clean renewal discount"

and "no claim discount" in its restitution order, as such amounts "are consequential damages and

do not in any way constitute or represent 'the value of the property' lost, damaged, or destroyed

as a result of [defendant's] crimes."); U.S. v. Farr, 1999 U.S. App. LEXIS 8783, at *3-5 (9th Cir.

May 7, 1999) (vacating restitution order and remanding for recalculation as it included legal fees

the victim incurred as a result of a claim against a third party for failing to record promissory

notes); Gvt. Of V.I. v. Davis, 43 F.3d 41, 46 (3d Cir. 1994), cert. denied, 515 U.S. 1123 (1995)

(relying on opinions from the Fourth, Fifth, Seventh, Ninth and Tenth Circuits holding that that

attorney's fees were consequential damages, and thus not recoverable under §3663(b)(1)); U.S.

v. Mullins, 971 F.2d 1138, 1147 (4th Cir. 1992) (based in the plain wording of the VWPA, the court held that "an award of restitution under the VWPA cannot include consequential damages such as attorney's fees and investigators' fees expended to recover the property."); U.S. v. Arvanitis, 902 F.2d 489, 497 (7th Cir. 1990) (remanding restitution order that including attorney's fees incurred by victim insurance company in investigating defendant's fraudulent claim for insurance on the basis that "legal fees generated in prosecuting a claim are not recoverable under the VWPA.").

Based on the above authority, the legal fees incurred by DuPont in connection with its decision to institute litigation against Dr. Min should not be included in the loss calculation. These principles are even more appropriate here, as the parties entered into a settlement stipulation in the civil litigation which specifically provides that "[t]he parties agree that they will bear their own costs, disbursements and attorney's fees which have been incurred up through the Effective Date [May 15, 2006]"  See Agreed Order at Ex. E.  (emphasis added). [13]

"The sentencing court, though it need not reach a precise figure as to loss, must make a 'reasonable estimate' of loss that must be based on the 'available information' in the record." Id. (citing U.S.S.G. §2B1.1 app. Note 3(C)). However, where the Government fails to offer a reliable calculation of the loss amount it claims, courts have deducted such amounts from the loss claimed. See, e.g., U.S. v. Rutgard, 116 F.3d 1270 (9th Cir. 1997) (finding error for district court to base Medicare fraud loss on total proceeds of medical practice because the practice was

---

[13]    It is further noted that the litigation between Dr. Min and DuPont was settled almost immediately after it was instituted.  Subsequent to that point in time, DuPont's counsel in the civil litigation billed DuPont for a significant amount of additional work which appears unrelated to the civil litigation (i.e., numerous consultations with DuPont regarding the status of the criminal matter, analyzing patent filings).  Further, various entries in that law firm's bills provided by the Probation Office reflect time unquestionably incurred to aid the government in its investigation, which would thus be barred by U.S.S.G. §2B1.1,'app. note 3(D)(ii).

33

"permeated with fraud"); <u>U.S. v. Maurello</u>, 76 F.3d 1304 (3d Cir. 1996) (finding that fees paid

for satisfactory services to disbarred lawyer not considered as loss; argument that no client would

have paid money to known disbarred lawyer rejected; complaints of dissatisfied clients alone do

not provide basis for reasonable estimate; government must prove the complaints are bona fide);

<u>U.S. v. Sweitzer</u>, 2005 U.S. Dist. LEXIS 41048 (M.D.Pa. April 22, 2005) (excluding sums from

Government's loss calculation where government failed to offer sufficient explanation for the

alleged loss figures). **Here, the Government itself concedes that it cannot prove by a**

**preponderance of the evidence certain categories of loss advocated by the Probation**

**Department.**

The amount of loss stipulated to by the parties is recognition of the complicated nature of

the case and the various theories of loss computation that might otherwise be employed. With

any stipulation, there is a certain give and take between the parties. Dr. Min's case proves no

different. Once the Government agreed that it would be inappropriate to use DuPont Research

and Development costs and other available theories, the challenge confronting counsel for Dr.

Min and the Government is distinguishing between those expenses which can be considered to

be reasonably foreseeable and direct from those that are "too remote." Based on the analysis of

the case law, scrutiny of the invoices for fees submitted by DuPont and the Government's

consultations with DuPont, counsel agreed to stipulate that $180,513.67 should be the amount of

loss which is to be considered "reasonably forseeable" and allowed to be included in the loss

calculation under the Guidelines. In arriving at this stipulation, the parties have generally

followed the rule that if the costs were incurred as part of the initial pre-government

involvement, or in the determination of DuPont's need for remedial action, they could be

considered as DuPont's "loss." If, however, the legal costs were incurred in subsequent

litigation or in assisting the Government's investigation, the case law required that those costs

not be added to the loss calculation.

**D.     This Court Should Depart As Dr. Min's Case Is Outside The Heartland Of Trade Espionage Cases**

Step two of <u>Gunter</u> requires that courts address motions for departure from the

Guidelines. <u>Ricks</u>, 2007 U.S. App. LEXIS 24742, at *3. Section 5K2.0 provides for a

downward departure if "there exists an aggravating or mitigating circumstance of a kind, or to a

degree, not adequately taken into consideration by the Sentencing Commissions in formulating

the guidelines that should result in a sentence different from that described." As the Third

Circuit explained in <u>U.S. v. Iannone</u>, 184 F.3d 214, 226 (3d Cir. 1999):

> The Commission conceives of each offense as "carving out a 'heartland,' a set of typical cases embodying the conduct that each guidelines describes." In the unusual case in which a defendant's conduct falls outside the typical 'heartland,' the court may consider a departure from the Guidelines sentence.

The Supreme Court in <u>Koon v. U.S.</u>, 518 U.S. 81 (1996) specified a methodology courts

should follow in evaluating whether a departure is appropriate:

> First, identify a factor of factors that take the case outside the Guidelines' 'heartland' and make it special or unusual. Second, determine whether the Guidelines forbid departures based on the factor, encourage departures based on the factor, or do not mention the factor at all. Third, apply the appropriate rule: (1) if the factor is forbidden, the court cannot use it as a basis for departure; (2) if the factor is encouraged, the court is authorized to depart if the applicable guideline does not already take it into account; (3) if the factor is discouraged, or encouraged but already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree, or in some way makes the case different from the ordinary case in which the factor is present; or (4) if the factor is unmentioned, "the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether [the factor] is sufficient to take the case out of the Guideline's heartland."[14]

---

[14]     A traditional sentencing "departure" diverges at step 2 from the originally calculated range for "reasons contemplated by the Guidelines themselves." <u>U.S. v. Floyd</u>, 499 F.3d

(Continued...)

Iannone, 184 F.3d at 226. (citations omitted).   Section 5K2.0 does not impose a "limit on the number of potential factors that may warrant a departure." Koon, 518 U.S. at 106.   Here, Dr. Min's behavior cannot be considered "garden variety" trade espionage.  It is clearly outside the heartland of such cases.  In analyzing the departure standard, we respectfully request that the Court engage in the following five step analysis:

(1)    consider the usual circumstances surrounding trade espionage cases—existence of a scheme to deliver commercially-viable trade secrets for cash.  Not one of those crucial elements are present in the instant case;

(2)    the Government's concession at page 4 of its response to the PSR that no other entity received DuPont information;

(3)    the Government's additional concession at page 4 that no other entity had the ability to convert the information into production lines that could compete with DuPont;

(4)    Dr. Min was sufficiently well acquainted with DuPont's product lines and manufacturing processes so that if he had actually had any immediate intention to harm DuPont through the theft and sale of trade secrets he would have clearly known how to do so; and

(5)    The absence of any evidence of either transfer or harm to DuPont would suggest an absence of that specific intent characteristic of the heartland trade espionage crime.  Given Dr. Min's technical, manufacturing and managerial experience together with his familiarity with

---

(Continued...)

308, 311 (3d Cir. 2007).  In contrast, a "variance" diverges at step 3 from the Guidelines, including any departures, based on an exercise of the court's discretion under §3553(a). Id.  "Although a departure or a variance could, in the end, lead to the same outcome—i.e., a reduction (or increase) in sentence as compared to the originally calculated range—it is important for sentencing courts to distinguish between the two, as departures are subject to different requirements than variances."  Id.

business dealings in Asia, he had all the tools had he wished to use them to create the nightmare that DuPont had originally feared. The Government's concession of minimal harm cannot be over emphasized.

It is respectfully submitted that the combination of these factors so significantly undermine most notions of an intention to do harm as to place Dr. Min's case far from the heartland of trade espionage cases. Perhaps the best description of why Dr. Min's case lies outside the heartland was provided by U.S. v. Hadash, 408 F.3d 1080, 1084 (8th Cir. 2005). In that case, the court noted that it is appropriate to vary downward where a defendant is a "law abiding citizen, who [did] an incredibly dumb thing" when the defendant "was not the type of defendant the guidelines section was designed to punish."

There are, of course, other reasons for a court to depart. Courts may depart based on extraordinary acceptance of responsibility, See, e.g., U.S. v. Lieberman, 971 F.2d 989 (3d Cir. 1992) ("[A] sentencing court may depart downward when the circumstances of a case demonstrate a degree of acceptance of responsibility that is substantially in excess of that ordinarily present."). Although the hardship that would be faced by the Min family is no different from many others, courts have recognized that, in some instances, a departure may be warranted based on family ties and responsibilities alone. See, e.g., United States v. Alba, 2002 U.S. App. LEXIS 6477 (3rd Cir. 2002) (downward departure warranted where defendant's purpose in reentering the country was to visit his son); United States v. Dominguez, 296 F.3d 192, 195 (3d Cir. 2002) (finding that a defendant was entitled to a downward departure based on family circumstances). While the undersigned recognizes that incarceration is always disruptive to a defendant's loved ones, it is submitted that Dr. Min's demonstrated responsibilities and family ties are an additional factor worthy of this Court's consideration.

37

### E.     Variance Departure

At step three of <u>Gunter</u>, district courts are to "exercise their discretion by considering the relevant §3553(a) factors" 462 F.3d at 247. As the Third Circuit stated in <u>U.S. v. Samuelsen</u>, 2006 U.S. App. LEXIS 24811, at *7-8 (3d Cir. Oct. 4, 2006):

> The decision in <u>Booker</u> had a titanic effect on federal sentencing. By excising those provisions of the Sentencing Reform Act that had previously required district courts to impose a sentence within the range recommended by the United States Sentencing Guidelines, the Supreme Court granted to district courts the discretion to issue the sentence that they believe best fits the particular circumstances of the case, in light of the broad objectives set forth in 18 U.S.C. §3553(a).

"The Guidelines have now become advisory and they no longer limit the grounds a court can consider at sentencing." <u>U.S. v. Vampire Nation</u>, 451 F.3d 189, 196 (3d Cir. 2006). "Thus, the Guidelines are now only one factor among many which can influence a discretionary sentence." <u>Id.</u> "<u>Booker</u> contemplates that the district court will impose a discretionary sentence *after* consideration of the advisory Guidelines, the grounds raised by counsel, the defendant's allocution, victim statement, other evidence, and the factors set forth in § 3553(a)." <u>Id.</u> at 197. (emphasis in original).

Under <u>Vampire Nation</u>, "post-<u>Booker</u> discretionary sentences not based on a specific Guidelines departure provision [are referred to] as 'variances.'" <u>Id.</u> at 195. The §3553(a) factors, in pertinent part, are as follows:

> (1)     the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)     the need for the sentence imposed—
>
> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and

38

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for—

(A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5)    any pertinent policy statement issued by the Sentencing Commission . . .;

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found to be guilty of similar conduct . . .

Consideration of the relevant statutory factors set forth in 18 U.S.C. §3553(a) supports downward departure. Those factors also support a non-custodial sentence, as it would be sufficient, but not greater than necessary, to satisfy the purposes of sentencing, as set forth in §3553(a)(2).

1.    **Nature and Circumstances of the Offense and History and Character of Dr. Min**

It is submitted that although the offense that Dr. Min committed was serious, it is not what was originally imagined by either the Government or DuPont. In considering the overall circumstances of the offense, the Court should also take into account Dr. Min's reaction when the offense was discovered. Dr. Min did not minimize his conduct or attempt to blame others. He provided substantial assistance. He provided substantiation to his version of events where possible. Rather than avoid responsibility, Dr. Min's immediate reaction was to try and undo the effects of the crime by cooperating with the government. He assisted the investigation and DuPont with confirmation that the company's worst fears were unfounded.

The nature and characteristics of Dr. Min mitigates in favor of non-incarceration.

39

### 2. Deterrence, Just Punishment, Respect for the Law and Protecting the Public

Section 3553(a)(2) contains four sub-parts that require consideration of the severity of the offense, deterrence, the need to protect the public and the need to rehabilitate the defendant. See 18 U.S.C. §3553(a)(2)(A)-(D). Those considerations will be served by a non-custodial sentence.

As to deterrence, one must consider the actual and negligible loss suffered by DuPont against the devastating ramifications already suffered by Dr. Min and his family. Since December 2005, Dr. Min has lost his reputation in the scientific community and the best use of the academic and commercial experience gained over the past 25 years. He has been forced to relocate and accept a position hundreds of miles away from home at reduced compensation. Neither he nor his family will ever be the same. These penalties have been suffered in a case where the information was never transferred and, as admitted by the Government even had it been transferred, could not be used. Anyone who might be deterred by the penalties suffered by others—let them look to the case of Dr. Min.

In analyzing the severity of the offense for purposes of variance, we ask the Court to consider the clear disparity between the fear of the Government and Dupont regarding the impact of the crime and the actual loss, either actual or intended. The failure to recognize the need for a variance is also at odds with ¶48 of the PSR which provides that "[t]hus far, there has been no evidence to suggest the defendant disseminated the trade secrets to others, specifically a foreign government." The government has refused to file a motion for departure on the basis of its inability to obtain the complete mechanical confirmation which it required. The quality of the veracity of Dr. Min's cooperation, coupled with his otherwise exemplary life, supports variance.

Incarceration is similarly unjustified by the need to deter future criminal conduct or to protect the public. There is no evidence that Dr. Min ever responded to a request for information

that was made to him. Dr. Min's refusal to accept any employment that might expose him to the appearance of a trade secret violation is additional strong evidence of the unlikelihood of recidivism. As Dr. Min states in his letter to the Court, he now refrains from making use of his present employer's confidential data base for fear of having such a secret being misinterpreted.

One final point must be considered on the issue of variance—Dr. Min's past academic and commercial accomplishments place him in a position to continue his good works and valuable service to his employer and, more importantly, to society. His continued creativity is best seen by the number of patent applications currently pending. It is a testament not only to his abilities but his constant striving to be a positive force. It is respectfully submitted that these facts alone merit consideration for variance.

## VIII.  CONCLUSION

It is more than a bit presumptuous for counsel to purport to remind a federal judge of the complexities of sentencing. The interests of society and the justice system, the needs of the victim, as well as the punishment and rehabilitation of the Defendant, must be considered. Despite the aspirations of Congress and the claims of prosecutors, the sentencing function is not completely susceptible to numeric computation. It is not a robot's exercise. A developing body of case law offers only limited – some might say – conflicting guidance. The abstract calculus, however, must be performed by the Judge.

In the instant case, we have filed a Motion to Depart on behalf of Dr. Min. The Defendant's Motion and the Defendant's acceptance of responsibility do not stand alone. Restitution will be made. This Defendant will not be a recidivist. He has offered to make presentations to the scientific community reminding them of the importance of maintaining absolute security. He is at risk of losing what little professional standing that remains to him.

41

Gary Min has lived an otherwise good life, dedicating himself to his family and to his profession. That achievement must surely count for something at an earthly time of judgment.

Should this Court show the leniency requested under these circumstances?  What message is sent to the community at large?  Where is the deterrence?  It is respectfully suggested that to the extent that any scientist may be deterred by the punishment of others, let him look to the career of Gary Min and consider the loss of a lifetime of professional accomplishment achieved in the face of almost insurmountable obstacles.  Let those who might be critical consider what happens to a departing employee who takes liberties with confidential information having no clear notion of conversion.  As for the interests of justice, let it be said that justice is served where cooperation is noted, restitution is made, punishment imposed and service rendered.  Justice is not compromised by extending leniency to one who had led an otherwise exemplary life.

Respectfully submitted,

DUANE MORRIS, LLP

BY:  _____
Michael M. Mustokoff, Esquire
30 South 17th Street
Philadelphia, PA  19103
(215) 979-1810/1816
Attorneys for Defendant

DM1\1214070.5

# EXHIBIT "A"

Gary Min

2775 Woods Crescent

Grove City, OH 43123

The Honorable Sue L. Robinson, Chief Judge

United States District Court of Delaware

844 North King Street

Wilmington, Delaware 19801

October 28, 2007

Dear Judge Robinson

Your Honor, I would like to write to you to describe my personal background in terms of my childhood, family, education and working experience, as well as church and community activities. I hope this will gave you an overall picture on me to bring in a fair judgment.

I was born from a working class family right after the great depression in China. My father was a barber, a woodworker and a calligrapher; my mother was also a barber. As a child I was very sickly. My parents were always worried about my health and ability to survive since my older brother died in 1960 due to limited food supply. The total family income was less than 100 Yuan, which is less than 60 US dollars. Additionally, my father had to save money to support his parents, who were living in the countryside. My grandparents were sick (my grandmother had a cancer and my grandfather was blind) and had almost no income.

I grew up during the Chinese Cultural Revolution. My parent asked me to practice Chinese martial arts in order to enhance my body, and immune system. As a child I always felt hungry. I had to take care of my young sister and young brother and cook the dinner for the family since I was 9 years old. My biggest wish at that time was to learn valuable skills such as traditional Chinese medicine, mechanics, and electrician, to become a skillful and successful person.

My neighbors given me a great helps on learning some of those skills. I was able to get some championships on Chinese Chess and ping-pong game, and learn on how to make transistor radios and build electric fans during primary school. Unfortunately, those neighbors were treated as "anti-revolutionary" during the Cultural Revolution. Some of them were put into jail for many years; the others were beaten in public view by the "red guiders". At that time, the "red guiders" could break into any home for searching without any legal permission. They would burn historical books, break collections, and send people to the countryside for work. Many terrible fates were brought upon them.

In order to get a better education, my mother transferred me to a high school, which was about where was one hour away by bicycle. To get there on time, I had to leave home at 5:30 am every morning and usually returned home after 9:00pm. We were living in Northeast part of China, where we had freezing cold winters. In order to get to school in the wintertime I had to ride a bicycle on top of a good 6 inches snow that covered the frozen road during the wintertime, for three years. Even so my hard work paid off, I was lucky enough to have a chance to enroll at college, at a time when less than 5% of high school graduates were able to. As for my neighborhood I was the only person who enrolled in college at that year.

At college I selected chemistry as my major and set up being a scientist as my career goal. I became a college professor after my graduation, where I supervised about 30 undergraduate students. I had worked on PEEK material at my college time and continued working with PEEK process after my graduation. I had also published several technical papers on PEEK synthesis and characterization. During that time China was becoming more social and allowed more Chinese students to learn abroad. I was then able to have a chance to take English tests such as, TOFEL and GRE, and applied at numerous universities in the U.S.

My hard work on academic and research performance paid off. I was given a full scholarship to the Department of Chemistry at University of Pennsylvania in 1990. With a turn of fate, I got a chance to work with Professor Alan G. MacDiarmid, who was Nobel laureate in Chemistry in 2000. Because of him I got my Ph. D. in 1995, published over 30 scientific papers and one patent (US5556700).

Right after my graduation, I joined DuPont Company and worked at DuPont Circleville Research Lab at Ohio for DuPont's film business. In my first five years at DuPont, I was working on developing numerous new products and technologies for business such as, Kapton

film recycle technology, Kapton-SMT, Kapton-CPB film, Kapton-HiK film, embedded passive technologies, etc. My technical contribution for DuPont is more than $5 million US dollars a year on business revenue. I also applied and granted numerous patents for the company (US702754, US7026032, US6159611, US6150456, EP902048, EP04023887.5, EP1431984, JP2004-200681, and U.S. Application No. 11 /395735). Because of my contributions, my name was listed at DuPont Corporate promotable list, which is a list of fast tract growth people and less than 10% DuPont employees could have this opportunity. This all proved to me that all those years of freezing in northwest China was finally paying off.

Since the summer of 2000, I was assigned as R&D supervisor and leading scientist at DuPont-Wirex joint venture in Taiwan, where I led a project team working on developing Pyralux-AC for printed circuit board business. This is a very hard job assignment for me as well for my family. My son, Eric, was just born and my daughter, Alice, was only 5 years old. I had to invite my mother come over to help me take care of my two children and help my wife, so she could still work. I was also requested to travel to Taiwan every two months and had to stay in Taiwan for 3-5 weeks each trip. The "post 911 security check" and "SARS in Asia" had added more difficulty for me and for business travelers in general.

My daughter, Alice, started ice-skating at the age of 5. It was very hard on us to take the 40-minute drive across Columbus to the ice skating rink. We had to leave the house at 5:20am almost everyday to drive her to practice. Then, we would have to drive back immediately to get Alice to school, which started at 8:00am. The schedule was four times per week; three of those times were during the weekdays. We kept doing this for five years until my case started. Unfortunately, I couldn't help them too much during the traveling. In this case, I would ask my wife to take digital photos of them to remind me of my kid's growth and to make video-tapes of Alice's competition performances. That was why we had many memory storage devices and hard disks. As DuPont-Wirex's people know, my computer's top screen always shows my daughter's pictures on ice. The happiest times in Taiwan, was when I called my wife and kids at home and while reviewing their pictures.

Since I took the job assignment for DuPont-Wirex in Taiwan, I had a conflict on managing my family time and working hours. In the day, I had to work in my lab at Circleville while most of my evenings were spent on conference calls due to the twelve-hour time difference between Ohio and Taiwan. In order to over come on this conflict, I established a home office at

my basement. This way, I could still spend some time to play with my kids at home and then continue to make conference calls with my team in Taiwan.

DuPont-Wirex did not have the resource and facility for the product development at that time and they did not even have sufficient R&D budget. To compromise this dilemma I had to transfer my lab equipment to Taiwan and had to conduct some experiments at my home office in order to guide the research group in Taiwan on the experimental details such as, dark spot inspection, polymer-A and polymer-B blending, curling study on cast-on-copper, wrinkle testing, and so on. This is why there were DuPont lab equipments and information in my house. I also had two offices at that time, one is at Circleville and the other one is at Taiwan. My boss wanted to close my Circleville lab and office in order to push me to spend more time in Taiwan. I was afraid to lose my lab equipment and office documents; therefore, I transferred more stuff to my home office in order to save them and then later transferred them to my group in Taiwan.

I had actually transferred a lot of lab equipment to DuPont-Wirex and DuPont Bayport plant over years such as, lab centrifuge, pine frames, hot-plates, magnetic stir, mechanical stir, optical microscope, gear pump, high shear blender, PH meter, flow meter, thickness gauge meter, wrinkle tester, LCR meter, etc. Transferring lab equipment is very common in the company. For example, my boss and I had driven his family van and transferred about 10 boxes lab equipment from his lab at Wilmington to our Circleville lab when he was transferred from Wilmington to Circleville.

With hard work, technical leadership, and the amazing team I had, we had successfully commercialized Pyralux-AC product at DuPont-Wirex within one year. This product had generated over $20 million in business revenue per year for DuPont. We had made two significant accomplishments: one is vertical expended DuPont polyimide film (Kapton) business to single-side polyimide copper laminate (Pyralux) business; the other is successfully demonstrated a business model on how to run business at Asia Pacific region. Extensively, DuPont used this technology to form a joint venture S.D.Flex in Korean with Samsung for the strategically business growth at Asia-pacific area.

By doing DuPont-Wirex's job, I realized that I needed to have MBA training in order to improve my business knowledge and managerial skills. I enrolled in the MBA class at The Ohio State University in 2002 and graduated in 2004. At that time, I have gotten numerous awards from DuPont and was promoted as Technology Manager in Asia pacific in early 2004. My job

role meant for me to look over the technology development in terms of strategy and planning in Asia Pacific; transferring the Pyrulux-AC technology to S.D.Flex Company; playing project management roles at DuPont-Taiwan Technical Center; managing a research group at DuPont-Wirex and a technical group at DuPont-Japan.

This position was the highest technical position in our business in Asia, which will significantly impact to our business since over 60% of our business revenue is in Asia and all of our competitions were also coming from Asia. I worked hard to demonstrate a great capability and integrity to get this job. I certainly did a great job performance in our business. We successfully established DuPont Taiwan Technical Center (DTTC), established a technical group in Japan, set up a record time (9 months) on technology transferring to S.D.Flex, networked with local Universities and institutes to promote DuPont's influence.

In the March of 2005, my wife and kids visited Taiwan. This was the first time for them to come to the island. Unfortunately, it was not an appreciated trip. Eric was sick with a strong allergies and Alice couldn't find a reasonable place for her ice-skating. My family wanted to see the possibility of moving to Shanghai instead of Taiwan. I had discussed on this idea with cooperate HR person and top management, then, proposed this idea to my boss on May. I thought my boss would understand why I decided not to move to Taiwan. I thought my boss would appreciate family value and consider moving me somewhere else. Unfortunately, my boss was very upset and demoted me from Technology manager (level-6) to Research associate (level-5A), moved me from managerial role back to research role, changed my research direction from electronics to wire & insulation business, which I had never worked with before, and forced me to move back to the US within three weeks.

I had searched several internal job opportunities and made numerous contacts within the company such as, TiO2 opportunity in Shangdong, Corian opportunity in Guangdong, and Flouro-polymer opportunity in Shanghai, and so on. I had talked to our CTO at electronic division and applied the Flouro-polymer position through HR manager at Flouro-polymer group.

I was contacted by a professional headhunter for the Victrex Company, a company based in the United Kingdom with a plant located in China. I believe that my name was obtained as a result of my attendance at a technical conference in Taiwan. They arranged two video conference interviews and one face-to-face interview in July. I had not reached out in any ways to secure a position outside of DuPont.

I moved back to the US within three weeks and worked as a research associate at a wire and insulation business, which was a totally new area for me. As new projects and new research area go, I had to re-learn all the skills in order to fit in the new job. I used DuPont EDL (Electronic Database Library) as my leaning tools and conducted numerous searches on technical information. I also was arranged to travel to Basil/ Switzerland to conduct a project meeting with Kevlar/Nomex groups with customers. I was arranged to visit Kevalr/Nomex lab in order to build a similar lab at Circleville. I certainly didn't mean to use the information in any other way. My family was actually very happy at that time. I could spend most of my evening time to play with my two kids, took my daughter to ice skating, took them for swimming and mini-golf, riding bicycles with them, etc. We also had a family vacation at the east coast to review the American history among New York, Philadelphia, D.C., and Williamsburg. My daughter loves history and she had read about almost all the places from her history books. She was very enthusiastic about the trip.

After two months, Victrex suddenly contact to me again and sent me an attractive job offer on October. They increased my pay significantly. However, they did not offer me "Ex-Pat package" for family and only covered one children's education fee at the American school. I signed the contract at October 18th in order to attend Victrex's annual meeting at San Diego. However, Victrex changed their arrangement after I signed the contract, which caused me a hesitation on my decision. This is one of the reasons why I did not resign from DuPont right away.

I continued to work on my projects and wanted to contribute my last effort to the company. For example, I wanted to finish the proposal on building the insulation lab for wire and insulation business; I wanted to finish the patent proposals, where had my name on it. I also took some photographs on my lab notebooks. I did not copy the front page, but copied the rest of the pages since they contained the experimental details. I wanted to finish CR&D project, so they could get an Apex proposal. I wanted to help DuPont-Wirex to solve their polyimide film bubble issues; I worked on the defect issues at Kapton-CR project for Bayport; Also, I wanted to keep a good friendship with the company, where I had worked ten years. I always believed that I could go back to DuPont and/or worked as a consultant for DuPont since many former DuPont employees were doing this.

At December 12th 2005, I officially resigned from DuPont and agreed continue work to the end of the year (December 29th). I realized that I would lose three weeks vacation on this agreement. However, I wanted to keep a positive image with them seeing as they housed me for ten years.

Just before the lunch on December 13th, one of our managers, Andy DesJardins, asked me to sign a termination agreement within 5 minutes and escorted me out to the Circleville Research lab, where I had worked for ten years. I had no idea on what was going on at that time since this was the first job I had in the U.S. This immediate termination caused me some trouble since I had all of my home office information at home. I did mention to Andy regarding some DuPont information at home weather I should destroy them myself or return them. Andy mentioned that I should be better off to bring back the items. I did eventually call him before leaving my house for the DuPont HR interview on December 19th. Unfortunately, he did not reply to me. In the Asian culture, "saving face" is very important aspect of professional reputation. In order to save "face", I missed the opportunity to return DuPont's stuff that I used in my home office because I was afraid of losing "face" by misunderstanding.

DuPont set up an interview with me on December 19th because I was at cooperate promotable list. Based on HR manager's word, DuPont consider the people from cooperate promotable list as DuPont's asset and they wanted to know the reason on my leaving. When I arrived at the lab, a manager from Wilmington, by the name of Don Palmatary met me and introduced himself as a DuPont cooperate HR manager. I was very pleased even though I just had a bad experience being escorted by Andy few days ago. I really appreciated that DuPont is a company who evaluates on their employee's value. During the interview, I explained to him that the reason of my leaving is due to a better job opportunity. I didn't want any other people get hurt from my resignation because I wanted to keep positive footnotes with the company.

The question moved to the EDL search and I start to realize that they were interrogating me. I explained to him just as I explained above. I also mentioned to him that I would keep Victrex informed if they wanted to contact Victrex. However, Don mentioned that this was an investigation only for me. Then, Don passed me his name card and a list on my EDL search. He asked me to write an explanation letter to him within the week. Followed on his request, I replied to him in the week and gave him my email address and phone numbers for the contact. I did not hear from him and I had to join in Victrex to start my new job in Shanghai.

I did not get any phone calls back from Andy and I was embarrassed to bring my home office information back to DuPont. Instead, I followed DuPont's corporate proprietary information protection program ("PIP") to destroy those DuPont confidential information at home, i.e., to shred, burn, pulverize or otherwise render the material impossible for reading. This was because I knew the information would be treated the same way by my colleagues if I brought them back.

While I was in Shanghai, I had a phone conversation with Don Palmatary in January since he left a massage at my home answering machine. I told him that I had started my Victrex's job and left my phone number in Shanghai and email address to him if he had any questions. I did not hear any thing from him until Victrex called me a meeting on February 8th right after I arrived in Geneva for a Victrex meeting. They took away of my computer immediately for investigation and informed me that I got one month to deal with DuPont. I would get to come back to my job if DuPont was satisfied on the investigation.

Facing Victrex's decision, I was totally disappointed. I immediately thought about Kaifu Li's case between Microsoft and Google. By my understanding, Victrex should help me to deal with DuPont since I was their employee at that time. When I asked the airline for a ticket back to the States, the airline lady made a mistake and re-booked my existing ticket to Shanghai, which was the ticket originally scheduled on, and told me that I had 10 minutes to catch up my airplane. I had no time to think at that time. With panic and disappointment, I flowed back to Shanghai. But, I called Don Palmatary immediately after I landed in Shanghai and set up a schedule to meet him at early following week, which he agreed.

While in Shanghai, I got one of my lawyers, Howard Chen, and arranged a phone conversation with Victrex regarding the legal support for Victrex such as using Victrex's lawyer and/or pay my legal cost. Victrex insisted on their decision and bought a ticket for me to come back to the States from Shanghai on February 14th. Combine panic with 24 hours of travel time. I naively thought if I deleted everything in my computer, there would be no damage to DuPont. I even deleted my Ph. D. thesis, which was located in a 10-year-old Macintosh computer at home. My family and me had no legal knowledge on our action, which may have resulted in a criminal charge.

After three month's investigation, DuPont agreed to have a settlement on the civil case in May. Based on this agreement, we ensured the termination agreement and agreed to bear each

party's legal cost. The government returned my passport with a contingency of not traveling to the People's Republic of China.

I immediately applied for numerous jobs from Internet and contacted with headhunters for any potential job positions since my family need money to cover my legal costs. With my previous working experience with DuPont and Victrex, I quickly got two interesting job positions. One was from Belgian company, Solvay, that would have been a competitor of Victrex; and the other was a Japanese company, Kaneka, a direct competitor of DuPont. Kaneka has a plant in Bayport, TX, within spitting distance of DuPont's own plant in that location. I followed on my agreement with DuPont and refused Kaneka's job interview. With Solvay, I did not realize the competition position with Victrex until they had mentioned during the job interview. For this reason, I rejected their job offering in order to show the integrity with Victrex.

With all of those limitations, I only had a very small window to search a job. It took me over 6 months to get the current job, which had no connections to my previous working experience. I worked as a research manager in a French company, who has an R&D center near Boston. The research project is based on building and construction industry. I learned from my mistakes and had no entrance to their technical database, Push-page. Over the last 12 months, I have to overcome a lot of difficulties in terms of government interviews, traveling back to Ohio to meet family, and avoid any international traveling to other countries, but still conducting my job. With my hardship and leadership, our R&D group is very productive. We had issued 12 invention disclosures, in which 5 of them are coming from me. We finished one project on the industrialization and had other three projects were at the last phase of industrialization. Our projects and technical innovation will directly impact to over $50 million business. The company likes me as well. They increased my incentive and added sale bonuses on selling my house in Ohio. We had a chance to increase our group members as well as projects. I had set up several joint development projects crossed different business and industries both internally and externally.

In summary, I never thought the EDL search would give me a big problem. As a managerial level DuPont employee, I had access to many high-level confidential databases such as HPM PACE program, Business database at Asia/Pacific, Technical project database at DuPont Taiwan Technical Center, etc. EDL is simply a basic database for all of DuPont researchers. As a scientist, I certainly had many scientific interests and had been working on those projects

during my ten years working experience at DuPont. Even though my working location was at Circleville, my job assignment had been changed to many different locations such as, DuPont Bayport plant, DuPont RTP technical center, DuPont Towanda plant, DuPont Experimental Stations, DuPont Parlin Plant, DuPont-Wirex JV in Taiwan, S.D. Flex in Korean, DuPont-Japan technical center, DuPont Taiwan Technical Center, etc. In DuPont's culture, management is encouraging scientist to have multi-business and even across different SBUs amounts of knowledge, which has been stated at DuPont promotion guidance.

I was one of the top performers in DuPont and had great responsibility and integrities in terms of on the cooperate promotible list, having gotten three levels of promotion within 5 years, co-established technical center and groups in Asia, etc. Over my ten years DuPont employeement, I also granted numerous patents (US702754, US7026032, US6159611, US6150456, EP902048, EP1431984, EP04023887.5, JP2004-200681, U.S. Application No. 11/395735, etc.) and published numerous scientific papers for the company. I had developed and improved several important products for business such as Kapton-CBP, HiK, CR, embedded passive technologies, Pyralux-AC, etc. My total technical contribution for DuPont would be over $30 million US dollars a year on business revenue, which is significant for the company. In short this case felt a lot like betrayal.

I also did my best to cooperate with the investigation team. I played negotiations with government in the front in order to get clear on the case and want to keep my scientific career as well as my family. I even put my in-law's family in risk by allowing DuPont's people to search their apartment (DuPont cancelled the action) and sending some electronic devices back to the U.S. for the investigation and conducting oversea phone calls. As you know the Chinese government had very tight control on transferring CDs, DVDs, and electronic memory devices to avoid any "Fa-long-Gong" and /or political involvement.

Reviewing my ten years employment history in DuPont, I have a great royalty to the company and am always in a position to protect company as well as increase the company's good image. For example, I had ensured DuPont's cast-on-copper technology patent in Taiwan by interviewing with the president of patent office. After we got the patent, we used our patent right to suit our local competitor, ThinFlex, to protect Pyralux-AC's technology for DuPont. I had also initiated several education projects and had increased DuPont's academic influence in

Asia. I had no intension to do anything to damage the company. I certainly did not release any DuPont information and have done no damage to DuPont.

I always feel deeply apologetic on the damages caused by my unwise behavior, which I had never thought about in the beginning. It clearly created a big information safety issue in the company. The first group got damaged internally would be the people in the DuPont Asia Group. Their many years' efforts have been significantly damaged and their royalties and trust will be challenged. Even broadly, with the un-accuracy of the statement and reports from news mediums, the whole Chinese community also got big negative impacts. I can clearly see this from the reaction of the local community. I lost many of my friends and contacts, some people even kept away from my family and me. This affliction has been flying in to places too far for my family and I to go. The financial impact is enormous for both DuPont and my family. I learned that DuPont had claimed $180 thousand dollar loss on their investigation. The financial impact for my family is even more devastating. I also lost my Victrex's job, and had no employment over 8 months, my daughter had to quit ice-skating, and both kids have had to quit private school, plus, I've had to pay the legal cost for two years. It is clear that I have been taught a big lesson from the case, which will become a mirror reflecting on my future life. For example, I have never even touched the technical date base or Push-page with my current job. I was lucky to be able to keep my current job and to bring income for my family and to pay the legal fees. I will appreciate greatly if the government gave to me a chance to continue work, to support my family, to pay taxes, to pay any damages from DuPont and also to keep my scientific career. I had made the biggest mistake in my lifetime. However, I have no intension to hurt any people and/or company. I had a poor knowledge in law, but I learned from my mistakes and would like to demonstrate success from the correction of my mistakes.

My imprisonment would significantly impact my scientific career, to the worst standards. I would have a great difficulty to find other professional jobs in the future. Certainly, all of my education, working experience, and dreams would be disappear. Even more, I may not be able to keep the family safe from anymore turmoil. My current job income ($6880 per month) is very important economic income for the family. My wife's income is only half of my income ($3200 per month). She would not have the ability to pay house mortgage ($2000 per month), family's living cost ($2500 per month), kids after school education ($500 per month), as well as taking care of grandparents ($500 per month). In this case, the bank will take the house away. The kid's after school education will be eliminated, which will impact to the growth of the two kids.

The two young kids, (I have a twelve year old daughter and a 8 year old son) would lose their father's care at their important growth period. Our family value will be dramatically damaged.

I had been very actively involved in our local community activities such as, The Chinese School in Columbus, Chinese Christian Church activities, Chinese volleyball team, Chinese Tai-Chi sport team, as well as Chinese Chorus. As a member of Chinese Chorus and Church Choir, I had conducted some performance during the Chinese Festivals. I was one of the organizers who formed the Tai-Chi Sports Team in Columbus. I was able to supply the team with many different learning tools such as Tai Chi swords, cloths videotapes and so on. The Tai-Chi Team has conducted several courses at Chinese School and has organized training programs for the locals in the summer. The Tai-Chi team has also conducted several performances during the Asian Festivals, which is a highly appreciated festival in Columbus during May. Our local television channel had reported the Tai-Chi Team's performance at the Asian Festival special program in 2003.

I have actively participated in bible study and church activities since I was a graduate student at University of Pennsylvania in Philadelphia. I have joined many church choirs in the local Chinese community. I have also participated in the local Church activities at Columbus and at one time sent my two children to the Grove City Christian Church schools. I was also very actively participating in many different charities such as donating money, clothes and such essicail items.

I also joined in the local Church when I started my job in Boston area. I have spent Friday on Bible study and Sundays serving God. I had participated in many lectures from Church regarding very important subjects such as God and life, how to become a real Christians. One of the subjective is very interested to me, "Why People Who Believed God had Always Gotten More Punishment". The lecture was conducted by Dr. Zhulong Huang, who was a pastor and editor in chief at Golden Lampstand Publishing Society in Hong Kong. He gave us several examples, there are many Christen were killed during the Tsunami at Southern Asia when they want to save others; the first doctor was killed by SAAS in Singapore was a Christian, who was supposed to be on vacation, but he insisted to go back to his job. The greatest of the people who believe God is the people who have no regret to face the difficulty and even challenges to the life. I believe God and I want to face the challenges from the case. I pray several times everyday and

wish God can help me to correct my mistakes and help me and my family to have a peaceful life. I will have a peaceful heart to your judgment.

Your Honor, I hope that the court will see me as a true person, who grew up from a poor family in China, who worked hard to become successful. A person who got an education opportunity in the U.S. and he cherished it. As a person who had a great royalty and made a great contribution for the company, who loves life and loves family, who will take care of his beloved kids and serves the community as best as he can. A man who made a mistake, but take steps to correct the mistakes. I believe that you are going to make a just and right decision. I trust your choice.

Best regards,

Gary Min

EXHIBIT "B"

**DuaneMorris®**

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
LOS ANGELES
CHICAGO
HOUSTON
HANOI
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BALTIMORE
BOSTON
WASHINGTON, DC
LAS VEGAS
ATLANTA
MIAMI
PITTSBURGH
NEWARK
WILMINGTON
PRINCETON
LAKE TAHOE
HO CHI MINH CITY

MICHAEL M. MUSTOKOFF
DIRECT DIAL: 215.979.1810
*E-MAIL:* mmustokoff@duanemorris.com

*www.duanemorris.com*

October 17, 2007

Robert Kravetz
Assistant United States Attorney
United States Attorney's Office, District of
Delaware
P. O. Box 2046
Wilmington, DE 19899

> Re:     **United States v. Gary Min**

Dear Mr. Kravetz:

The purpose of this memorandum is to provide the Court and the Probation Department with some additional information in advance of the Sentencing of Dr. Min, a matter in which both the government and defense can agree is exceedingly complex. Consistent with our many discussions, we have attempted to set forth what we believe to be a reasonably objective review of facts and circumstances established during the government's two years of investigation and numerous interviews of our client, Dr. Gary Min:

1.     The government has no affirmative evidence that Dr. Min has ever sold or even transferred any information to any person or company, other than the information uploaded to Dr. Min's Victrex computer. As to that information, it has been determined that all of the DuPont information in the computer was found in the "recycle bin," and that all but one of the documents were dated from a period between 1999 and 2002. Dr. Min relinquished that computer to Victrex when he arrived in Geneva. Dr. Min contends the information found on that computer was "back up" used in international traveling on behalf of his employer, prior to 2002.

2.     The government and Dr. Min's counsel have agreed, consistent with Federal Sentencing Guidelines, that the losses which the Government can prove by a preponderance of evidence is equal to $375,395.04. The parties have stipulated that this amount should govern Dr. Min's relevant conduct under U.S.S.G. §2B1.1. The parties also agree that although this amount is appropriate for purposes of loss, a separate analysis is required as to the amount of restitution due to DuPont. The parties have further stipulated that Dr. Min's conduct should be categorized as an attempt under U.S.S.G. § 2X1.1.

DuaneMorris

Robert Kravetz
October 17, 2007
Page 2


3.      Dr. Min has met with the government on ten (10) separate occasions to attend
debriefing sessions.  In order for Dr. Min to attend these sessions, it was necessary for him to
drive either from his family home in Grove City, Ohio, or his work place in Boston,
Massachusetts.

4.      Dr. Min contends that in order to assist the government with its efforts to confirm
much of the information developed during his debriefing sessions, it was necessary to place his
family in China at some risk in order to provide federal agents with computer hardware, software
and pictures which they required.  Although the parties may disagree as to the actual degree of
risk to Dr. Min's family, it was necessary that the drop off of these materials take place at a
DuPont facility in Shanghai, China.  It is agreed by the parties that Dr. Min made all reasonable
efforts to provide confirming information.

5.      Until July 2005, there was never any reason to question Gary Min's loyalty or
dedication to the DuPont Chemical Company.  During his first six years of employment, he had
never even taken a vacation.  Although he had taken advantage of "comp time" due him as a
result of week-end travel, he took his first vacation after being with DuPont for six years.  He
was a key member of the team that developed several new products and new business such as,
Kapton®-CPB, Pyralux®-AC, and embedded passives, which generated at least $5 to $20
million in sales per year for DuPont.  He is co-inventor on four patents and was a co-inventor
with two other DuPont scientists on two patent applications on work that he had done in Taiwan
(US7026032, US6159611, US6150456, EP902048, EP04023887.5, US702754, EP1431984,
JP2004-200681, U.S. Application No. 11/395735).  DuPont regarded Gary as a highly-respected
scientist, which was reflected in the strong performance ratings that he received.

6.      Dr. Min has stressed during the debriefing sessions that his greatest desire was to
continue working for DuPont in the United States.  His family had made a good home in Grove
City, Ohio.  His children were in private school.  His daughter had made exceptional progress as
a figure skater by age 11.  In July, 2005, Dr. Min provided a Taiwanese headhunter, Vicki Lee,
with his resumé.  Dr. Min is unsure as to whether this contact was originally initiated through the
Victrex Corporation, his participation in a Taiwanese seminar or some other circumstance.
There is no question but that as a result of headhunter contact, Dr. Min was ultimately hired by
Victrex Corporation on October 18, 2005.

7.      Prior to coming to DuPont, Dr. Min had earned his undergraduate degree in
China.  Since coming to the United States, he has earned both a Master's in Business
Administration from Ohio State University and a Ph.D. in Chemistry from the University of
Pennsylvania.  Dr. Min is an American citizen.  He has told you and the FBI that he feels no
allegiance to the Chinese government; the United States government, however, can neither
confirm nor deny the validity of Dr. Min's assertion.  He has stated how, as a young graduate
assistant, he was present at the student rallies in Tieneman Square in an effort to protect the

DuaneMorris

Robert Kravetz
October 17, 2007
Page 3

younger undergraduates whom he mentored. He believes those activities delayed his ability to
leave China and come to the United States.

8.     Dr. Min has informed you that his grandparents were trades people and lost what
little they had in the Communist takeover of Mainland China. His father, unable to enter the
family herb business, became a hair cutter, a woodworker and a calligrapher. Dr. Min has
informed the Government that his family was very poor and that he was able to progress through
the Chinese educational system only through his own efforts and without the support of the
Communist Party or any other entity.

9.     Dr. Min requested a management assignment with DuPont in Asia. The parties
agreed that, in order to fulfill the intended managerial role and to satisfy Dr. Min's desire to be
assigned to Asia, Dr. Min would be transferred to Asia on a 3-5 year assignment. Dr. Min's
proposal to move his family to Shanghai was rejected by DuPont because it did not resolve the
issue of him needing to be present full-time in Taiwan with the research group he was assigned
to manage. When Dr. Min declined to move his family to Taiwan, he was reassigned from his
position as Asia/Pacific Technical Manager of the DuPont Taiwan Technical Center to work as a
Research Associate at DuPont's facility in Circleville, Ohio. Dr. Min was demoted in title from
a management position (Level 6) to a research position (Level 5A), although DuPont did not
reduce his salary from the higher level.   Both during his assignment in Taiwan and after his
reassignment to Ohio, Dr. Min sought employment elsewhere within DuPont with various
business groups: Corain® business in Guangzhou, TiO2 opportunity in Shangdong and
Flouropolymer opportunity in Shanghai. Dr. Min sent his resume to the HR manager at
Flouopolymer business and had talked to the CTO of Electronic and Flouropolymer platform on
the internal job opportunities. Dr. Min has consistently maintained that his disaffection was
never directed at DuPont so much as his immediate supervisor. Although Dr. Min's supervisor
at DuPont insists that Dr. Min never expressed his dissatisfaction at being reassigned to him, and
that Dr. Min did not  indicate that he was considering leaving the company because of his
reassignment, Dr. Min states otherwise. He contends that his colleagues knew that he was
unhappy with the demotion. He also states that supervisors within DuPont had to know that he
was considering transferring based on the numerous inquiries he made regarding reassignment.
He has provided the government with some of the names and people he contacted.

10.     In July 2005, Ms. Lee contacted Dr. Min on behalf of one of her clients, Victrex
Company. Victrex is a company based in the United Kingdom with a plant located in China.
Victrex manufactures a product called PEEK™.  The polymer PEEK™, (polyether-ether-
ketone) is a product different from Vespel® and Kapton®, which are polyimide based materials.
All three belong to the high performance polymer category, and they are functional competitors
within a narrow segment of the motor, generator, and transformer industries. Kapton® is a film
based material, which is made through polymer solution casting technology. Victrex's PEEK™
is a pelletised resin manufactured by a chemical process. A small proportion of Victrex PEEK is

DuaneMorris

Robert Kravetz
October 17, 2007
Page 4

converted into film using an extrusion process but this is a completely different technology from Dupont's Kapton process. It is also our understanding that Victrex PEEK™ is a raw material which DuPont uses in the manufacture of certain Vespel® parts. In summary, PEEK™ is a high performance polymer material: Vespel® is a molded finished product, comprising high performance parts; Kapton® is a film utilizing a totally different technology and is therefore, is a different product.

     11.    On the one occasion when a Victrex employee actually requested confidential sales information from Dr. Min, he did not provide any confidential pricing information.

     12.    As to Dr. Min's access to DuPont confidential information, the following can be said:

     (a)    Dr. Min understood that the DuPont information which he accessed was confidential and not to be shared. As a managerial level DuPont employee, Dr. Min had access to many high level confidential databases such as HPM PACE program, Business database at Asia/Pacific, Technical project database at DuPont Taiwan Technical Center, etc. EDL is simply a basic database for all of DuPont researchers.

     (b)    In the evidence offered by the government in the change of Plea Colloquy, there appeared to be three particular time periods of particular concern:

     (i)    The period from the summer of 2005 through October 18, 2005;

     (ii)    October 18, 2005 through December, 2005; and

     (iii)    January-February, 2006.

### The period from the summer of 2005 through October 18, 2005

The government noted that in May 2005, Dr. Min conducted 11 searches and accessed 45 abstracts, 13 of which had full text pdf attachments. He did not access the EDL in June or July 2005. During the month of August, 2005, two weeks after Dr. Min's third interview with Victrex, he conducted 165 searches and accessed 464 abstracts, 75 of which had full PDF attachments. In September 2005, Dr. Min conducted 65 searches and accessed 689 abstracts, 188 of which had full text pdf attachments. At least 22 of the searches related to PEEK and/or Vespel.

     1.    Although 129 of the searches related to PEEK™ and five related to Vespel®, Dr. Min contends that as a result of being demoted to a scientific research associate, it was necessary for him to reacquaint himself with information concerning Kevlar, Nomex and associated

DuaneMorris

Robert Kravetz
October 17, 2007
Page 5


products. DuPont insists that Dr. Min did not need to reacquaint himself with these technologies because of his reassignment. According to DuPont, although the reassignment may have required Dr. Min to familiarize himself with the Kevlar and Nomex product lines, that would not involve searching for manufacturing or other base technology. DuPont contends that Dr. Min would only have to familiarize himself with the Kevlar and Nomex product lines. Dr. Min argues to the contrary. He states that the Kapton group proposed to use intermediate Kevlar or use un-canlindadded Thermount (Kevlar/Nomex laminate) and Numexas filler or substrate to make polyimide laminates for high dimensional stability flexible printed circuit materials and/or insulating materials.

2.      Dr. Min and DuPont's Edward McKenzie, were traveling to Basil, Switzerland in September of 2005, where they discussed a joint project with the Kevlar and Nomex groups for the customer of Von Roll/Isola, which is a global leader in electrical insulation materials. Dr. Min claims he thought it was necessary to reacquaint himself with the science regarding those products so that he could assist Mr. McKenzie in his sales efforts. Kevlar is not a typical electrical insulating material. After the Basil trip, Dr. Min visited Kevlar and Nomex groups. Subsequent to that trip, he generated a testing equipment list for the purpose of establishing the wire and cable testing capability at Circleville for Kapton group. Dr. Min contends that it was necessary for him to review manufacturing and base technology in order for him to generate the equipment lists for Kapton Group at Circleville. DuPont disagrees with this contention.

3.      During this time period, Dr. Min had three interviews with Victrex in July 2005. Although Dr. Min does not recall an interview in September, he agrees that he was formally offered a job in October by Victrex. He signed an Employment Agreement with Victrex on October 18, 2005. He did so in order to attend a Victrex annual meeting in San Diego. At about the same time, Dr. Min contends that Victrex made changes to his employment arrangement which caused him to reconsider his decision to leave DuPont.

During the same period, he was also exploring other potential job opportunities within DuPont and checked on internal career opportunities frequently. For example, he also made numerous searches on Corian, TiO2 and Flouropolyer groups. Although DuPont contends that Dr. Min would have no reason to consult research reports to search for job opportunities, Dr. Min states that he was looking for a technical position due to his reassignment. Thus, it was necessary for him to conduct searches into the manufacturing processes in order for him to match his professional background with DuPont personnel needs He specifically mentions job opportunities in connection with a TiO2 plant to be built in Shangdong, China and a Corian facility in Guangzhou. Dr. Min has provided the government with a detailed list of the DuPont job opportunities about which he made inquiry.

DuaneMorris

Robert Kravetz
October 17, 2007
Page 6


**October 18, 2005 through December, 2005**

During this period Dr. Min made numerous searches and accessed numerous abstracts. Once again, there is no affirmative evidence that Dr. Min copied any of those documents and no evidence that he transferred any of the information in those documents, other than the information uploaded onto his Victrex-issued laptop computer.

The government notes that Dr. Min did make digital photographs of numerous DuPont lab notebooks, including his own lab notebooks and possibly lab notebooks of research scientists who worked under him. Dr. Min indicated that he was not aware of a DuPont policy prohibiting lab notebooks from being copied or photographed. Dr. Min admits that he did not photograph the inside covers of the lab notebooks, which clearly states that the within contents are confidential. Dr. Min considered the lab notebooks to be, "rightly or wrongly his scientific diaries" [his professional portfolio].

At that time, Dr. Min was also in the middle of preparing several patent proposals for DuPont: 1) Halogen-free coverlay; 2) new generation of Pyralux (Cairo project) (On the above two items, he was a coinventor with two other DuPont scientists on two patent applications on work that he had done in Taiwan); 3) methods for highly filled polyimide film, etc (See U.S. Patent Application No. 11/395735). Among other reasons, he thought it necessary to have the lab book photographs so that he would have this work available for the patents, as well as to make certain that he would receive full recognition of his inventorship.

Dr. Min had worked with several researchers from DuPont Center R&D group on several APEX project proposals such as, non-electronic packaging, capacitor film for clothing protection, ink-jetting packaging, etc. He had co-fielded a provisional patent on "Methods for forming patterns of a filled dielectric material on substrates", which was one part of an APEX project. After Dr. Min was assigned to the wire & insulation business, he was working with DuPont's CR&D group researcher on a nano-TiO2 filled polyimide (new Kapton-CR) for wire and insulation applications. He had evaluated several samples from CR&D group and arranged a trip to visit them for the proposal based on positive experimental data from lab. The trip was cancelled due to the resignation.

Dr. Min has consistently stated that another reason for his scanning the DuPont information is based on a belief that someday he might return to DuPont as a consultant, as was the case of many other DuPont employees. Dr. Min admits, however, that although he had no specific intention to transfer DuPont information to anyone else, he knew to a practical certainty that the information might be useful to him in some way or another in the future.

DuaneMorris

Robert Kravetz
October 17, 2007
Page 7

### January-February, 2006

The Government has no affirmative evidence that Dr. Min used his Victrex-supplied computer to transfer any information to his new employer or anyone else. The Government has determined forensically that seven different external software storage devices were connected to the Victrex computer. Dr. Min has provided those devices to the Government. The Government's forensic analysis concluded that no DuPont proprietary documents were stored on these devices.

In the Plea Colloquy there was some mention of a DuPont Business Plan being on that computer. The Business Plan was dated between 1999 and 2002. Dr. Min advises that the DuPont China Business Plan contained on the computer had been produced by some local Chinese sales personnel and was not very sophisticated. Dr. Min, himself, produced for DuPont's purposes a much more sophisticated and detailed Business Plan that was relied upon by DuPont in seeking business opportunities in China. Gary's Business Plan was acted upon by DuPont's HPM Strategic Manager, John Austin, who was sent by the Company to explore moving DuPont's Wirex polymide film line to the Company's Lycra plant in Shanghai. Although it was against DuPont corporate policy to have a home office as well as a home laboratory, Dr. Min states that it was necessary for him to follow through on international assignments in Taiwan. Dr. Min contends that he maintained a home office from the start of his Taiwan job assignment. He did this due to the 12 hour time difference between Ohio and Taiwan. During the five (5) year time period, it was necessary for him to conduct international conference calls routinely with Taiwan. He states he conducted some experiments at his home office such as darks-pot inspection on films and polymers, polymer-A and polymer-B blind test, solubility of monomers at different temperature, to guide his research group in Taiwan. When DuPont made the decision to relocate Dr. Min to Taiwan, the company closed his office and lab at Circleville. As a result, Dr. Min moved additional DuPont equipment to his home. Over the years, some of these materials had already been transferred to Taiwan such as, optical microscope, centrifuges, LCI meter, high shear mixer, hot place, pine-frame, glass plate, wrinkle-testing rolls, gear pump, gauge meter, stirring bars, etc. In the Plea Colloquy, the government noted the large amounts of DuPont confidential information destroyed by Dr. Min and in his possession at the time of his arrest. Dr. Min contends that all of the information in his possession was stored at home as part of his "home office" Dr. Min conceded during the debriefing sessions, however, that he was unauthorized by DuPont to have a "home office." He stated that after he became knowledgeable of DuPont's investigation – during which DuPont Corporate Security showed to Dr. Min the federal criminal statute for illegally transferring trade secrets -- he panicked and attempted to destroy all of those materials rather than return them for fear of being misunderstood.

In attempting to destroy all of the DuPont materials in his possession, he actually did follow DuPont's corporate proprietary information protection program ("PIP") to process those DuPont confidential information, i.e., to shred, burn, pulverize or otherwise render the material

DuaneMorris

Robert Kravetz
October 17, 2007
Page 8

impossible for reading. There is no affirmative evidence that what was destroyed was anything other than what was described by Dr. Min, i.e., DuPont confidential information gathered by him over the years. The Government did uncover in February 2006 numerous documents that Dr. Min did not destroy, including boxes of DuPont confidential documents at a storage facility that was rented in his wife's name and in a one-bedroom apartment leased in his mother's name.

According to Dr. Min, the DuPont equipment that was found in his home was originally intended to be taken by Dr. Min to Taiwan. He said that the transfer of equipment in this way was something frequently done at DuPont and he had transferred numerous equipment to DuPont's Bayport plant and the DuPont-Wirex plant since he had the DuPont job. Dr. Min agreed with the Government that he did not have authority from DuPont to conduct any experiments at his residence. At the time of his resignation, Dr. Min did not bring up the laboratory equipment that he retained at his residence because he was embarrassed about keeping the equipment.

Dr. Min claims that, when first notified of DuPont's request to come back to the United States for further questioning, he hoped to convince Victrex to assist him in what he thought was a routine business dispute with DuPont. (Dr. Min can supply e-mails between himself and Victrex to confirm the subject matter of these communications).

In addition to the numerous assurances of contrition offered by Dr. Min, there are some additional uncontroverted facts.

- Even after being out of work for over six months as a result of his termination by DuPont, Dr. Min claims to have refused employment with a Belgian company, Solvay, that would have been a competitor of Victrex. He also rejected a job opportunity with Kaneka, a direct competitor of DuPont. Kaneka has a plant in Bay Port, Texas, a short distance from DuPont's own plant in that region.

- The Government has been able to corroborate much, but not all of the information provided by Dr. Min during the numerous debriefing sessions.

  Dr. Min is willing to speak with DuPont personnel regarding his criminal offense, which includes his failure to observe the Company's policies concerning access to confidential information. He has also offered to discuss his views on how DuPont's corporate culture and his academic background contributed to his failure to comprehend the true enormity of his lapse in judgment.

DuaneMorris

Robert Kravetz
October 17, 2007
Page 9

        We believe that mutual agreement as to these representations will present the Court with
a more accurate picture of Dr. Min's actions than what has previously been provided.

                                        Sincerely,

                                        *[signature]*

                                        Michael M. Mustokoff

MMM/ks
Cc:    The Honorable Colm F. Connolly
       Special Agent Peter J. Lapp, FBI
       Martin Durkin
       Gary Min

# EXHIBIT "C"

Alice Min

2775 Woods Crescent

Grove City, OH 43123

The Honorable Sue L. Robinson, Chief Judge

United States District Court of Delaware

844 North King Street

Wilmington, Delaware 19801

October 26, 2007

Dear Judge Robinson

What can a twelve-year-old girl say on behalf of her family's imprisonment with this painful case? I can't pretend that nothing has happened nor can I act as though nothing has changed. Everyday we are haunted with the possibility of a dark future with my dad in jail or an ongoing court case that may never end. For almost two years our Christmas tree has stayed in the basement. For almost two years the blade of my skate has not touched the coolness of the ice. For a year I have not worn a uniform, but have to decide on a pair of jeans and shirt. For two years I have not lived a day without the reminders of my dad's case tugging at the strings of guilt and pain in the back of my mind. When I walk into school I wonder if anyone else is going through the turmoil of life in the same treacherous waters as my family is. Then a glance into my brother's innocent face robs me of speech and heart. He is only eight yet he has gone through so much without knowing anything more than a for sale sign in our front yard. Yet my dad remains strong through the turmoil, taking us swimming and always bringing back a tiny but miraculous souvenir from his travels. I yearn one day to return to a peaceful life of happiness and calmness. For now we tread these waters fiercely hoping that we will not drown into the deep or get separated, lost, away from one another.

Why do they accuse my father as a criminal? Why? Have you read what they write about my father online? The case has not even ended, he may be innocent until proven guilty, but his pride is no more. The tone of these letters does not show him as an innocent man, but a possible fraud committer. I wish to punch that screen. What do they know? Have they met him? Have they seen him so immersed in getting his PhD? The ferocity of his determination lining his eyes, trying to understand more, to give a better future, money for college, an example of the importance of education. They've never heard him explain math, science, life and the importance of our education. He taught my brother and me things that we would have

never learn in a lifetime at school. When he tells us these artifacts of knowledge, I can hear the longing and understanding tone that only the most loving and intelligent of teachers could express. The effect of his imprisonment on us would be tragic. I cannot imagine life without my dad. Even though the past few years he has not been home all the time, I could always count on him to be a call away. I could always count on him to help me with school. He would always be there for me. I yearn for a day where my family can all be together with a blinding smile on each of our faces. My father didn't mean to look at the confidential papers to steal them, but to nurture his long time passion, a talent that could help humankind, a beauty of scientific knowledge that his ambition lays.

About every two to three weeks my dad comes home from Boston, a blinding smile on his face matching the one on my brother's tiny complexion. The joy it brings us to play ping-pong, Chinese Chess, swimming, or monkey-in-the-middle has made it a treasure worth more than gold. Though at times that gold is diminished to bronze, it is still a bright spot in my week. My father has done so much for me; to list all of the charity would take up all of the Harry Potter book's pages and more. He taught me how to swim; he fed my love for history and taught me what I know of Chinese. He tried to teach me soccer, but quite frankly my feet aren't exactly one with the ball more like one with the grass. Even so he would still comforted me by saying that soccer wasn't my sport ice skating was. He always supported my ice skating dreams. Always telling me that I could land a double jump maybe even a triple, though we have yet to see if that is true. Because of my dad I have become very knowledgeable with history and have been able to visit places that would some people would only have dreamt of going. Places like the tallest building in the world Taipei 101, Williamsburg, Shanghai, a Modern Greek façade of politics called Washington D.C. and the old capitol of Xian. What more could I say other than my father is a respectable, ambitious, loving and caring man who has done more for me than all my friends added together. I plead dear Judge Robinson to show him mercy, my dad is not a criminal, he was and he never will be, he was just a curious scientist looking over files. He never meant any harm. We have suffered two years with this case. I cannot imagine two years more, let alone ten. Will there never be a Christmas tree? Will I never go to my old school again? Will we never see a day without this affliction tugging at our minds? Our fate rests with you, your honor. May you make the wisest, fairest choice. Thank you for your time.

Sincerely,

*Alice Min*

Alice Min

Ms. Chunhong Liu

No. 6-4 Nanjing Street,

Changchun, PRC 130051


The Honorable Sue L. Robinson, Chief Judge

United States District Court of Delaware

844 North King Street

Wilmington, Delaware 19801

October 28, 2007

Dear Judge Robinson:

Your Honor, as mother of Gary Min, I would like to speak on his behalf. Out of my three children, Gary has given me the most pride and joy. As a child I never needed to worry about him. He never got into fights; he always worked his hardest at every possible part of his life. In short he was a good child. In high school he would leave at five every morning and close his restless eyes at midnight. Every part of him was determined to his goal. One summer we had a couple of friends over who were enjoying the pleasure of conversations. Gary, who was still intently studying in the other room, had put on a woolen cap to muffle out our sounds. His focus and determination still strikes me proud. I wasn't the only person who saw success in his future. Everyone on our block also thought Gary would be very successful.

He kept on working hard through out college. He made many friends and all the professors liked him as a student. One of his chemistry professor's took around few months to solve an experiment and still didn't have a satisfied result. Gary however took only two weeks to figure the experiment out. This experiment not only showed his ability but proved his worthiness not only to his fellow classmates but his professors in general.

Gary's father passed away in 1987 due to lung cancer. As a single mother, I had to take care of the whole family. At that time, Gary just graduated from college, his younger sister was still in a community college, and his younger brother was only 15 years old. I had to work hard to bring more incomes for the family and paid the medical expenses from his dad, but cannot offer enough time to educate the younger son. Unfortunately, he never made in the college. I will always feel guilty on my children's behalf for the loss of their beloved father.

In 1990, Gary attended University of Pennsylvania for a PhD. His professor Dr. MacDiarmid was a Nobel laureate in chemistry. Under his supervision Gary achieved and learned more than he ever would have. After college Gary applied for a job at DuPont, much to his joy and surprise he was accepted as an employee. Through out his years at DuPont he gained insight, knowledge and was always honored to call himself a DuPont employee. DuPont helped him mature not only

from a lowly employee to a technical manager, but from a rookie in a new country to an ambitious pro.

Since then Gary has always worked his hardest at DuPont. Climbing up promotional lists like a monkey on a ladder. Because of him DuPont has gained many accomplishments and revenues. In return DuPont also rewarded him. Since I came here in November 6th 2000 I've seen him work harder then ever. Leave everyday a seven and getting home very late at night. On top of that he would often go on business trips. In 2003 he was transferred to a branch of DuPont in Taiwan. Seeing as he was living part time in Taiwan and his wife, Wei-Wei, had to work I took over some household chores. I hope this would have at least lightened his overly stressed load, so he would not worry about the kids. This way he could pour his hearts content into his work.

Even when times at work hard, he would always be there for his family. He called back home almost everyday during his business trips. Regardless of minutes he would always take time to tell his kids a fascinating new legend of the places he had been. He would also take a lot of pictures for the kids and explained to them where he had been and the facts about the local cultures. Through this the kids not only gained insight on the human race's variety but also the stark fascination of human difference.

Perhaps if Gary had shown a little interest in law, we would not be in this predicament at the moment. This way he would have known at least how an innocent browsing could possibly cause a huge affliction like this one. We are lucky enough that his innocent reading had not caused huge damages to the company or the country. I think through this affliction my son will learn a lesson and prevent this from ever happening again.

As a worried mother, I beg your honor to give my son a second chance and not put him in the jail. If you cannot deem him innocent looking at the present sees the past. Know that he is a good respectable man who deserves a second chance. For he has learn his lesson, he will continue to work on becoming an even more successful and respectable man.

With my current age, high blood pressure, and many other diseases, it will be very difficult for me to come over again to help the family since the medical treatment in the U.S. is very expensive. Due to this, Wei-Wei will have a hard time to keep her job while taking care of two young children. The effect of the imprisionment would put the whole family under big jeopardy. The house would be taken away, the kids education would be down graded yet again, everything Gary has worked hard to achieve for his family would be gone. Nothing more than a shadow of a has been in the past.


Sincerely yours,


Ms. Chunhong Liu  *Ch Liu*

(I have to let you know that I wrote this letter in Chinese and asked my granddaughter, Alice, to help me on the translation.)

Wei-Wei Wu

2775 Woods Crescent

Grove City, OH 43123

The Honorable Sue L. Robinson, Chief Judge

United States District Court of Delaware

844 North King Street

Wilmington, Delaware 19801

October 26, 2007

Dear Judge Robinson

As I am writing to you today, I still struggle to put into words the emotions and thoughts I have for this painful case Gary and I have been through for almost 2 years. We have been married for 13 years. Yet I still have great pride for the man he is today. I am very proud of him to immediately take the responsibility for his mistakes. When DuPont asked him to come back to have a meeting at the Circleville Plant, he bought a ticket and flew back from China. During the past 2 years, he has cooperated with the government on every aspect of the investigation. We also voluntarily informed government when our children and I visited my parents in China.

Gary and I met at Philadelphia, Pennsylvania, when both of us were in the college. After we graduated, we moved to Columbus, Ohio, where he took the job at DuPont, while I work at FedEx. We were so happy that we were on the right path to fulfill the American Dream; having a nice house, two beautiful children and a job we love very much. We were able to invite both of our parents to visit us in US. We took them to Las Vegas, New York and Washington DC, places they would have never imagined going.

During Gary's ten years with Dupont, he was very enjoyed his work and had always worked hard on his projects. He spent a lot of time on business traveling and lost a lot of weekends on conducting plant tests. However, he always put family first. In the morning, he would send kids to school on the way to work. In the evening, he would spend few hours on their homework, playing with them, telling them stories. Once they were asleep would he finally continue his work in his home office until midnight.

Since 2000, he was assigned travel to DuPont-Wirex in Taiwan. He had to travel to Taiwan every two months and stay there for 3-5 weeks each time. While he was staying at home, he would always call us even if he was in, Taiwan, Korea, or Japan. Even so he made a great success on his job and got several promotions in the company. However, we lost a lot of family time. We had to invite my mother-in-law come over for taking care of our two young kids. When he was back Gary would always bring stories of the many different cultures and legends of them. One reason Alice loves history is because of Gary's travels.

DuPont decided to relocate our family to Taiwan after he was promoted as a technology manager. After our two children and I visited Taiwan in spring of 2005, we decided to stay in US, not to move to Taiwan, but we would move to Shanghai if Dupont would allow us. This was because I grew up in Shanghai and their grandparents would help us to take care of the two kids.

Unfortunately, this request initiated the punishment of Gary's demotion as well as the next two years of nightmare for the family.

We sent our children to the Grove City Christian Daycare and School until the summer of 2006. Gary and I are very careful on kid's education and spend a lot time and efforts for them such as music lessons on piano and violins, sports lessons on tennis and ice-skating, art lessons on print and drawing. Our efforts got good rewards, both Eric and Alice are members of The Columbus Shimpony Youth Orchestras. As an ice skater Alice had won many figure skating awards. Due to the expensiveness of legal fees she has not been able to return to the ice.

Because of this case and his unemployment, we couldn't afford the private school and had to limit our children's after school activity. But I am still very proud of him to be able to overcome huge obstacles in order to start a new career at Boston and continue to nurture our family's well being. Unfortunately, the government's case started right after Gary took the Boston job. Gary has had to work hard in his new job and fully cooperated with Government on the investigation, on top of that he has to come back to Columbus every 2-3 weeks. My family is also very stressful on making any decision of moving to Boston or staying in Columbus. The sentencing time had been moved from March, May, July, October, and November. We all wish this would just end, though it doesn't seem possible.

Gary's imprisonment will be not only significantly impact to his personal career but also to our family. It would be no doubt about that Gary's imprisonment will kill his professional career to find any new job. All of his education, working experience, and his dreams would disappear into nothing but thought. Gary's job income ($6880 per month), which is doubled of my income ($3270 per month), is very important for the family in terms of paying house mortgage ($2000 per month), family's living cost ($2500 per month), kids after school education ($500 per month), as well as taking care of grandparents ($500 per month). Even more, our family value will be dramatically damaged. Definitely, it will have a big impact to growth of two kids. With two young kids, 12 years and 8 years, I would hate to see them lose their father's care. They were so proud of their father in terms of father's knowledge, influence, and education. They will have a hard time to accept dad's imprisonment. Certainly, they will face a big pressure from the local community as well as other kids.

Your honor, I hope that the court sees him as a man, who desperately wants to continue to provide for his family, serve his community and redeem his earlier misbehavior by committing to a plan that would satisfy the government and help the greater good in life. As the mother of our two children and wife who wishes for a new start, it terrifies me to think the emotion and financial burdens of removing him from our family, would have the great impact on our two innocent children. I believe that you are going to make a just and right decision. I trust your choice.

Sincerely,

Wei-Wei Wu

Ms. Zhaoqing Xu
4932 Oxford Ct.
Bensalem, PA 19020

The Honorable Sue L. Robinson, Chief Judge
United States District Court of Delaware
844 North King Street
Wilmington, Delaware 19801

October 12, 2007

Dear Judge Robinson:

Your Honor, as a friend of Gary Min and a member of the local Chinese community, I would like to describe my personal knowledge and relationship with Mr. Min. I met Mr. Min about fifteen years ago at Philadelphia when he was a graduate student at University of Pennsylvania.

At that time, he worked with famous professor Alan MacDiarmid, who won the Nobel Prize in 2000 in Chemistry. Under his supervision, Mr. Min has published several important scientific papers and conducted several scientific lectures. Mr. Min had actively participated church activities at Philadelphia. He helped a lot of people especially for senior citizens in terms of helping them on English, translation, assistance on bible studies, offering people rides, and helping people on housing. He and his team have conducted an excellent performance to our local Chinese community during the Chinese Autumn Moon Festival and Chinese Spring Festival in Philadelphia.

Mr. Min got married in the spring of 1994 in Las Vegas. He loves his wife very much and used all of his money to buy a new car for her right after the marriage. They have two children, Alice and Eric. Mr. Min wants his children to be close to the God and has sent them to Christian School. He is very actively involved in charities and has donated money, clothes, books and a car which was the same car that Gary bought for his wife after their marriage to the local communities.

Mr. Min also loved sports such as soccer, ping-pong ball, volleyball, swimming, bicycle, and golf. His daughter used to ice skate and they dreamed their daughter would be the next Michelle Kwan. To help her accomplish this goal, both of them had worked hard to drive Alice across the downtown traffic to the ice rink for five years.

Your Honor, as an old friend, I see Mr. Min is an excellent husband to his wife and qualified father for the children. He loves life, works hard, loves his family deeply, and contributes greatly to the community. He shows a strong integrity and has helped many people in the last ten years.

Sincerely yours,

Ms. Zhaoqing Xu

55 South Merkle Road
Bexley, Ohio 43209-1939

October 15, 2007

The Honorable Sue L. Robinson, Chief Judge
United State District Court of Delaware
Wilmington, Delaware 19801

Dear Judge Robinson,

I am writing to you in the capacity of a long term scientific collaborator of Dr. Y.G. Min. I have known since the early 1990's when he was a graduate student working in the laboratories of his Ph.D. mentor, Dr. Alan G. MacDiarmid. As a physicist interested in the properties of new types of plastic materials I had been extensively collaborating since 1985 with the world renowned chemist Dr. MacDiarmid who was to go on to receive the 2000 Nobel Prize in Chemistry for his inauguration of this field.

I was fortunate to work closely with a substantial fraction of Dr. MacDiarmid's students. Dr. Min clearly was among the best of these many students. In addition to his obvious skill in chemical synthesis, Dr. Min early on developed keen insights enabling him to both accurately develop the details of his studies as well as develop broad new models and concepts. The quality of his research was always first rate. He was always ethical, going to pains to explain any short comings in his experimental studies or in the models he was developing. Dr. Min was easy to work with, carefully listening to the needs and objectives of others on the team, and following through on his commitments in a timely manner. His character made him a delight to work with.

The extent of my regard for Dr. Min can be seen in the extent we co-published scientific articles. For your background information I attach to this letter a list of over 20 of the scientific manuscripts that we have co-published. In each case his contributions were reliable and genuine, and never questionable as to their origin. In fact, I have mentored over 40 students to the Ph.D. degree and I without hesitation place Dr. Min among the top tier for reliability and for the ethics with which he carried out his work and, to the best of my knowledge, his personal life.

As further indication of the high regard I have for Dr. Min and his work, he was included him as a co-author on approximately 11 of my invited presentations at scientific meetings and an additional 16 my research group's contributed presentations at scientific meetings. Dr. Min worked hard, with insight and dedication.

Our scientific collaborations ceased when Dr. Min joined DuPont, as would be expected. During the period of his employment at DuPont we never discussed his technical work at the company. Because he was such a well organized and thoughtful scientist I was pleased to recommend him as a candidate for the Executive MBA program

at The Ohio State University. As I anticipated, Dr. Min successfully completed this program.

In sum, I have been pleased to work closely with Dr. Min as a scientist and to get to know him as an individual. Based on my experience I have the highest regard for Dr. Min and his ethical behavior.

Sincerely,

Arthur J. Epstein

Y.-G. Min List
**21 articles co-published with Arthur Epstein and 27 talks with Epstein that represent collaborative work**

**Y.-G. Min Articles with Arthur Epstein (21)**

1. A.G. MacDiarmid, Y. Min, J.M. Wiesinger, E.J. Oh, E.M. Scherr, and A.J. Epstein, *Towards Optimization of Electrical and Mechanical Properties of Polyaniline: Is Cross-Linking between Chains the Key?,* **Synthetic Metals 55,** 753-760 (1993).
2. E.J. Oh, Y. Min, J.M. Wiesinger, S.K. Manohar, E.M. Scherr, P.J. Prest, A.G. MacDiarmid, and A.J. Epstein, *Polyaniline: Dependency of Selected Properties on Molecular Weight,* **Synthetic Metals 55,** 977-982 (1993).
3. J. Joo, Z. Oblakowski, G. Du, J.P. Pouget, E.J. Oh, J.M. Wiesinger, Y. Min, A.G. MacDiarmid, and A.J. Epstein, *Microwave Dielectric Response of 'Mesoscopic' Metallic Regions and Intrinsic Metallic State of Polyaniline,* **Physical Review B, Rapid Communications 49,** 2977-2980 (1994).
4. K.A. Coplin, S. Jasty, S.M. Long, S.K. Manohar, Y. Min, A.G. MacDiarmid, and A.J. Epstein, *Neutral Soliton Formation and Disorder in Pernigraniline Base,* **Physical Review Letters 72,** 3206-3209 (1994).
5. Y. Min, A.G. MacDiarmid, and A.J. Epstein, *The Concept of "Secondary Doping" as Applied to Polyaniline,* **Polymer Preprints 35,** 231-234 (1994).
6. A.J. Epstein, J. Joo, R.S. Kohlman, A.G. MacDiarmid, J.M. Wiesinger, Y. Min, J.P. Pouget, and J. Tsukamoto, *The Metallic State of Conducting Polymers: Microwave Dielectric Response and Optical Conductivity,* **Materials Research Society Symposium Proceedings 328,** 145-156 (1994).
7. J.P. Pouget, Z. Oblakowski, Y. Nogami, P.A. Albouy, M. Laridjani, E.J. Oh, Y. Min, A.G. MacDiarmid, J. Tsukamoto, T. Ishiguro, and A.J. Epstein, *Recent Structural Investigations of Metallic Polymers,* **Synthetic Metals 65,** 131-140 (1994).
8. J. Joo, A.J. Epstein, V.N. Prigodin, Y. Min, and A.G. MacDiarmid, *Phonon-Induced Nonmetal-Metal Transition of a Doped Polyaniline,* **Physical Review B, Rapid Communications 50,** 12226-12229 (1994).
9. A.J. Epstein, J. Joo, R.S. Kohlman, G. Du, A.G. MacDiarmid, E.J. Oh, Y. Min, J. Tsukamoto, K. Kaneto, and J.P. Pouget, *Inhomogeneous Disorder and the Modified Drude Metallic State of Conducting Polymers,* **Synthetic Metals 65,** 149-157 (1994).
10. J. Joo, E.J. Oh, G. Min, A.G. MacDiarmid, and A.J. Epstein, *Evolution of the Conducting State of Polyaniline from Localized to Mesoscopic Metallic to Intrinsic Metallic Regimes,* **Synthetic Metals 69,** 251-254 (1995).
11. R.S. Kohlman, Y. Min, A.G. MacDiarmid, and A.J. Epstein, *Optical Conductivity of Doped Polyaniline: Effects of Disorder,* **Synthetic Metals 69,** 211-212 (1995).
12. Y. Min, Y. Xia, A.G. MacDiarmid, and A.J. Epstein, *Vapor Phase "Secondary Doping" of Polyaniline,* **Synthetic Metals 69,** 159-160 (1995).

13.  J.K. Avlyanov, Y. Min, A.G. MacDiarmid, and A.J. Epstein, *Polyaniline: Conformational Changes Induced in Solution by Variation of Solvent and Doping Level*, **Synthetic Metals 72**, 65-71 (1995).

14.  A.G. MacDiarmid, J.K. Avlyanov. Z. Huang, Y.-G. Min, and A.J. Epstein, *Molecular Conformation - Electronic Peroperties Relationships in Polyaniline and Polypyrrole*, **Proceedings Annual Technical Conference of Society of Plastics Engineers 2**, 1394-1396, Boston, MA 7-11 May 1995.

15.  A.G. MacDiarmid, J.K. Avlyanov, Z. Huang, Y.-G. Min, and A.J. Epstein, *Polyaniline and Polypyrrole: Effect of Molecular Conformation on Electronic and Related Properties*, **Polymeric Materials Science & Engineering 72**, 395-396 (1995).

16.  R.S. Kohlman, Y.G. Min, A.G. MacDiarmid, and A.J. Epstein, *Tunability of High Frequency Shielding in Electronic Polymers*, **Proceedings Society of Plastics Engineers Annual Technical Conference (ANTEC 1996)**, 1412-1416, Indianapolis, IN 5-9 May 1996.

17.  W. Zheng, Y. Min, S.-J. Lee, A.G. MacDiarmid, M. Angelopoulos, Y.-H. Liao, and A.J. Epstein, *The Molecular Conformation of non-Doped Polyaniline and Its Effect on the Properties of Doped Polyaniline*, **Materials Research Society Symposium Proceedings 413**, 535-540 (1996).

18.  R.S. Kohlman, J. Joo, Y.G. Min, A.G. MacDiarmid, and A.J. Epstein, *Crossover in Electrical Frequency Response through an Insulator-Metal Transition*, **Physical Review Letters 77**, 2766-2769 (1996).

19.  R.S. Kohlman, D.B. Tanner, G.G. Ihas, Y.G. Min, A.G. MacDiarmid, and A.J. Epstein, *Inhomogeneous Insulator-Metal Transition in Conducting Polymers*, **Synthetic Metals 84**, 709-714 (1997).

20.  R.S. Kohlman, A. Zibold, D.B. Tanner, G.G. Ihas, T. Ishiguro, Y.G. Min, A.G. MacDiarmid, and A.J. Epstein, *Limits for Metallic Conductivity in Conducting Polymers*, **Physical Review Letters 78**, 3915-3918 (1997).

21.  W. Zheng, Y.G. Min, A.G. MacDiarmid, M. Angelopoulos, Y-H. Liao, and A.J. Epstein, *Effect of Organic Vapors on the Molecular Conformation of Non-Doped Polyaniline*, **Synthetic Metals 84**, 63-64 (1997).

**Y.-G. Min Presentations with Arthur Epstein (total 27)**

Invited (11) :

1.  A.G. MacDiarmid, Y. Min, E.J. Oh, E.M. Scherr, X. Tang, J.G. Masters, and A.J. Epstein, *Towards Optimization of Electrical and Mechanical Properties of Polyaniline: Is Cross-Linking between Chains the Key?*, **International Conference on Science and Technology of Synthetic Metals**, Göteborg, Sweden, 12-18 August 1992.

2.  A.G. MacDiarmid, J.M. Wiesinger, J.K. Avlyanov, Y. Min, Y. Xia, and A.J. Epstein, *"Secondary Doping" A New Concept of Doping*, **Materials Research Society 1993 Fall Meeting**, Boston, Massachusetts, 29 November-3 December, 1993.

3.  A.J. Epstein, J.Joo, R.S. Kohlman, A.G. MacDiarmid, J.M. Weisinger, Y. Min, and J. Tsukamoto, *The Metallic State of Conducting Polymers: Microwave Dielectric Response and Optical Conductivity,* **Materials Research Society 1993 Fall Meeting,** Boston, Massachusetts, 29 November-3 December, 1993.

4.  Y. Min, A.G. MacDiarmid, and A.J. Epstein, *The Concept of "Secondary Doping" as Applied to Polyaniline,* **The American Chemical Society Meeting,** San Diego, CA, 8-15 March, 1994

5.  J. Joo, Z. Oblakowski, J.P. Pouget, E.J. Oh,  G. Min, J. Weisinger, A.G. MacDiarmid, and A.J. Epstein, *The "Metallic" State of Polyaniline,* **American Physical Society 1994 March Meeting,** Pittsburgh, PA, 21-25 March, 1994.

6.  J. Joo, Z. Oblakowski, A.J. Epstein, E.J. Oh, J.M. Weisinger, G. Min, and A.G. MacDiarmid, *Evolution of the Metallic State of Polyaniline,* **The International Conference on Science and Technology of Synthetic Metals,** Seoul, Korea, 24-29 July 1994.

7.  A.G. MacDiarmid, J.K. Avlyanov, Z. Huang, Y.-G. Min, and A.J. Epstein, *Polyaniline and Polypyrrole: Effect of Molecular Conformation on Electronic and Related Properties,* **American Chemical Society Spring Meeting 1995,** Anaheim, CA, 2-4 April, 1995.

8.  A.G. MacDiarmid, J.K. Avlyanov. Z. Huang, Y.-G. Min, and A.J. Epstein, *Molecular Conformation - Electronic Peroperties Relationships in Polyaniline and Polypyrrole,* **Annual Technical Conference of Society of Plastics Engineers (ANTEC),** Boston, MA, 7-11 May 1995.

9.  R.S. Kohlman, Y.G. Min, A.G. MacDiarmid, and A.J. Epstein, *Tunability of High Frequency Shielding in Electronic Polymers,* **Society of Plastics Engineers Annual Technical Conference (ANTEC 1996),** Indianapolis, IN, 5-9 May 1996 [Society of Plastic Engineers 54th Annual Technical Paper, ANTEC '96, 1412-1416].

10. R.S. Kohlman, D.B. Tanner, G.G. Ihas, Y.G. Min, A.G. MacDiarmid, and A.J. Epstein, *Inhomogeneous Insulator-Metal Transition in Conducting Polymers,* **International Conference on Science and Technology of Synthetic Metals,** Snowbird, Utah, 28 July-2 August 1996.

11. W. Zheng, Y. Min, A.G. MacDiarmid, M. Angelopoulos, Y.-H. Liao, and A.J. Epstein, *Effect of Organic Vapors on the Molecular Conformation of Non-Doped Polyaniline,* **International Conference on Science and Technology of Synthetic Metals,** Snowbird, Utah, 28 July-2 August 1996.

Contributed (16):

1.  E.J. Oh, Y. Min, S.K. Manohar, A.G. MacDiarmid, and A.J. Epstein, *Polyaniline: Dependency of Selected Properties on Molecular Weight,* **American Physical Society 1992 March Meeting,** Indianapolis, Indiana, 16-20 March 1992 [Bulletin of the American Physical Society 37, 569 (1992)].

2.  J. Joo, Z. Oblakowski, G. Du, A.J. Epstein, J.P. Pouget, Y. Min, and A.G. MacDiarmid, *Structural Control of Charge Delocalization: Metallic States of Polyaniline,* **American Physical Society 1993 March Meeting,** Seattle, Washington, March 21-26, 1993 [Bulletin of the American Physical Society 38, 311 (1993)].

3.  R.S. Kohlman, A.J. Epstein, G. Min, and A.G. MacDiarmid, *Evolution of the Optical Response of Polyaniline: Effects of Inhomogeneous Disorder on the Metallic State,* **American Physical Society 1994 March Meeting,** Pittsburgh, PA. 21-25 March 1994. [Bulletin of the American Physical Society 39, 338-339 (1994)].

4.  Y. Min, Y. Xia, J.K. Avlyanov, A.G. MacDiarmid, and A.J. Epstein, *Polyaniline: "Secondary Doping" in the d,l-Comphorsulfonic Acid System,* **American Physical Society 1994 March Meeting,** Pittsburgh, PA. 21-25 March 1994. [Bulletin of the American Physical Society 39, 426 (1994)].

5.  R.S. Kohlman, A.J. Epstein, G. Min, and A.G. MacDiarmid, *Evolution of Dielectric Response in Polyaniline,* **International Conference on Science and Technology of Synthetic Metals,** Seoul, Korea 24-29 July 1994.

6.  Y. Min, Y. Xia, A.G. MacDiarmid, and A.J. Epstein, *Vapor Phase "Secondary Doping" of Polyaniline,* **International Conference on Science and Technology of Synthetic Metals,** Seoul, Korea 24-29 July 1994.

7.  R.S. Kohlman, A.J. Epstein, Y.G. Min, and A.G. MacDiarmid, *Inhomogeneous Metallic State of Polyaniline: Effects of Processing,* **American Physical Society 1995 March Meeting,** San Jose, CA., March 1995 [Bulletin of the American Physical Society 40, 281 (1995)].

8.  S.M. Long, A.J. Epstein, Y. Min, Y. Sun, and A.G. MacDiarmid, *Internal Structure of Nonlinear Excitations in Polyaniline,* **American Physical Society 1995 March Meeting,** San Jose, CA., March 1995. [Bulletin of the American Physical Society 40, 281 (1995)].

9.  M. Angelopoulos, L.H. Liao, A.G. MacDiarmid, G. Min, W. Zheng, A.J. Epstein, R. Kohlman, S. Long, and Y.Z. Wang, *A Comprehensive Study of the Effect of LiCl on the Morphological Structure and on the Electronic and Transport Properties of Polyaniline,* **Materials Research Society Meeting,** Boston, MA, 27 November - 1 December 1995.

10. W. Zheng, Y. Min, S.-J. Lee, A.G. MacDiarmid, M. Angelopoulos, Y.-H. Liao, and A.J. Epstein, *The Molecular Conformation of Non-Doped Polyaniline and Its Effect on the Properties of Doped Polyaniline,* **Materials Research Society Meeting,** Boston, MA, 27 November - 1 December 1995.

11. W.P. Lee, G. Du, R.S. Kohlman, A.J. Epstein, Y. Min, A.G. MacDiarmid, and J. Joo, *Transport Properties of Doped-Polyaniline Near the Insulator - Metal Transition,* **American Physical Society 1996 March Meeting,** St. Louis, MO, 18-22 March 1996. [Bulletin of the American Physical Society 41, 557 (1996)].

12. R. S. Kohlman, A.J. Epstein, D.B. Tanner, G.G. Ihas, T. Ishiguro, H. Kaneko, Y.G. Min, and A.G. MacDiarmid, *Temperature Dependent Low Frequency Optical and DC Transport Near a Metal Insulator Transition,* **American Physical Society 1996 March Meeting,** St. Louis, MO, 18-22 March 1996. [Bulletin of the American Physical Society 41, 557 (1996)].

13.  W. Zheng, Y. Min, A.G. MacDiarmid, M. Angelopoulos, Y-H. Liao, and A.J. Epstein, *The Moledular Conformation of Non-Doped Polyaniline and Its Effect on the Properties of Doped Polyaniline.* **American Physical Society 1996 March Meeting,** St. Louis, MO, 18-22 March 1996 [Bulletin of the American Physical Society 41, 757 (1996)].

14.  S.M. Long, K.R. Brenneman, R.S. Kohlman, A.Saprigin, A.J. Epstein, M. Angelopoulos, Y.-H. Liao, Y. Min, W. Zheng, and A.G. MacDiarmid, *Intrinsic Paramagnetic Defects in Emerne Base: Interchain Self-Doping.* **American Physical Society 1996 March Meeting,** St. Louis, MO, 18-22 March 1996 [Bulletin of the American Physical Society 41, 757 (1996)].

15.  Saprigin, R.S. Kohlman, K.R. Brenneman, S.M. Long, A.J. Epstein, Y. Min, A.G. MacDiarmid, M. Angelopoulos, and Y.H. Liao, *Optical and EPR Study of LiCl Pseudodoping of Emeraldine Base (EB).* **American Physical Society 1996 March Meeting,** St. Louis, MO, 18-22 March 1996 [Bulletin of the American Physical Society 41, 757 (1996)].

16.  W. Zheng, Y. Min, A.G. MacDiarmid, M. Angelopoulos, Y.-H. Liao, and A.J. Epstein, *Aggregation and Molecular Conformation of Doped Polyaniline in Chloroform*, **International Conference on Science and Technology of Synthetic Metals,** Snowbird, Utah, 28 July-2 August 1996.

# EXHIBIT "D"



**U.S. Department of Justice**

*United States Attorney's Office*
*District of Delaware*

---

*Nemours Building*
*1007 N. Orange Street, Suite 700*      *(302) 573-6277*
*P.O. Box 2046*      *FAX (302) 573-6220*
*Wilmington, Delaware 19899-2046*

October 26, 2007

**VIA HAND DELIVERY**

Martin P. Durkin
United States Probation Officer
United States Probation Office / Pretrial Services Agency
824 Market Street, Suite 400
Wilmington, DE  19801

        Re:    **United States v. Gary Min, Criminal Action No. 06-121-SLR**
               **Government's Response to Presentence Investigation Report**

Dear Mr. Durkin:

        The Government has reviewed the Presentence Investigation Report (PSR) prepared on October 9, 2007, with respect to the above-captioned case. Defense counsel has raised objections to the Government regarding the initial loss calculation in the PSR of $375,395.04. Although both parties agree that DuPont incurred external expenses in that amount in responding to Dr. Min's offense, the Government concurs that not all of the expenses can be included in the Guidelines loss calculation as the "reasonably foreseeable pecuniary harm" caused by Dr. Min's conduct. See U.S.S.G. § 2B1.1, app. note 3(A).  In addition, the parties agree that two additional expenses incurred by DuPont should be included within the loss calculation.  As set forth in more detail in Part I below, the parties submit that the corrected loss figure should be $180,513.67. See Attachment A. This figure represents the reasonably foreseeable actual loss suffered by DuPont in responding to Dr. Min's conduct, as well as the cost of lab equipment that Dr. Min did not return to DuPont following his termination.  Accordingly, defendant should be subject to a 10-level increase under U.S.S.G. § 2B1.1(b)(1)(F), and his resulting Guidelines range of imprisonment should be 24 to 30 months. See PSR ¶ 62, 99.

        Additionally, in Part II below the Government offers several minor corrections to facts contained within the PSR.

        **I.    Loss Calculation**

        Trade secret prosecutions brought under 18 U.S.C. § 1832 are governed by Section 2B1.1 of the United States Sentencing Guidelines.  Section 2B1.1 is the general Guidelines section for most economic crimes, encompassing a large and diverse group of property, fraud, and forgery offenses. See U.S.S.G. App. A (cross-referencing 291 federal statutes which use Section 2B1.1 to establish

the Guidelines offense level).[1] Under Section 2B1.1, the applicable Guidelines range is determined by focusing on the amount of loss that the defendant's criminal conduct caused the victim. Given the breadth of criminal conduct covered by Section 2B1.1, there are various methods by which the district court can calculate the applicable loss amount. See U.S.S.G. § 2B1.1, app. note 3. In the end, the district court is required to make a "reasonable estimate of the loss" based upon the available evidence and unique circumstances of each particular case. Id., app. note 3(C).

Trade secret prosecutions present a number of different scenarios by which a court can determine the victim's loss under Section 2B1.1. The loss calculation is driven in some measure by the various ways in which a defendant, acting with the requisite criminal intent, can violate the trade secret statute, as well as by the actual or intended harm the particular violation causes the victim.[2] For example, given the particular factual circumstances in a case, the district court could consider any of the following methodologies in calculating the loss amount:

- the trade secret owner's research and development costs for technology from which proprietary information was converted;
- a reasonable royalty for the proprietary information, based on what a willing buyer would pay a willing seller in an arms-length transaction;
- the fair market value of the business or product line that could be infringed upon by a competitor with access to the trade secret;
- in a government sting operation, the amount the defendant paid for the trade secret;
- the amount for which the defendant sold or tried to sell the trade secret to a third party;
- the amount for which similar trade secret information has been sold in the open market;
- the market price that the defendant actually received or paid in exchange for the technology; and
- any other methodology with calculates the reasonably foreseeable pecuniary losses caused by the defendant's conduct.

See, e.g., United States v. Ameri, (8th Cir. 2005) (finding that the proper loss amount was the developmental costs of software stolen by the defendant); United States v. Wilson, 900 F.2d 1350 (9th Cir. 1990) (holding that the proper measure of loss was the costs incurred by the victim in developing the proprietary information); United States v. Pemberton, 904 F.2d 515 (9th Cir. 1990) (determining that the value of technical landscape drawings stolen by the defendant was the contract price agreed to by the legitimate buyer); Uniform Trade Secrets Act § 3(a) (1995) ("In lieu of damages measured by other methods, the damages caused by misappropriation may be measured by

---

[1]Prior to November 2001, "theft" (Section 2B1.1) and "fraud" (Section 2F1.1) crimes were covered by different guidelines. In November 2001, the Sentencing Commission consolidated the "theft" and "fraud" guidelines – each of which covered a diverse amount of economic crimes – into the single "economic loss" guideline of Section 2B1.1. See U.S.S.G. App. C, amdt. 617.

[2]The statute lists twenty-eight different acts whereby a defendant, acting with the requisite criminal intent, can commit a theft of trade secrets. 18 U.S.C. § 1832(a). The statute further criminalizes attempts and conspiracies to steal trade secrets. Id.

imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.").

In this case, the selection of a particular loss methodology can lead to drastically different results. For example, if the Guidelines loss figure is calculated based upon the fair market value of the DuPont product lines from which Min accessed proprietary information, the loss figure would exceed $400 million and Dr. Min would be subject to a term of imprisonment of 120 months. If, on the other hand, the Guidelines loss figure is calculated based on the reasonably foreseeable costs incurred by DuPont in responding to Dr. Min's crime, the loss figure is $180,513.67 and Dr. Min would be subject to a term of imprisonment of 24 to 30 months.

There are several reasons why the reasonably foreseeable expenses that DuPont incurred in responding to Dr. Min's offense are an appropriate loss calculation. First, such expenses are consistent with the applicable Guidelines standard that DuPont's actual losses should consist of the "reasonably foreseeable pecuniary harm" that Dr. Min knew, or should have known under the circumstances, would result from his conduct directed toward DuPont. U.S.S.G. § 2B1.1, app. note 3(A).[3] Both parties believe that this actual loss standard captures Dr. Min's conduct, and defendant has stipulated that this loss calculation should be utilized to determine his Guidelines offense level. Second, Dr. Min denies that he ever transferred the proprietary information in question to a third

---

[3] The November 2001 amendment to the Sentencing Guidelines introduced the "reasonably foreseeable pecuniary harm" language into consolidated Guideline Section 2B1.1 for the first time. U.S.S.G. App. C, amdt. 617. In so doing, the Sentencing Commission explicitly declined to draw a distinction between "direct" and "consequential" damages that had been reached by some courts, including the United States Court of Appeals for the Third Circuit, prior to the amendment. See United States v. Daddona, 34 F.3d 163 (3d Cir. 1994). According to the Sentencing Commission:

> "Reasonably foreseeable pecuniary harm" is defined to include pecuniary harms that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense. The Commission determined that this standard better ensures the inclusion in loss of those harms that reflect the seriousness of the offense and the culpability of the offender.

> The definition deletes the previous rule that, by negative implication, excludes consequential damages (except in specific cases), thus resolving a circuit conflict. The Commission decided, however, not to use the term "consequential damages" or any similar civil law distinction between direct and indirect harms. Rather, the Commission determined that the reasonable foreseeability standard provides sufficient guidance to courts as to what types of harms are included in loss.

U.S.S.G. App. C, amdt. 617, Reason for Amendment (citations omitted). Applying the actual loss definition in the present case, the parties submit that the agreed-upon costs represent the reasonably foreseeable pecuniary harm that DuPont incurred in responding to Dr. Min's conduct.

party, and, with the exception of DuPont proprietary documents that were uploaded to Dr. Min's Victrex computer, the Government has no affirmative evidence that Dr. Min distributed or attempted to distribute DuPont proprietary materials to a third party. This consideration mitigates against using the fair market value of DuPont product lines as the appropriate loss figure, since there is no indication that any other entity received DuPont proprietary information, yet alone had the ability to convert the information into product lines that could compete with DuPont. Finally, a Guidelines range based upon DuPont's reasonably foreseeable expenses in responding to Dr. Min's conduct is a fair and just sentence that accurately reflects Dr. Min's culpability in the offense. Although Dr. Min accessed and stored a tremendous amount of DuPont proprietary materials, and destroyed numerous DuPont proprietary documents after being advised of federal obstruction of justice laws, there is no affirmative evidence that DuPont proprietary information was compromised after it was unlawfully converted by Dr. Min. For these reasons, the Government agrees with defendant and the Probation Office that the expenses incurred by DuPont in responding to Dr. Min's offense comprises a reasonable estimate of DuPont's loss under Section 2B1.1.

Initially, DuPont determined that its external costs were $375,395.04. That figure represents the loss amount that is currently included in the PSR. See PSR ¶ 62. Although the parties agree that DuPont incurred all of these losses, not all of the costs qualify as "loss" attributable to Dr. Min in calculating his offense conduct under Section 2B1.1. Both parties agree that $147,105.26 in costs that DuPont paid to Deloitte Financial Advisory Services LLP, as well as $13,217.88 in legal fees that DuPont paid to Kelly Law Services, should be excluded from the Guidelines loss calculation as costs incurred by DuPont primarily to aid the government in the prosecution and criminal investigation of Dr. Min's offense. U.S.S.G. § 2B1.1, app. note 3(E)(ii); see also U.S.S.G. App. C, amdt. 617, Reason for Amendment ("The loss definition . . . excludes from loss certain costs incurred by . . . victims in connection with criminal investigation and prosecution of the offense. Such losses are likely to occur in a broad range of cases, would present a fact-finding burden in those cases, and would not contribute to the ability of loss to perform its essential function."). Similarly, the parties agree that $56,355.85 in legal expenses that DuPont incurred in filing a civil injunction suit against Dr. Min – in which the parties reached a settlement agreement that each would bear its own costs – should be excluded from the loss calculation.

The remaining costs incurred by DuPont, however, should be included as reasonably foreseeable losses resulting from Dr. Min's offense. A large number of documents accessed by Dr. Min off of the EDL server concerned sensitive technology subject to export control regulations imposed by the Department of Commerce. In order to survey the extent of export-controlled documents accessed by Dr. Min, and to affirmatively comply with Department of Commerce regulations, DuPont hired outside counsel to review all of the documents accessed by Dr. Min, and to file approximately ten license determinations with the Department of Commerce. This review process is necessary for corporations such as DuPont in order to determine whether export-controlled technology was compromised; to report possible export violations to the Department of Commerce; and to protect against civil, administrative, and criminal penalties for export violations. See, e.g., 15 C.F.R. § 764. Dr. Min was aware of export-control laws from his training at DuPont, and he conceded to the Government during an interview session that he may have accessed information on technology that was export-controlled. In fact, Dr. Min stated that he had to counsel his employees on export-control-related issues while employed as a DuPont technology manager in Taiwan. Since

4

Dr. Min was aware that he accessed technology that was possibly export-controlled, it was reasonably foreseeable that the $94,167.63 in attorney's fees that DuPont spent to ensure compliance with export regulations based upon his conduct should be included in calculating DuPont's loss.[4] See United States v. Blackburn, 9 F.3d 353 (5th Cir. 1993) (including in loss calculation the attorney's fees that the victim bank incurred in defending against a lawsuit filed by the defendant, which was part of the defendant's fraudulent scheme).

DuPont also spent $46,881.15 to hire an outside contractor, Hyden & Associates. Those expenses arose out of DuPont's response to Dr. Min's conduct in February 2006. The contractor's efforts resulted in, *inter alia*, the recovery of numerous bags of shredded DuPont technical documents referenced in paragraph 39 of the PSR.[5]

DuPont has indicated that it incurred two other direct costs in responding to Dr. Min's offense that were not included in the original loss calculation. DuPont officials incurred $14,464.89 in travel expenses to meet with Dr. Min in Ohio and Victrex officials in London prior to the search of his residence in February 2006. See PSR ¶ 32, 36. In addition, as noted in the PSR, Dr. Min did not return approximately 20 boxes of lab equipment to DuPont following his resignation in December 2005. Id. ¶¶ 17, 45. That lab equipment – which included Kapton film rolls and samples – was later found in an apartment leased by Dr. Min's mother-in-law. The lab equipment and Kapton products, which have been returned to DuPont, had a fair market value of $25,000. See United States v. Medford, 194 F.3d 419 (3d Cir. 1999) (Alito, J.) (utilizing the fair market value of property that had been recovered following the defendant's theft in order to calculate the loss amount).

In many respects, Dr. Min's conduct in this case is virtually identical to the conduct prohibited by 18 U.S.C. § 1030(a)(4). That statute makes it a criminal violation for one to knowingly, and with the intent to defraud, exceed authorized access to a computer which is used in interstate commerce. The loss analysis employed in the computer fraud context provides an analogous basis for the District Court to employ in making the required "reasonable estimate" of the amount of loss with respect to Dr. Min's conduct. The actual loss in such cases under Section 2B1.1 "includes the following pecuniary harm, regardless of whether such pecuniary harm was reasonably foreseeable":

> any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its condition prior to the offense, and any revenue lost, cost incurred, or other damages incurred because of interruption of service.

---

[4]The original Crowell & Moring, LLP loss figure submitted by DuPont was $97,475.63. That figure erroneously included approximately $3,308.00 in fees that related to another matter.

[5]Although the original Hyden & Associates loss figure was $61,240.02, the parties agree that only $46,971.15 in expenses should be included as "reasonably foreseeable" loss. The additional $14,268.87 in expenses were incurred after February 2006, and represent costs expended by DuPont primarily to aid the Government's ongoing investigation. U.S.S.G. § 2B1.1, app. note 3(E)(ii).

U.S.S.G. § 2B1.1, app. note 3(A)(v)(III). Similarly in Dr. Min's case, the reasonably foreseeable costs incurred by DuPont included taking reasonable steps to respond to Dr. Min's offense in order to determine the breadth of proprietary information that Dr. Min had accessed, as well as to meet its regulatory requirements with the Department of Commerce.

Thus, when the discounted original losses are added to the additional losses that DuPont incurred, the amount of loss that was reasonably foreseeable to Dr. Min's conduct was $180,513.67. The Government submits that this loss figure should govern Dr. Min's offense level under Section 2B1.1.

## II.    Minor Corrections to the PSR

The Government has no substantive objections to any additional facts or Guidelines calculations set forth in the PSR. The Government offers several minor corrections to the PSR:

- In paragraph 15, the technology accessed by Dr. Min was Vespel®, not Vespler as originally mispelled in the Rule 11 Statement of Facts.

- With respect to paragraph 34, the Government agrees with defense counsel that there is no evidence Dr. Min responded to John Getz's email.

- Included within the boxes of lab equipment and 106 confidential documents that Dr. Min stored at the one-bedroom apartment were Kapton film rolls and samples. See ¶ 45. Although Dr. Min contends that he intended to transport the Kapton film to Taiwan, DuPont has informed the Government that Dr. Min was unauthorized to store Kapton products at his residence.

- Dr. Min earned $131,848.00 at DuPont in 2005. He received a monthly salary of $9,134.00 for five months, and a monthly salary of $9,454 for seven months. Dr. Min also received a $20,000 bonus in February 2005. See PSR ¶ 91.

Yours very truly,

COLM F. CONNOLLY
United States Attorney

BY: _____
Robert F. Kravetz
Assistant United States Attorney

cc:    Michael M. Mustokoff, Esq.
       Jonathan L. Swichar, Esq.
       File

6

**Attachment A**

**Loss Calculation Figures for Dr. Gary Min's Conduct**

| Category of Cost | Loss Amount |
|---|---|
| Crowell & Moring LLP | $94,167.63 |
| Hyden & Associates | $46,881.15 |
| Laboratory Equipment and Kapton Products | $25,000.00 |
| Travel Expenses | $14.467.89 |

**Total**    $180,513.67

DuaneMorris®

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
CHICAGO
HOUSTON
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
DETROIT
BOSTON
WASHINGTON, DC
ATLANTA
MIAMI
PITTSBURGH
NEWARK
ALLENTOWN
WILMINGTON
CHERRY HILL
HARRISBURG
BANGOR
PRINCETON
WESTCHESTER

MICHAEL M. MUSTOKOFF
DIRECT DIAL: 215.979.1810
E-MAIL: mmustokoff@duanemorris.com

www.duanemorris.com

October 25, 2007

**VIA FACSIMILE AND HAND DELIVERY**

Martin P. Durkin
United States Probation Officer
Suite 400
824 Market Street
Wilmington, DE 19801-3588

> Re:   United States v. Gary Min--Case No. 1:06CR00121-001 (SLR)

Dear Mr. Durkin:

As you know, this law firm represents Gary Min ("Dr. Min") in the above-captioned matter. This letter responds to the October 9, 2007 Presentence Investigation Report (the "Report") prepared by the Probation Office for the Honorable Sue L. Robinson in anticipation of the November 6, 2007 sentencing of Dr. Min. This letter identifies perceived inaccuracies set forth in the Report and provides additional information not mentioned therein, which we believe to be critical to a determination of Dr. Min's sentence, and thus warrants inclusion in a supplemental Report.

**Perceived Inaccuracies In The Report**

The most significant inaccuracy in the Report relates to statements which suggest that the Sentencing Guidelines are, in some way, binding. As discussed below, and we believe that of the United States Attorney, any such suggestion is legally inaccurate. The Sentencing Guidelines have not been considered to be binding since the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).

In Booker, the Supreme Court held that the United States Sentencing Guidelines violate the Sixth Amendment. As a remedy, the Court severed the statutory provision making the Guidelines mandatory. After Booker, "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 306.

Martin P. Durkin
October 25, 2007
Page 2

The Third Circuit Court of Appeals has reiterated that District Courts are to follow Booker. The Sentencing Guidelines are not to be treated as mandatory and courts are to exercise flexibility and discretion in making sentencing decisions. The Third Circuit has repeatedly reversed and remanded sentences where the trial court indicated that the Guidelines limited discretion in sentencing. See, e.g., United States v. Shreffler, 2006 U.S. App. LEXIS 6063, at *2 (3d Cir. Mar. 13, 2006) (remanding for sentencing where District Court found that sentencing was limited by the Guidelines); United States v. Penzera, 2006 U.S. App. LEXIS 3491, at *2 (3d Cir. Feb. 14, 2006) (sentence remanded where "the defendant was sentenced under the mandatory Sentencing Guidelines regime that existed prior to Booker").

Although the Third Circuit's recent decision in United States v. Tomko, 2007 U.S. App. LEXIS 19755 (3d Cir. Aug. 20, 2007) has created some confusion in certain circles regarding the extent of a District Court's discretion to depart below the Sentencing Guidelines, the decisive factors for that Court in that decision were that the defendant's misconduct was not a "garden-variety tax evasion offense", that the scheme spanned a number of years, involved multiple co-conspirators and involved sophisticated fraudulent billing. Id. at *31. More importantly, the Third Circuit found that the sentence of probation did not come close to satisfying the interests of deterrence where the home confinement ordered would take place in the mansion the defendant built through the fraudulent tax evasion scheme, thus allowing the defendant to enjoy the very fruits of his crimes. Id. at *25-26.

In the instant case, Dr. Min's behavior must also be considered not to be "garden variety trade espionage". There is no evidence of a conspiracy involving Dr. Min for monetary gain. Further, there is no evidence of a crystallized plan to divert Dupont confidential information. We understand the government to have acknowledged that there appears to be no discernible pattern in Dr. Min's wanderings in Dupont's confidential data. For reasons set forth at pages 11 and 12 of this response, we believe Dr. Min's case to be clearly outside the heartland of trade espionage cases, warranting departure. Alternatively, the unique facts underlying this case and involving Dr. Min's personal and professional background warrant a variance from the Guidelines.

## Paragraph 1

We object to the characterization that the Information alleges that Dr. Min "stole" trade secrets, in violation of 18 U.S.C. §1832(a). Rather, the Information charged that Dr. Min acted "with the intent to convert trade secrets . . ." and "did without authorization appropriate and download trade secrets belonging to Dupont . . ."

Martin P. Durkin
October 25, 2007
Page 3

## Paragraph 2(a)

We object to the bare references to the terms of the plea agreement that "[t]he parties agree that the fair market value of the property unlawfully downloaded by the defendant exceeds $400,000,000. The Government understands that the defendant does not believe the fair market value of the property taken should be used to calculate the amount of loss under §2B1.1(b)(1) of the Sentencing Guidelines." Since the plea agreement was entered, a good measure of what was originally considered to be circumstantially incriminating evidence has been explained and has been found not to be inculpatory, to the benefit of Dr. Min. At this point in time, both we and the Government agree that the amount of loss should be limited to $180,513.67. See 10/26/07 Letter from AUSA Robert F. Kravetz. Both we and the Government also agree that although this amount is appropriate for purposes of loss, a separate analysis is required as to the amount of restitution due to Dupont. As set forth below, we also object to the Report's statements as to the amount of restitution owed to Dupont.

## Paragraph 14

The Report states that "[Dr.] Min has admitted to FBI that he resented the demotion and felt Dupont had 'betrayed' him." On the contrary, Dr. Min has consistently maintained that he had no resentment towards Dupont due to his demotion. Rather, his disaffection with the demotion was directed at his supervisor, Brian Auman, who rejected Dr. Min's request that he and his family be moved to Shanghai where his wife could be close to her family. Dr. Min has stated that he had always entertained the idea of returning to Dupont in the future as an employee or consultant.

## Paragraph 15

The Report states that "[s]hortly after the demotion, [Dr.] Min contacted a headhunter." The facts concerning the initial contacts between Dr. Min and the Taiwanese headhunter, Vicky Lee, remain unclear. Dr. Min maintains that sometime during the summer of 2005, Dr. Min was contacted by Ms. Lee on behalf of Victrex. Dr. Min believes that his name was obtained as a result of his attendance at a technical conference in Taiwan. He maintains that he did not reach out in any way to secure a position outside of Dupont.

We also object to the statement that "[a]lthough Dupont does not manufacture PEEK, it manufacturers two competing chemicals: Vespler and Kapton." (emphasis added). There is disagreement between us and the Government regarding the degree of competition between Victrex's product, PEEK, and Dupont products. The "best" that Dupont has claimed regarding this purported competition is that all three products (PEEK, Vespel and Kapton) "belong to the high performance polymer category, and they are functional competitors within a narrow

Martin P. Durkin
October 25, 2007
Page 4

segment of the motor, generator, and transformer industries." See 10/17/07 Letter to AUSA
Robert F. Kravetz at ¶10, (emphasis added).

We maintain that although all three products belong to the high performance polymer
category, they are not direct competitors. The polymer PEEK (polyether-ether-ketone) is a
product different from Vespel and Kapton, which are polyimide-based materials. Kapton is a
film-based material, which is made through polymer solution casting technology. Victrex's
PEEK is a pelletised resin manufactured through a chemical process. A small proportion of
Victrex's PEEK is converted into film using an extrusion process, but this is a completely
different technology from Dupont's Kapton process. It is also our understanding that Victrex's
Peek is a raw material which Dupont uses in the manufacture of certain Vespel parts. In
summary, PEEK is a high-performance polymer material; Vespel is a molded finished product,
comprising performance parts; and Kapton is a film utilizing a totally different technology, and
thus is a different product.

**Paragraph 16**

Paragraph 16 summarizes certain events relating to Dr. Min being offered employment
by Victrex. We believe that this paragraph should also note the following: (1) that Dr. Min
executed an employment agreement with Victrex on October 18, 2005 in order to attend a
Victrex annual meeting in San Diego; and (2) that shortly after Dr. Min signed the employment
agreement, Victrex advised him that he was not to attend the annual meeting, which caused Dr.
Min to reconsider his decision to leave Dupont.

**Paragraph 17**

Paragraph 17 provides that documents accessed by Dr. Min on December 10, 2005 and
December 12, 2005 "appeared to cover a large number of subjects which bore no apparent
relation to [Dr.] Min's employment with Dupont." There is strong disagreement between
Dupont and Dr. Min as to which subjects accessed by Dr. Min on the EDL bear "apparent
relation" to Dr. Min's employment at Dupont.

DM1\1214348.2

Martin P. Durkin
October 25, 2007
Page 5

Although 129 of the searches related to PEEK and five related to Vespel, Dr. Min contends that as a result of being demoted to a scientific research associate, it was necessary for him to reacquaint himself with information concerning Kevlar, Nomex and associated products. Dupont insists that Dr. Min did not need to reacquaint himself with these technologies because of his reassignment. According to Dupont, although the reassignment may have required Dr. Min to familiarize himself with the Kevlar and Nomex product lines, that would not involve searching for manufacturing or other base technology. Dupont contends that Dr. Min would only have to familiarize himself with the Kevlar and Nomex product lines. Dr. Min argues to the contrary. He states that the Kapton group proposed to use intermediate Kevlar or use un-canlindadded Thermount (Kevlar/Nomex laminate) and Numexas filler or substrate to make polyimide laminates for high dimensional stability flexible printed circuit materials and/or insulating materials.

Dr. Min and Dupont's Edward McKenzie, were traveling to Basil, Switzerland in September of 2005, where they discussed a joint project with the Kevlar and Nomex groups for the customer of Von Roll/Isola, which is a global leader in electrical insulation materials. Dr. Min claims he thought it was necessary to reacquaint himself with the science regarding those products so that he could assist Mr. McKenzie in his sales efforts. Kevlar is not a typical electrical insulating material. After the Basil trip, Dr. Min visited Kevlar and Nomex groups. Subsequent to that trip, he generated a testing equipment list for the purpose of establishing the wire and cable testing capability at Circleville for Kapton group. Dr. Min contends that it was necessary for him to review manufacturing and base technology in order for him to generate the equipment lists for Kapton Group at Circleville.

During the period Dr. Min was interviewing with Victrex, he was also exploring other potential job opportunities within Dupont and checked on internal career opportunities frequently. For example, he also made numerous searches on Corian, TiO2 and Flouropolyer groups. Although Dupont contends that Dr. Min would have no reason to consult research reports to search for job opportunities, Dr. Min states that he was looking for a technical position due to his reassignment. Thus, it was necessary for him to conduct searches into the manufacturing processes in order for him to match his professional background with Dupont personnel needs. He has specifically identified job opportunities in connection with a TiO2 plant to be built in Shangdong, China and a Corian facility in Guangzhou. Dr. Min has also provided the Government with a detailed list of the Dupont job opportunities about which he made inquiry.

Dr. Min has consistently stated that another reason for his scanning the Dupont information is based on a belief that someday he might return to Dupont as a consultant, as was the case of many other Dupont employees.

DM1\1214348.2

Martin P. Durkiñ
October 25, 2007
Page 6

Most importantly, the Government has no affirmative evidence that Dr. Min used his Victrex-supplied computer to transfer any information to his new employer or anyone else. (See paragraph 48 of the PSR). The Government has determined forensically that seven different external software storage devices were connected to the Victrex computer. Dr. Min has provided those devices to the Government. The Government's forensic analysis concluded that no Dupont proprietary documents were stored on these devices.

### Paragraph 25

Paragraph 25 states that "between August and December 2005, [Dr.] Min downloaded approximately 22,000 abstracts from the EDL and accessed approximately 16,706 documents . . ." (emphasis added). We object to the statement that Dr. Min "downloaded" approximately 22,000 documents. Rather, we have been advised by the Government that it only has evidence that almost all of the documents were "accessed" by Dr. Min, and not downloaded . We further understand that any documents which Dr. Min viewed, even for a few seconds, were considered by the Government to be "accessed" by him.

### Paragraph 28

This paragraph states that Dr. Min's research assignments for Dupont did not require him to review the production methods of Kevlar and Nomex. Dr. Min disagrees with this statement. He contends that as a result of being demoted to a research associate, it was necessary for him to reacquaint himself with information concerning Kevlar, Nomex and associated products. Further, he and Dupont's Edward McKinsie, were traveling to Basil, Switzerland in September of 2005, where they discussed a joint project with the Kevlar and Nomex groups for the customer of Von Roll/Isola. After the Basil trip, Dr. Min visited Kevlar and Nomex groups. Subsequent to that trip, he also generated a testing equipment list for the purpose of establishing the wire and cable testing capability at Circleville for Kapton group.

Dr. Min contends that it was necessary for him to review manufacturing and base technology in order for him to generate the equipment lists for Kapton Group at Circleville.

### Paragraph 29

Paragraph 29 states that "[i]nformation about Dupont's production method [related to Titanium Dioxide] would be beneficial to Dupont's competitors, including competitors in China." We believe that this statement is unnecessary and unfair to Dr. Min, and should be removed. We believe it improperly implies that Dr. Min had some actual or potential dealings with Dupont's competitors regarding Dupont's production method for Titanium Dioxide and there is no evidence to support that any such dealings existed.

Martin P. Durkin
October 25, 2007
Page 7

### Paragraph 31

This paragraph states that "[i]n the last two weeks of his employment with Dupont . . . [Dr.] Min conducted multiple searches for 'Apex,' a term which Dupont uses to designate the pinnacle of programs in which the Company is investing for long term purposes." We believe that this statement improperly implies that Dr. Min had no purpose for conducting Apex searches in this time-frame. On the contrary, Dr. Min maintains that certain of these searches were related to legitimate employment responsibilities. Dr. Min had worked with several researchers from the Dupont Center R&D group on several Apex project proposals, such as non-electronic packaging, capacitor file for clothing protection and ink-jetting packaging. He had also co-fielded a provisional patent on "Methods for forming patterns of a filled dielectric material on substrates", which was one part of an Apex project. After Dr. Min was assigned to Dupont's wire and insulation business, he was working with Dupont's CR&D group researcher on a nano-TiO2 filled polyimide for wire and insulation applications. He had evaluated several samples for CR&D group and arranged a trip to visit them for the proposal based on positive experimental data from the lab. The trip was cancelled due to Dr. Min's resignation.

### Paragraph 34

Paragraph 34 states that on January 17, 2006, Dr. Min received an e-mail from a Victrex employee requesting Kapton pricing information. The paragraph neglects to state, as we believe it must, that Dr. Min never responded to the requests for information.

### Paragraph 44

This paragraph describes an encounter between Dr. Min and FBI agents at a storage facility. The paragraph should note that the Government has confirmed that Dr. Min's mother had high blood pressure. Dr. Min has always contended that his mother had left her medicine at the storage facility and that he drove to the storage facility in order to retrieve his mother's medicine. At the time of the encounter, Dr. Min's mother was lying down in the car in extreme distress.

### Paragraph 49

Paragraph 49 provides that Dupont's loss is $375,395.04 and that "this figure will be utilized by the probation office in determining [Dr. Min's] Guideline range." As stated herein, both we and the Government agree that $180,513.67 should be the amount of loss used in determining the Guideline range.

Martin P. Durkin
October 25, 2007
Page 8

### Paragraphs 50; 110-113

Paragraph 50 states that "[a]s a result of [Dr. Min's] conduct, the Dupont Company suffered a direct financial loss of $357,395.04." The paragraph then states that restitution "in that amount" should be paid to Dupont. Paragraphs 110 through 113 reiterate that Dr. Min should be ordered to pay restitution to Dupont in the amount of $375,395.04.

This paragraph is inaccurate in two respects. First, as noted above, both we and the Government agree that the amount of loss is $180,513.67. Second, while it is agreed this amount should govern Dr. Min's relevant conduct, a separate analysis is required as to the amount of restitution due to Dupont.

The amount of loss stipulated to by the parties is recognition of the complicated nature of the case and the various theories of loss computation that might otherwise be employed. Dr. Min stipulates to $180,513.67 as the amount of loss to be used under the Guidelines. While Dr. Min accepts responsibility for this amount for purposes of loss under the Guidelines, as attorneys, we must seek to minimize in accordance with the law, whatever amount of restitution is ordered by the Court. The $180,513.67 to be used under the Guidelines for loss is based on the following: (1) $94,167.43 for attorney's fees incurred by DuPont in retaining Crowell & Moring LLP; (2) $46,881.15 for DuPont to engage Hyden & Associates to investigate Dr. Min's alleged activity; (3) $25,000 for "laboratory equipment and Kapton products"; and (4) $14,467.89 for certain "travel expenses." Thus, at a minimum, $141,048.58 of the loss amount relates to attorney's fees and investigative costs. We would be remiss, if we did not point out case law in the Third Circuit and elsewhere which bars attorney's fees and investigative costs incurred by a victim from being included in restitution orders.

For example, in Gvt. Of V.I. v. Davis, 43 F.3d 41 (3d Cir. 1994), the defendant pled guilty to charges of conspiracy to commit fraud, forgery and perjury. On appeal, the defendant argued that the district court improperly ordered as restitution the amounts of legal fees incurred by the victim to recover property fraudulently obtained by the defendant. In reviewing the district court's restitution order, the Court concluded that §3663(b)(1) expressly limits restitution to the value of property that was damaged, lost or destroyed during or as a direct result of the criminal acts in question. Relying on opinions from the Fourth, Fifth, Seventh, Ninth and Tenth Circuits holding that "restitution under the VWPA cannot include consequential damages," the Davis Court held that attorney's fees were consequential damages, and thus not recoverable under §3663(b)(1). Id. at 46; see also, U.S. v. Simmonds, 235 F.3d 826 (3d Cir. 2000) (relying upon Davis and holding that District Court erred by including the value of the victims' "clean renewal discount" and "no claim discount" in its restitution order, as such amounts "are consequential damages and do not in any way constitute or represent 'the value of the property' lost, damaged, or destroyed as a result of [defendant's] crimes.").

DM1\1214348.2

Martin P. Durkin
October 25, 2007
Page 9

Courts outside the Third Circuit have likewise repeatedly found that attorney's fees and investigative costs are not proper components of restitution. For example, in U.S. v. Barany, 884 F.2d 1255, 1257 (9th Cir. 1989), the defendant was convicted of mail fraud based on her submissions of false insurance claims. Prior to the conviction, the defendant filed a lawsuit against her insurance company for breach of contract and bad faith based on delaying action on her claim. Id. The presentence report estimated that the insurance company was entitled to restitution, the majority of which related to the attorney's fees and costs which the company spent defending against the defendant's civil suit. Id. at 1258. In holding that attorney's fees should not have been included in the restitution order, the court stated:

> In this case, the amount of resources [the insurance company] chose to spend in defending the civil suit is only tangentially related to the defendant's original offenses . . . Moreover the district court in the criminal case is clearly without authority to award attorney's fees in a wholly separate civil suit still pending in a state court. The general rule is that litigants must pay their own attorney's fees . . . [The insurance company's] quest for recovery of its attorney's fees should be directed to the court in the civil case which is best positioned to evaluate such a request. Being remote from knowledge of the course of the proceedings and of the complexity of the issues in the civil case, the district court cannot easily judge the reasonableness of the hours claimed or that rates charges by [the insurance company's] attorneys. Accepting the probation officer's recommendation would result in [the insurance company] obtaining an award of attorney's fees for a wholly separate civil case, bypassing entirely the jurisdiction of the state court presiding over that case.

Id. at 1261 (citations omitted). See also, U.S. v. Farr, 1999 U.S. App. LEXIS 8783, at *3-5 (9th Cir. May 7, 1999) (vacating restitution order and remanding for recalculation as it included legal fees the victim incurred as a result of a claim against a third party for failing to record promissory notes); U.S. v. Mullins, 971 F.2d 1138, 1147 (4th Cir. 1992) (based in the plain wording of the VWPA, the court held that "an award of restitution under the VWPA cannot include consequential damages such as attorney's fees and investigators' fees expended to recover the property."); U.S. v. Arvanitis, 902 F.2d 489, 497 (7th Cir. 1990) (remanding restitution order that including attorney's fees incurred by victim insurance company in investigating defendant's fraudulent claim for insurance on the basis that "legal fees generated in prosecuting a claim are not recoverable under the VWPA.").

### Paragraph 62

This paragraph increases the base offense level by 12 points based on a loss amount of $375,395.04. As noted above, both we and the Government have stipulated that the loss amount which should be considered under the Sentencing Guidelines is $180,513.67. Based on Section

Martin P. Durkin
October 25, 2007
Page 10

2B1.1(b)(1)(f), loss exceeding $120,000, but less than $200,000, increases the base offense level by 10. Thus, the base offense level for loss amount should only be increased by 10 and not by 12.

### Paragraph 64

Paragraph 64 states that Dr. Min was a Research & Development Supervisor and lead scientist "[a]t the time of the instant offense." At the time of the alleged conduct and Dr. Min's resignation, he was a Research Associate.

### Paragraph 94

This paragraph lists the assets, liabilities and net worth of the Min family. Dr. Min and his spouse support their parents in China, providing them at least $10,000 annually.

### Paragraph 99

Based on the amount of loss agreed to by Dr. Min and the Government, we object to the determinations in this paragraph that the total offense level should be considered 19 and that the guideline range for imprisonment is 30 to 37 months.

### Part E

Additionally, we object to Part E of the Report, which is titled "factors that may warrant departure." Under this heading, you state that "[p]ursuant to the Plea Agreement, the government stipulated that it might file a Substantial Assistance Motion on the defendant's behalf, if he continues to cooperate fully and truthfully with the government. As of this writing, no such motion has been filed."

Initially, we object to this paragraph, as it is well-established law that a motion for departure from the Government is not required for the Court to depart from the Guidelines. See, e.g., U.S. v. Jones, 382 F.3d 403, 406 (3d Cir. 2006).

We submit that, at a minimum, the unique circumstances distinguishing this case from the "heartland" of others are definite grounds for departure from the Guidelines.

As the Third Circuit stated in U.S. v. Samuelsen, 2006 U.S. App. LEXIS 24811, at *7-8 (3d Cir. Oct. 4, 2006):

> The decision in Booker had a titanic effect on federal sentencing. By excising those provisions of the Sentencing Reform Act that had previously required district courts to impose a sentence within the range recommended by the United

DM1\1214348.2

Martin P. Durkin
October 25, 2007
Page 11

States Sentencing Guidelines, the Supreme Court granted to district courts the discretion to issue the sentence that they believe best fits the particular circumstances of the case, in light of the broad objectives set forth in 18 U.S.C. §3553(a).

"One essential component of the Guidelines is the departure procedure." Id. at *8. "The Guidelines recognize a number of grounds on which a district court may depart, upward or downward, from the otherwise applicable range." Id. at *8-9. "These provisions, no less than those relating to offense level and criminal history category, are indispensable to calculating the 'sentencing range . . . as set forth in the [G]uidelines' for purposes of 18 U.S.C. §3553(a)." Id. "District courts are under the same obligation post-Booker as they were pre-Booker with respect to ruling upon requests for departures." Id.

18 U.S.C. §3553(b) provides for a downward departure if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Section 5K2.0 permits departures for "mitigating circumstance[s] . . . not adequately taken into consideration by the Sentencing Commission."

We submit that the instant case is atypical and far removed from the "heartland" of trade espionage cases, considering: (1) there is no evidence that Dr. Min ever transferred any confidential Dupont information to a third party; (2) there is no evidence that Dr. Min had any plans to transfer Dupont information to a third party; (3) there is evidence consistent with Dr. Min accessing the EDL system relating to ongoing employment responsibilities, the search for job opportunities with Dupont and simply to satisfy scientific curiosity prior to leaving Dupont; and (4) that Dr. Min's behavior was truly aberrant in view of his otherwise exemplary life. All of the factors, individually, and in toto, merit departure from the Guidelines as being outside the heartland of trade espionage cases. Moreover, Dr. Min's refusal to accept employment opportunities with actual competitors of Dupont, even when desperate for any job, is strong evidence of contrition.

Part F

Part F states that you have not "identified any facts or circumstances addressed in the report, that may be relevant to sentencing, that were not otherwise considered in the guideline calculations or departure analysis."

"The Guidelines have now become advisory and they no longer limit the grounds a court can consider at sentencing." U.S. v. Vampire Nation, 451 F.3d 189, 196 (3d Cir. 2006). "Thus, the Guidelines are now only one factor among many which can influence a discretionary sentence." Id. "Booker contemplates that the district court will impose a discretionary sentence

Martin P. Durkin
October 25, 2007
Page 12

*after* consideration of the advisory Guidelines, the grounds raised by counsel, the defendant's allocution, victim statement, other evidence, and the factors set forth in § 3553(a)." Id. at 197. (emphasis in original).

Under U.S. v. Vampire Nation, 451 F.3d 189, 195 n.2 (3d Cir. 2006), "post-Booker discretionary sentences not based on a specific Guidelines departure provision [are referred to] as 'variances.'"

The Report makes no mention of a basis for variance. To do so, ignores the absolutely stellar personal and professional life of Dr. Min prior to and after the offense. It also ignores the clear disparity between the fear of the Government and Dupont regarding the impact of the crime and the actual loss, either intended or which occurred. The failure to recognize the need for a variance is also at odds with ¶48 of the Report which provides that "[t]hus far, there has been no evidence to suggest the defendant disseminated the trade secrets to others, specifically a foreign government." Although the government has not filed a motion for departure on the basis of its inability to obtain mechanical confirmation of what the available evidence indicated, the quality of Dr. Min's level of cooperation, coupled with his otherwise exemplary life, supports variance.

We will make ourselves available at your convenience to further discuss in advance of the sentencing hearing any of the issues raised herein. We hope that a Supplemental Report, accounting for the above issues and perceived inaccuracies in the Report, will be forthcoming.

Thank you for your attention to this matter.

Very truly yours,

Michael M. Mustokoff

MMM/jnv
cc:    The Honorable Colm F. Connolly
       Robert Kravetz, AUSA
       Gary Min

DM1\1214348.2

# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

E. I. DU PONT DE NEMOURS AND COMPANY,    :
:
Plaintiff,    :
:
:        Case No. C2:06-cv-118
v.    :
:        Judge Marbley
GARY MIN,    :
:        Magistrate Judge Kemp
Defendant.    :

---

## AGREED ORDER

---

This Order ("Order") is agreed to by and among the parties in the above-captioned matter (the "Litigation") and submitted for the Court's approval as of May 12, 2006 (the "Execution Date").

WHEREAS, Defendant Gary Min, Ph.D. ("Dr. Min"), then being employed by Plaintiff E. I. du Pont de Nemours and Company ("DuPont"), and DuPont entered into an Employment Agreement dated November 1, 1995 (the "Employment Agreement"), a copy of which is attached hereto as Exhibit A;

WHEREAS, on December 12, 2005, Dr. Min tendered his resignation to DuPont and his last day of employment was December 13, 2005;

WHEREAS, DuPont alleges that prior to tendering his resignation, Dr. Min accessed, downloaded and/or obtained certain confidential and/or trade secret information regarding DuPont, its business and/or its products, in deviation of the Employment Agreement;

WHEREAS, DuPont alleges that certain information accessed, downloaded and/or obtained by Dr. Min is confidential, proprietary and subject to reasonable efforts by DuPont to maintain its secrecy;

WHEREAS, DuPont alleges that Dr. Min has breached his Employment Agreement and has instituted litigation against Dr. Min to enjoin such activities and for other relief;

WHEREAS, on February 15, 2006, the Court issued a Temporary Restraining Order ("TRO") upon the motion of DuPont, a copy of which is attached hereto as Exhibit B;

WHEREAS, the TRO has continued in full effect by agreement of the parties and by subsequent Order of the Court dated February 27, 2006;

WHEREAS, Dr. Min has made certain representations and warranties as set forth herein;

WHEREAS, the parties agree that the agreement of DuPont to enter into this Order and forego Court resolution of permanent injunctive relief is in reliance on the representations, warranties, and agreements made herein by Dr. Min; and

WHEREAS, the parties desire to amicably conclude this matter as to permanent injunctive relief and, accordingly, have reached the agreement memorialized herein;

NOW, THEREFORE, in consideration of the promises, covenants and agreements herein, which the parties hereby agree are sufficient consideration, the parties agree as follows:

1.    **Dismissal of Litigation and Agreement to a Permanent Injunction.**

Within ten (10) business days of the Effective Date, as defined below, the Parties agree to cause to be dismissed any and all pending litigation or other proceeding each has instituted against the other, including but not limited to this matter. The Parties expressly agree that the dismissal of this matter will be without prejudice under Rule 41, and that DuPont will be entitled

- 2 -

to refile the action (including any related claims) in accordance with Ohio law upon reliable evidence that Dr. Min is in violation of any provision of this Order.

The Parties acknowledge and agree that DuPont does not have the authority to dismiss or guarantee the dismissal of any criminal investigation or litigation, including any criminal investigation or litigation arising out of or related to Dr. Min's employment with DuPont. DuPont further agrees that within ten (10) business days of the Effective Date, it will advise all federal authorities with which it has had any oral or written contact regarding Dr. Min, or which DuPont is aware is investigating Dr. Min, to advise that the parties have entered into this Agreed Order. The Parties agree that the Court has jurisdiction to issue this Agreed Order and that this case is properly venued.

The terms of the TRO issued on February 15, 2006 by the Court are hereby modified and converted to a permanent injunction. The terms of the permanent injunction are as follows:

(a)    Dr. Min shall comply with the terms of his Employment Agreement with DuPont;

(b)    Dr. Min shall refrain from using or disclosing to any third party DuPont trade secrets, including confidential and proprietary information relating to its inventions, discoveries, patents, technologies, processes, advancements and products;

(c)    Dr. Min shall return to DuPont any and all property and documents obtained as an employee of DuPont and still in his possession or under his control, including all written, electronic and computerized reproductions thereof relating to any DuPont inventions, discoveries, patents, technologies, processes, advancement or products, or any other information marked as Confidential by DuPont, including copies of all documents retrieved from the DuPont EDL; and

(d) Dr. Min shall immediately report to DuPont if he is solicited by any Person regarding any information entrusted to him or otherwise accessed by him as a DuPont employee.

2.    **Representations and Warranties of Dr. Min.**  Dr. Min represents and warrants that:

(a)    he has surrendered and delivered to DuPont or the federal authorities all DuPont property in his possession and all DuPont documents and/or any written, electronic and computerized reproductions thereof relating to any DuPont inventions, discoveries, patents, technologies, processes, advancement or products, or any other information marked as Confidential by DuPont, including copies of all documents retrieved from the DuPont EDL;

(b)    he has returned all information and property of which DuPont is the rightful owner to either DuPont or the federal authorities involved in a related criminal investigation;

(c)    he has not used, disclosed, sold, or otherwise shared any information deemed confidential and/or secret by DuPont; and

(d)    he will not use, disclose, sell, or otherwise share any information deemed confidential and/or secret by DuPont.

Dr. Min and his counsel further warrant and agree that within ten (10) days of the Effective Date of this Order, any documents designated as Confidential in this matter, including all paper or electronic copies thereof, shall be returned, through the parties' counsel, to the party that filed or produced the documents, and will retain no such documents or copies thereof for any purposes.

Dr. Min and his counsel acknowledge and agree that DuPont is entering into this Agreement in reliance upon these representations and warranties and, in the absence of each of these representations and warranties, would not have entered into this Agreement.

3.    **Miscellaneous**.

(a)    This Order will be binding upon the parties hereto and upon their heirs, administrators, representatives, executors, successors, and assigns.

(b)    This Order contains the entire agreement of the parties about the subjects in it, and it replaces all prior contemporaneous oral or written agreements, understandings, statements, representations and promises by the parties with respect thereto, except that it shall not diminish Dr. Min's continuing obligations under the Employment Agreement. This Agreement may not be amended except by an order of this Court.

(c)    This Order is the result of a compromise and shall never, at any time, or for any purpose, be considered to be an admission of liability or responsibility on the part of any party in this Litigation, nor as an admission or concession of the truth of any claim, right, issue, controversy, cause of action or dispute.

(d)    This Order will be interpreted under the laws of the State of Ohio. Any action to enforce the terms of this Order will be brought in the U.S. District Court for the Southern District of Ohio. The Parties consent to the jurisdiction of said Court for such an action and agree that any such action would be properly venued before this Court.

(e)    The parties agree, in accordance with this Court's prior Order and direction, that the terms of this Order will be treated as confidential except as is reasonably necessary to effectuate this Order and/or cooperate with any related federal investigation, or as otherwise permitted by the Court.

(f)    The parties agree that they will bear their own costs, disbursements and attorney's fees which have been incurred in connection with the Litigation up through the Effective Date. Notwithstanding the foregoing, the parties agree that they are in no way limited or prohibited

from seeking attorneys' fees from the other party if it later becomes necessary to seek Court intervention to enforce this Order and/or refile this action pursuant to Paragraph 1 of this Order.

(g)    This Order is subject to and will become effective and enforceable only upon approval of this Order by the Court (the "Effective Date").

APPROVED AND ORDERED.

JUDGE ALGENON L. MARBLEY

APPROVED:

E. I. DU PONT DE NEMOURS
AND COMPANY

By: _Michael Clarke_

Date: _May 8, 2006_

Susan M. DiMickele (0064837), Trial Attorney
Lori Maiorca Zancourides (0076342)
Squire, Sanders & Dempsey L.L.P.
1300 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700
(614) 365-2499 (facsimile)
sdimickele@ssd.com
lzancourides@ssd.com

Attorneys for Plaintiff
E. I. du Pont de Nemours and Company

Gary Min

Date:_____

Michael M. Mustokoff (PA # 15674)
Jonathan L. Swichar (PA # 80380)
Admitted Pro Hac Vice
Duane Morris LLP
30 South 17th Street
Philadelphia, Pennsylvania 19103
(215) 979-1810/1816
(215) 979-1020 (facsimile)
MMustokoff@duanemorris.com
JSwichar@duanemorris.com

Attorneys for Defendant Gary Min

- 6 -

from seeking attorneys' fees from the other party if it later becomes necessary to seek Court

intervention to enforce this Order and/or refile this action pursuant to Paragraph 1 of this Order.

     (g)    This Order is subject to and will become effective and enforceable only upon

approval of this Order by the Court (the "Effective Date").

    APPROVED AND ORDERED.

JUDGE ALGENON L. MARBLEY

APPROVED:

E. I. DU PONT DE NEMOURS
AND COMPANY

By:_____

Date: _____

Susan M. DiMickele (0064837), Trial Attorney
Lori Maiorca Zancourides (0076342)
Squire, Sanders & Dempsey L.L.P.
1300 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700
(614) 365-2499 (facsimile)
sdimickele@ssd.com
lzancourides@ssd.com

Attorneys for Plaintiff
E. I. du Pont de Nemours and Company

Gary Min

Date: May 9, 2006

Michael M. Mustokoff (PA # 15674)
Jonathan L. Swichar (PA # 80380)
Admitted Pro Hac Vice
Duane Morris LLP
30 South 17th Street
Philadelphia, Pennsylvania 19103
(215) 979-1810/1816
(215) 979-1020 (facsimile)
MMustokoff@duanemorris.com
JSwichar@duanemorris.com

Attorneys for Defendant Gary Min

-6-

## CERTIFICATE OF SERVICE

I, Michael M. Mustokoff, Esquire, hereby certify that on this 2nd day of November, 2007,

a true and correct copy of Defendant Gary Min's Motion for Downward Departure and

Sentencing Memorandum in support thereof have been electronically filed with the court and

sent via Federal Express to:

> Colm F. Connolly
> Robert F. Kravetz
> U.S. Attorney's Office
> 1007 Orange Street, Suite 700
> P.O. Box 2046
> Wilmington, DE 19899-2046

Additionally, a copy of said pleadings has been sent via e-mail and Federal Express to:

> Martin P. Durkin
> United States Probation Officer
> United States Probation Office/Pretrial Services Agency
> 824 Market Street, Suite 400
> Wilmington, DE 19801

_Michael M. Mustokoff_
Michael M. Mustokoff, Esquire