IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 06-121-SLR |
| | ) | |
| GARY MIN, aka YONGGANG MIN, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE TO DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE

Defendant Gary Min pleaded guilty to a one-count Felony Information, which charged him

with theft of trade secrets, in violation of 18 U.S.C. § 1832. In so doing, Dr. Min agreed that he

intended to convert DuPont trade secrets to his own economic benefit, and that he knew to a

practical certainty that his conduct would injure DuPont. See 18 U.S.C. § 1832; United States v.

Hsu, 155 F.3d 189, 196 (3d Cir. 1998). Dr. Min now faces an advisory Guidelines range of

imprisonment of either 24-30 month or 30-37 months, depending on how the Court calculates

DuPont's amount of loss at the sentencing hearing.[1] In his sentencing memorandum filed with this

Court, Dr. Min argues that the Court should both depart and vary downward from that range

primarily because his conduct was inconsistent with that of a typical trade secret defendant, and

because the Government has no affirmative evidence that Dr. Min transferred, or was tasked to

transfer, DuPont proprietary information to a third party.

Although the Government contends that the District Court should deny Dr. Min's departure

motion because his conduct was not outside the heartland of typical trade secret cases, the

Government acknowledges that this is a very difficult case to determine an appropriate sentence.

---

[1]The Government is on record as stating that the amount of loss should be $180,513.60,
which would result in a Guidelines range of 24-30 months. Gov't Response to PSR (Oct. 26, 2007);
Def.'s Mot. for Downward Departure Ex. 4.

On one hand, Dr. Min agreed during his Rule 11 change of plea hearing to numerous aggravating facts that comprise his offense conduct. For example, over a seven-month period, Dr. Min accessed thousands of DuPont documents containing proprietary trade secret information, violating the trust that DuPont had placed in him when it granted Dr. Min access to DuPont's Electronic Database Library ("EDL"). For three of those months, Dr. Min accessed DuPont documents after he had already accepted a job to work for a company that produces a product that competes with a DuPont product within a narrow market segment. In addition, after DuPont Corporate Security officers confronted Dr. Min and showed to him the federal statute pertaining to theft of trade secrets, Dr. Min transferred DuPont proprietary information from his house to a storage facility that was rented in his wife's name, as well as to an apartment that was rented in his mother's name; engaged in the systematic burning and shredding of countless DuPont documents; and erased a computer hard drive that had on it numerous DuPont proprietary documents, just prior to a scheduled meeting with DuPont officials. Dr. Min has yet to fully explain his conduct regarding these actions to the Government's satisfaction.

Yet, there are also mitigating factors that exist in Dr. Min's favor. Dr. Min agreed to waive Indictment and plead guilty to a felony Information, thus relieving the Government from having to present an Indictment to a Federal Grand Jury. Over the past year, Dr. Min has met with FBI and Department of Commerce agents on ten occasions to participate in detailed debriefing sessions. Much, but not all, of the information provided by Dr. Min at those sessions has been corroborated. As of the time of sentencing, the Government has no affirmative evidence that Dr. Min transferred any DuPont proprietary information to a third party, other than the DuPont documents that were uploaded onto his Victrex-issued laptop computer. With respect to those documents, the

2

Government has no affirmative evidence that Victrex solicited Dr. Min to obtain that information, or that Dr. Min passed that information on to any Victrex employees. In addition, Dr. Min has had a stellar academic and professional career. He was highly-regarded at DuPont, which makes his conduct in this case even more puzzling.

In the end, however, the Government believes that the section 3553(a) sentencing factors counsel a sentence within the advisory Guidelines range. Dr. Min's conduct, which he has acknowledged to be illegal and dishonest, abused the trust that DuPont had placed in him over the course of his career. Although DuPont's external costs have been calculated to comprise the actual pecuniary loss the company incurred, Dr. Min's impact on the company extended beyond economic losses, as noted by DuPont in its Victim Impact Statement to the Court. Moreover, Dr. Min's significant obstructive behavior impeded the Government's ability to make a full accounting of the DuPont property that Dr. Min had in his possession and the proprietary information that he had destroyed. Furthermore, the Court has a strong interest in deterring others from engaging in conduct similar to Dr. Min. As Congress has recognized, the "development of proprietary economic information is an integral part of America's economic well-being." H.R. Rep. 104-788, U.S.C.C.A.N. 4021, 4023 (Sept. 16, 1996). Because "the nation's economic interests are a part of its national security interests . . . threats to the nation's economic interests are threats to the nation's vital security interests." Id. The Government has limited resources to pursue theft of trade secrets prosecutions, and a primary objective of the cases which the Government prosecutes is to deter similarly-situated employees from converting proprietary information.

3

In this response, the Government will respond primarily to Dr. Min's motion for downward departure. The Government will make additional arguments on the record at Dr. Min's sentencing hearing regarding the Section 3553(a) sentencing factors as applied to Dr. Min's case.

## I.   BACKGROUND[2]

At his Rule 11 change of plea hearing, Dr. Min acknowledged that between May 2005 and December 2005 he accessed 22,000 abstracts and 16,706 documents containing DuPont proprietary information from a secure password-protected database known as the Electronic Database Library, or EDL.[3] The vast majority of the documents accessed by Dr. Min had limited or no relevance to his job responsibilities at DuPont. In June 2005, Dr. Min began interviewing for a job with Victrex, LLC, a company which manufactures PEEK®, a product that is a functional competitor within a narrow market segment with the DuPont product Kapton®. On October 18, 2005, Dr. Min accepted

---

[2] The Government stands by all of the facts recited at the Rule 11 Change of Plea Hearing, which were agreed to by Dr. Min. This section provides a brief summary of those facts, as well as some additional information that the Government learned during its ten debriefing sessions with Dr. Min.

[3] Dr. Min's statement in his Sentencing Memorandum that "the Government agrees that much of what was mislabeled as 'downloading' was not more than a few second's worth of scanning" is somewhat misleading. Def.'s Sent. Memo. (D.I. 23) at 8. DuPont's Information and Computing Technologies Division tracks EDL usage. The tracking software records which abstracts or documents a user has viewed off of the system after the user enters a particular search term. In this respect, the EDL can be analogized to a web-based search engine, such as Google. Although a search term might reveal thousands of documents, the tracking software records only the abstracts or documents that Dr. Min physically viewed. Thus, every time that Dr. Min clicked on an abstract or a document it was recorded.

The tracking software does not have the capability to determine whether the user downloaded a particular abstract or document onto the user's computer or onto an external storage device, such as a CD or thumb drive. The Government's investigation revealed that Dr. Min downloaded over 100 documents from the EDL onto his DuPont issued laptop computer. According to DuPont officials who reviewed those documents, most were not relevant to Dr. Min's assignment at Circleville, Ohio. In addition, Dr. Min had numerous hard copies of documents stamped "DuPont Confidential" at his residence, the storage facility, and the one-bedroom apartment.

a job with Victrex, yet he did not notify his superiors at DuPont until December 12, 2005. During

that three-month period, Dr. Min continued to work at DuPont and continued to access DuPont

proprietary information from the EDL. After Dr. Min left DuPont in December, he began working

for Victrex. In early-February 2006, Dr. Min uploaded 180 DuPont documents onto his Victrex-

issued laptop computer, 50 of which were marked confidential or special control. Although that

data was found in his computer's "Recycle Bin," the documents had not been erased from his

computer hard drive and were easily accessible.

      After Dr. Min notified DuPont that he had accepted a job with Victrex, DuPont's

Information and Computing Technologies Division notified DuPont Corporate Security that Dr. Min

had accessed an unusually high volume of abstracts and documents off of the EDL system within

the past few days. These documents covered subjects which apparently bore no relation to Dr.

Min's scope of employment with DuPont. As a result, DuPont terminated Dr. Min that same day.

Prior to leaving DuPont, he signed a termination agreement that certified that, with the exception of

certain items Dr. Min had paid for with DuPont expense funds, he had returned to the company all

"materials which either belong to DuPont or are of a secret or confidential nature relating to

[DuPont's] business which were in his possession or under his control." A week later, on December

19, 2007, three DuPont officials interviewed Dr. Min. The officials stressed to Dr. Min that it was

important that he return to DuPont all of the company's proprietary information that he still had in

his possession. The officials further gave to Dr. Min a copy of the federal trade secrets statute, 18

U.S.C. § 1832. Dr. Min told the officials that he had not conducted any improper searches on the

EDL, and he certified to the DuPont officials that he did not have any hard copy or electronic

versions of DuPont proprietary materials at his home or on any computers.

Contrary to Dr. Min's assertion to the DuPont officials, between December 2005 through the date that a search warrant was executed on February 14, 2006, Dr. Min oversaw the systematic destruction of DuPont proprietary information that he had kept at his home near Columbus, Ohio, as well as in a storage facility that was rented in his wife's name and a one-bedroom apartment rented in his mother's name. Indeed, on the date the search warrant was executed, FBI and Department of Commerce agents discovered that DuPont documents had been burned recently in Dr. Min's fireplace, and that he had executed an erasure program on one of his computer hard drives. Because the documents had been destroyed and the hard drive had been erased, the Government has been unable to make a full accounting of all the DuPont proprietary information that Dr. Min had in possession, including whether Dr. Min had downloaded any other DuPont proprietary information onto other electronic media. In addition, agents uncovered DuPont documents in Dr. Min's house. Dr. Min later acknowledged that he had stored DuPont confidential documents on several computers and external hard drives at the residence. Some of the materials uncovered during the search were photographs of confidential DuPont lab notebooks. Although Dr. Min claims in his Sentencing Memorandum that he was unaware he could not photograph confidential lab notebooks that he and others on his scientific team had worked on at DuPont, Def.'s Sent. Mem. (D.I. 23) at 12, Dr. Min neglects to note that he photographed every page of the lab notebooks *except for* the page in each notebook marked "DuPont confidential." Had Dr. Min's conduct in photographing the lab notebooks been as innocent as he explains it, he would have photographed every page of the lab notebooks.

A subsequent search of a storage facility that had been rented in Dr. Min's wife's name in early-December 2005 yielded approximately100 additional DuPont documents, approximately 70 of

which were marked "confidential." A search of an apartment that had been rented in Dr. Min's

mother's name in early-February 2006 uncovered approximately 104 additional DuPont documents

marked "confidential," as well as approximately twenty boxes of DuPont laboratory equipment

valued at approximately $25,000.[4] Thus, Dr. Min's certification to DuPont on December 12, 2005,

that he had returned all DuPont property was, at the very least, misleading.

Between October 2006 and October 2007, agents from the FBI and the Department of

Commerce interviewed Dr. Min on approximately ten occasions. The overriding purpose of those

interviews was to be able to give the victim, DuPont, full assurances that no DuPont information

had been disseminated to a third party. Although the FBI has been able to corroborate much of the

information that Dr. Min provided to the Government, the Government cannot give DuPont the full

measure of assurances that it had hoped to give at the start of the process.

Dr. Min notes correctly that the Government has no affirmative evidence that Dr. Min

transferred any DuPont proprietary information to a third party, other than the information uploaded

onto his Victrex-issued laptop computer, or that Dr. Min had been tasked by a third party to engage

in the conduct that he undertook. One of the Government's major concerns was that Dr. Min had

downloaded additional DuPont proprietary information onto his Victrex-issued laptop computer.

The Government's forensic investigation revealed that seven external computer storage devices had

---

[4]Dr. Min told the FBI in February 2005 that DuPont had allowed him to keep the laboratory equipment at his home to set up a home lab to do experiments. As Dr. Min correctly notes in his Sentencing Memorandum, however, DuPont has a policy against its employees setting up home laboratories. This policy seeks to avoid any experiments being performed outside of controlled environments, and the concomitant liability and dangers to the employee and the community that would flow if an experiment was not performed according to plan. DuPont never gave Dr. Min authority to set up a home laboratory or to store any laboratory items at his residence, especially after he resigned and signed a form certifying that he had returned all DuPont equipment in his possession.

been attached to the Victrex laptop while Dr. Min was in China. Dr. Min's family members in

Shanghai were able to provide each of these devices to DuPont officials in China, which turned

them over to the Government.[5] The FBI's review of the devices revealed that they contained

primarily family pictures and movies. There were no DuPont proprietary documents found on any

of the storage devices. Moreover, there was no indication that any DuPont documents had been

erased from the storage devices in the past; rather, the family movies and pictures appear to be the

only items that had been downloaded onto the devices. This evidence was by far the most

significant in giving DuPont some assurances that Dr. Min had not transferred DuPont proprietary

information to a third party in China. In addition, the investigation has revealed that, when

requested by a Victrex official to provide pricing information for DuPont Kapton, Dr. Min did not

respond.

Despite the fact that Dr. Min has been able to give the Government and DuPont some degree

of assurances that DuPont proprietary information was not disseminated to a third party, there

remain some fundamental questions that Dr. Min has not been able to answer to the Government's

satisfaction. Key among them are the breadth of DuPont proprietary information that Dr. Min

accessed and downloaded off of the EDL. Dr. Min correctly notes in his Sentencing Memorandum

that there is heavy disagreement between himself and the Government regarding his explanation for

accessing a large number of documents off of the EDL. Def.'s Sent. Mem. (D.I. 23) at 11. Dr. Min

claims that he accessed many documents off of the EDL to aid him in internal job opportunities

---

[5]Dr. Min's statement that family members in China were placed "at some inconvenience and greater risk" is a little overdramatic. Those family members simply took the storage devices, which were at Dr. Min's inlaws' residence in Shanghai, to DuPont's office space at a commercial building in Shanghai. They did not have to mail the storage devices, or to meet with any United States Government officials. The Government finds it hard to believe that their actions in returning the storage devices would have placed the family members in any danger.

within DuPont. The Government strongly disagrees with Dr. Min's explanation for two reasons. First, the majority of the searches occurred after Dr. Min had already accepted a job with Victrex on October 18, 2005. Second, even accepting Dr. Min's explanation that he wanted to review certain documents for DuPont job opportunities after he accepted the Victrex job, DuPont maintains (and the Government agrees) that there was no legitimate reason for Dr. Min to access documents containing *specific production methods* of DuPont technologies such as Kevlar, Nomex and Kapton.

At times during the debriefings, Dr. Min's explanations as to why he needed to search for certain technologies were inconsistent. One example is Dr. Min's explanation as to why he needed to search for PEEK information on the DuPont EDL. PEEK is the primary product produced by Victrex. Dr. Min explained at one debriefing session that he searched DuPont's EDL system for PEEK in the fall of 2005 in order to know what DuPont was doing in relation with PEEK so that he would not have a conflict of interest when he went to work for Victrex. This was in spite of the fact that Dr. Min never worked on DuPont's version of PEEK and that he had already accepted the job with Victrex. At a subsequent debriefing session, however, Dr. Min acknowledged that his explanation for searching for PEEK as to avoid a future conflict of interest was not entirely accurate, and that he could have benefitted in the future from knowing about DuPont's experiences with PEEK.

In addition, Dr. Min's explanation as to why he burnt, shredded and erased DuPont proprietary information in his possession after he left the company in December 2005 has never fully been explained to the Government's satisfaction. Dr. Min explained that he could not simply throw out DuPont information in the trash, as that would not comply with DuPont's Proprietary Information Program (PIP) which governs the storage and handling of all DuPont confidential

9

information.[6]  Thus, he and other family members systematically destroyed a large quantity of

DuPont proprietary information, including CD-Roms to which he had downloaded DuPont

information.  During our numerous debriefing sessions, we have never been able to pinpoint exactly

which documents were destroyed at Dr. Min's direction.  Because of his actions, the Government

will never be able to fully account for all of the DuPont information that Dr. Min downloaded onto

his various computers and other storage devices, or stored at the three locations.[7]

## II.  Dr. Min is not entitled to a "heartland" departure

### A.  Dr. Min's conduct is not outside the "heartland" of theft of trade secrets cases

Although federal law once mandated district courts to impose sentence within the applicable

guidelines range, the Supreme Court's landmark sentencing decision in United States v. Booker,

543 U.S. 220 (2005), rendered the guidelines advisory.[8]  Under Booker and its progeny, district

---

[6]Dr. Min admitted during our debriefing sessions that he made a false statement to an FBI agent on February 15, 2005, when he told the agent that he had no knowledge of DuPont's PIP program.  The false statement contrasts with Dr. Min's subsequent rationale that he destroyed DuPont documents *in accordance with* DuPont's PIP to avoid the technology from falling into the hands of a third party.

[7]Dr. Min asserted during our debriefing sessions and in his Sentencing Memorandum that in his panic he destroyed numerous documents, including a PhD thesis stored on an Apple Macintosh computer.  Def.'s Sent Mem. (D.I. 23) at 14, Exhibit A at 8.  An FBI forensic examination, however, has revealed that Dr. Min did not delete any documents from the Apple computer.  In fact, contrary to Dr. Min's assertion, the computer had not been turned on in approximately ten years.

[8]In Booker, the Supreme Court issued two decisions which fundamentally transformed the federal sentencing landscape.  In the first, or Constitutional decision, the Court held that the mandatory nature of the Sentencing Guidelines violated the Sixth Amendment because the process required district courts to impose sentence based upon factual findings that were not admitted by a defendant or decided by a jury beyond a reasonable doubt.  Id. at 226-244.  In the second, or remedial decision, the Court cured the Constitutional defect by severing the portion of the Sentencing Reform Act that made the Guidelines mandatory.  Id. at 244-68.  As a result, district courts must fashion a sentence based upon the factors set forth in 18 U.S.C. § 3553(a), and appellate courts are to review the ultimate sentence imposed to determine whether it is "reasonable."  Id. at 245-46, 261.

courts are to consider the relevant factors set forth under 18 U.S.C. § 3553(a) in imposing the

defendant's sentence, regardless of whether that sentence varies from the sentence calculated by the

Guidelines. United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006). Yet, prior to this ultimate

determination, district courts are still required to calculate the applicable Guidelines range for each

defendant – including ruling upon formal departure motions. United States v. King, 454 F.3d 187,

196 (3d Cir. 2006); United States v. Cooper, 437 F.3d 324, 330 (3d Cir. 2006).[9]

Courts developed a vast body of sentencing departure law prior to the decision in Booker,

which remains relevant when district courts rule upon departure motions at step two of the

sentencing process. See note 9, supra. One dominant feature of the Sentencing Reform Act of 1984

was to create the United States Sentencing Commission (the "Commission"), an independent

agency located in the judicial branch that was tasked by Congress to develop a comprehensive set of

federal sentencing guidelines. See 28 U.S.C. § 994. The Commission created a guidelines system

that takes into account, among other things, the defendant's offense conduct, role in the offense, and

---

[9]The United States Court of Appeals for the Third Circuit developed a three-step sentencing
procedure for district courts to follow post-Booker.

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as
> they would have before Booker.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on
> the record whether they are granting a departure and how that departure affects the
> Guidelines calculation, and take into account our Circuit's pre-  Booker case law,
> which continues to have advisory force.
>
> (3) Finally, they are required to exercise their discretion by considering the relevant
> [18 U.S.C.] § 3553(a) factors, in setting the sentence they impose regardless whether
> it varies from the sentence calculated under the Guidelines.

United States v. Ricks, 494 F.3d 394, 398 (3d Cir. 2007) (quoting United States v. Gunter, 462 F.3d
237, 247 (3d Cir.2006) (internal quotation marks, citations, and alterations omitted)).

prior criminal history. The Commission explained that it intended "the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G. ch. 1, pt. A, p. 12 (Nov. 2006). The Commission recognized, however, that "it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." Id. Thus, the Commission created a system which allowed district courts to depart from the guidelines range in "atypical" cases – cases in which "a particular guideline linguistically applies but where conduct *significantly* differs from the norm[.]" Id. (emphasis added).

In Koon v. United States, 518 U.S. 81 (1996), the United States Supreme Court authored its seminal decision involving sentencing departures. There, the Court stated that a sentencing court considering a departure request must first determine the factors that potentially take the case outside of the "heartland" and make it a special or unusual case. Next, the Court should examine the Sentencing Guidelines to determine whether the Guidelines forbid, encourage, or discourage a departure based on those factors, or whether the Guidelines do not consider the factor at all. Id. at 95-96. Based upon the Sentencing Commission's treatment of the particular departure factors, courts are to apply the following rules:

- If a factor is forbidden, the district court cannot use it as a departure basis.

- If a factor is an encouraged departure basis, the district court may depart if the applicable guideline does not already take the factor into account.

- If a factor is a discouraged, or an encouraged factor already taken into account by the Guidelines, the court may depart only if the factor is present to an "exceptional" degree or in some other way makes the case different from the ordinary case where the factor is present.

- If a factor is unmentioned in the Guidelines, the court must, after considering the "structure and theory of both relevant individual guidelines and the Guidelines taken as

12

a whole," decide whether the factor is sufficient to take the case out of the Guideline's heartland.

Id.; see also United States v. Iannone, 184 F.3d 214, 226-27 (3d Cir. 1999).

In this case, Dr. Min has brought a motion for downward departure on the basis that his case is atypical and far removed from the "heartland" of trade espionage cases because there is no affirmative evidence that he transferred DuPont technology to a third party. Because this case-specific factor is not mentioned in the Guidelines, the Court must examine U.S.S.G. § 2B1.1 as well as the Sentencing Guidelines as a whole to determine whether Dr. Min's conduct takes the case outside the Guideline's heartland.

The Government submits that Dr. Min's conduct was within the heartland of trade secrets offenses. As an initial matter, the Government has affirmative evidence that Dr. Min at least intended to transmit the property to a third party, in that he uploaded proprietary DuPont information to his DuPont computer. Moreover, as noted in the Government's October 26, 2007 letter to the Probation Office, the trade secrets statute lists twenty-eight different acts in which a defendant, acting with the requisite criminal intent, can commit a theft of trade secrets. 18 U.S.C. § 1832(a). Dr. Min certainly violated the trade secrets statute when he downloaded DuPont proprietary information off of the EDL, photographed confidential lab notebooks, and retained hard copies of DuPont confidential documents in his possession. Dr. Min admitted at his Rule 11 Change of Plea hearing that he committed these acts knowing to a practical certainty that his conduct would injure DuPont. Dr. Min reiterated that position in his Sentencing Memorandum, see Def.'s Sent. Mem. (D.I. 23) at 12, which diminishes his argument in the Sentencing Memorandum that he acted without the specific intent to violate the trade secrets statute. Thus, it is

13

clear from Dr. Min's conduct and his own subsequent concessions that he in fact violated the trade secrets statute several different ways with the requisite intent.

Section 2B1.1 of the Sentencing Guidelines, which governs most basic economic offense, governs the calculation of Dr. Min's Guidelines offense level. Section 2B1.1 calculates the offense level based primarily on the economic loss caused by a defendant's conduct. As noted in our response to the Probation Office, trade secret prosecutions present a number of different methodologies by which a court can determine the victim's loss under Section 2B1.1. The loss calculation is driven in some measure by the various ways in which a defendant, acting with the requisite criminal intent, can violate the trade secret statute, as well as by the actual or intended harm the particular violation causes the victim. As we listed in that letter, the district court may consider any of the following methodologies in calculating the loss amount:

- the trade secret owner's research and development costs for technology from which proprietary information was converted;
- a reasonable royalty for the proprietary information, based on what a willing buyer would pay a willing seller in an arms-length transaction;
- the fair market value of the business or product line that could be infringed upon by a competitor with access to the trade secret;
- in a government sting operation, the amount the defendant paid for the trade secret;
- the amount for which the defendant sold or tried to sell the trade secret to a third party;
- the amount for which similar trade secret information has been sold in the open market;
- the market price that the defendant actually received or paid in exchange for the technology; and
- any other methodology with calculates the reasonably foreseeable pecuniary losses caused by the defendant's conduct.

See, e.g., United States v. Ameri, (8th Cir. 2005) (finding that the proper loss amount was the developmental costs of software stolen by the defendant); United States v. Wilson, 900 F.2d 1350 (9th Cir. 1990) (holding that the proper measure of loss was the costs incurred by the victim in developing the proprietary information); United States v. Pemberton, 904 F.2d 515 (9th Cir. 1990)

(determining that the value of technical landscape drawings stolen by the defendant was the contract

price agreed to by the legitimate buyer); Uniform Trade Secrets Act § 3(a) (1995) ("In lieu of

damages measured by other methods, the damages caused by misappropriation may be measured by

imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or

use of a trade secret.").

    In this case, the selection of a particular loss methodology can lead to drastically different

results, some of which might be unduly punitive given the manner in which Dr. Min committed his

offense. After careful consideration of an appropriate loss amount, the Government agreed that Dr.

Min's loss amount should be calculated based upon the reasonably foreseeable external costs that

DuPont incurred in responding to his crime. The parties reached this agreement on the basis that

such costs comprised the "reasonably foreseeable pecuniary harm" that Dr. Min knew, or should

have known under the circumstances, would result from his conduct directed toward DuPont.

U.S.S.G. § 2B1.1, app. note 3(A). Although there remains some disagreement between the parties

and the Probation Office over the final actual loss figure that was reasonably foreseeable, there is

agreement between the parties that using DuPont's external losses was a fair methodology to

approximate Dr.Min's conduct.

    That basic agreement regarding loss, and the Government's decision not to pursue a higher

loss figure, counsels against Defendant's motion for a downward departure. There is no dispute that

Dr. Min's conduct caused DuPont to suffer at least $180,513.60 in actual losses. Those loss figures

were taken into account in determining Dr. Min's applicable Guidelines range under Section 2B1.1.

Given that Dr. Min has accepted responsibility for violating the trade secrets statute in several

different ways, and that Dr. Min acknowledges that he was responsible for at least $180,513.60 in

15

losses incurred by DuPont, the Government submits that Dr. Min's case is not outside the heartland of trade secrets cases.

In addition, the Guidelines calculation takes into account that Dr. Min abused the position of trust he held at DuPont and engaged in obstructive conduct relating to his offense. Dr. Min's conduct in accessing numerous DuPont documents outside his work responsibilities, as well as systematically destroying DuPont documents and CD-Roms in his possession, provide additional justification that his conduct was not outside the heartland of trade secrets offenses. After months of investigation, there remains a degree of uncertainty regarding Dr. Min's conduct. That uncertainty flows directly from Dr. Min's own misconduct in violating the trade secrets statute, which is an additional basis for the Court to consider in determining that his misconduct does not fall outside the heartland of trade secrets offenses.

Although the Court may consider Dr. Min's justifications for his conduct when weighing the Section 3553(a) factors, the Court should deny Dr. Min's downward departure motion under a departure analysis.

## B. Dr. Min should not receive a departure for extraordinary acceptance of responsibility

Dr. Min also contends that the Court may depart downward under Section 5K2.0 based on Dr. Min's extraordinary acceptance of responsibility. This request is seemingly based upon Dr. Min's participation in the numerous debriefing sessions with the Government, although those debriefing sessions did not result in the Government filing a motion for downward departure for substantial assistance under U.S.S.G. § 5K1.1. Dr. Min's request, however, is foreclosed by applicable Third Circuit precedent. In United States v. Abuhouran, 161 F.3d 206 (3d Cir. 1998), the United States Court of Appeals for the Third Circuit held that U.S.S.G. § 5K2.0 does not give a

16

district court the authority to grant a downward departure on the grounds of substantial assistance to the government where the government does not move for such a departure under Sentencing Guideline § 5K1.1, except in two limited circumstances: (1) where the Government's refusal to file a 5K motion is based upon an unconstitutional motive such as the defendant's race, religion, or gender; and (2) where the Government's refusal to file the 5K motion is made in bad faith. Id. at 212. The Court of Appeals noted that U.S.S.G. § 5K2.0 does not give the district court any further authority to consider a downward departure than the court already has under Section 5K1.1:

> We believe that departures are permissible under § 5K2.0 for substantial assistance without a government motion only in those cases in which a departure is already permitted in the absence of a government motion under § 5K1.1. The heartland of § 5K1.1 is where the defendant substantially assists the government. We think that the only cases falling outside the heartland are those in which the government improperly – either because it has an unconstitutional motive or because it has acted in bad faith with regard to a plea agreement – refuses to offer a motion, and possibly those in which the assistance is not of the sort covered by § 5K1.1.

Id. at 214. The Court of Appeals explained that the rationale behind forbidding such departures is to avoid the district court from having to scrutinize prosecutorial decision-making – an inquiry that is generally inappropriate in the absence of unconstitutional prosecutorial misconduct. Id. at 215-16.

In this case, Dr. Min has not alleged that the Government acted in bad faith or based upon an unconstitutional motive in deciding not to file a 5k motion. In fact, Dr. Min observed in his Sentencing Memorandum that the Government has not attempted to exaggerate the evidence against Dr. Min. Def.'s Sent. Memo (D.I. 23) at 10 n.6. Because there are no allegations that the Government decided not to request a downward departure for improper reasons, and because Dr. Min is going to receive a three-level decrease in his Guidelines offense level for acceptance of

17

responsibility, the Court should deny Dr. Min's departure request for extraordinary acceptance of responsibility.[10]

### C.   Dr. Min is not entitled to a departure based upon extraordinary hardship to his family

In addition, Defendant asserts that he may be entitled to a downward departure based on extraordinary hardship to the Min family.  District courts have the authority to depart downward based upon family circumstances where the impact of a sentence will have an "unusual or extraordinary" impact on a defendant's family.  United States v. Dominguez, 296 F.3d 192, 195 (3d Cir. 2002) (stating that "although the ordinary impact of a sentence on family members will not support a downward departure, where the impact is unusual or extraordinary, the District Court has discretion").  Because family ties and responsibilities are a discouraged departure basis, see U.S.S.G. § 5H1.6, courts should not ordinarily consider a departure motion on that basis unless the defendant's family ties and responsibilities are present to an unusual degree from the heartland of cases covered by the guidelines.  Thus, a downward departure motion based on family circumstances should not be granted "based primarily on generic concerns regarding breaking up families."  Id. at 196-97.  This is because the fact that "incarceration will disrupt the family unit

---

[10]The departure basis in United States v. Lieberman, 971 F.2d 989 (3d Cir. 1992), set forth in Defendant's Sentencing Memorandum, does not apply in this case.  There, when confronted by his employer with evidence of wrongdoing, a bank Vice President immediately confessed to embezzling money from his bank.  In addition, he voluntarily reported his crime to the FBI and made full restitution over-and-above the amount sought by the bank prior to sentencing.  Moreover, there was no disagreement between the parties in that case that the defendant had been entirely truthful with law enforcement authorities after he admitted his wrongdoing.  Id. at 996.  In this case, the Government has noted above several instances in which Dr. Min acknowledged that he was not fully candid with either DuPont or Government officials, both after his conduct was uncovered by DuPont officials and during debriefings with the Government.  These actions alone preclude Dr. Min's case from being one of the "limited" cases in which Dr. Min's acceptance of responsibility is outside the heartland.

18

cannot be considered atypical, inasmuch as innumerable defendants no doubt could establish that

their absence will cause a void in their children's lives." United States v. Sweeting, 213 F.3d 95,

102 (3d Cir. 2000).  As a result, "[d]isintegration of family life in most cases is not enough to

warrant departure."  United States v. Gaskill, 991 F.2d 82, 85 (3d Cir. 1993).  In making the

ultimate determination whether a departure is warranted on the basis of family circumstances, the

district court should also consider factors such as the need for deterrence, incapacitation, just

punishment, and rehabilitation.  Dominguez, 296 F.3d at 199.

 In analyzing whether a downward departure for family circumstances is appropriate, a prior

decision authored by the United States Court of Appeals for the Third Circuit is instructive.  In

United States v. Sweeting, 213 F.3d 95 (3d Cir. 2000), the Court of Appeals held that the district

court erred in granting a 12-level departure to a defendant convicted in a drug conspiracy on the

basis of "extraordinary family ties and responsibilities."  The defendant in Sweeting argued that her

circumstances as a single mother of five, who had a child with Tourette's syndrome under the care

of a regimented treatment program, qualified for a downward departure. The Court of Appeals

disagreed, finding that the defendant's circumstances were not extraordinary.  The Court first noted

that the district court's finding that the defendant was devoted to her children and a positive

influence on their lives "was inappropriate because [those facts] do not take this case out of the

'heartland' of cases sentenced under the Guidelines involving a defendant who is also a parent." Id.

at 102.  The Court of Appeals also found that the defendant's status as a single parent was not an

extraordinary basis for a departure.  Id. at 103; see United States v. Headley, 923 F.2d 1079, 1082

(3d Cir. 1991).  In addition, the Court of Appeals concluded that the child's medical condition was

not so severe, and the defendant's specific care for her child not so irreplaceable, that the

19

defendant's "otherwise ordinary family ties and responsibilities [we]re transformed into the 'extraordinary' situation warranting a departure under section 5H1.6." Id. at 104. Compare Gaskill, 991 F.2d at 82 (finding that a downward departure was appropriate where the defendant was the only source of care to his mentally ill wife, and where there were a lack of available sources to care for her other than the defendant).

In this case, Dr. Min has not identified *any* exceptional circumstances that his family might face if he is incarcerated beyond those faced by many families under similar circumstances. The Government has no doubt that Dr. Min is a devoted husband, father, and son to his family, and that his family will suffer economically while he is in prison. As the Court of Appeals noted in Sweeting, however, the fact that the defendant is a devoted parent whose family depends upon him for support and guidance "simply does not meet the threshold of 'extraordinary' when compared to the innumerable cases in which parents commit crimes and are sentenced under the Guidelines." Sweeting, 213 F.3d at 104. In the absence of any concrete basis beyond the heartland of cases in which a defendant's incarceration impacts his family, the Court should deny Dr. Min's departure motion based upon family ties and responsibilities. The Government recognizes that the Court may consider these factors when analyzing the Section 3553(a) sentencing factors and determining an appropriate sentence.

## III. CONCLUSION

For the reasons set forth above, the Government requests the Court to deny Defendant's motions for downward departure.

Respectfully submitted,

/s/ Colm F. Connolly
United States Attorney

/s/ Robert F. Kravetz
Assistant United States Attorney

Dated: November 5, 2007

21